IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| PROVIDENCE TITLE COMPANY | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 4:21-cv-00147 |
| v. | § | |
| | § | |
| TRULY TITLE, INC., TRACIE L. FLEMING, MARK J. FLEMING, KIM SHEETS-SHEFFIELD, AND GRAHAM HANKS | § § § § | |
| | § | |
| Defendants. | § | |
| | § | |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, Plaintiff Providence Title Company ("Providence") files this Motion for Preliminary Injunction against Defendants Truly Title, Inc. ("Truly"), Tracie L. Fleming ("T. Fleming"), Mark J. Fleming ("M. Fleming"), Kim Sheets-Sheffield ("Sheffield"), and Graham Hanks ("Hanks") (collectively, "Defendants").

### INTRODUCTION

Truly is a relatively new entrant into the Texas title market, but is now Providence's direct competitor. In mid-2019, Truly entered into negotiations with Providence about a potential business acquisition. It gained access to significant Providence trade secret information regarding employee and office profitability, salaries, and customers. Truly obtained that information while bound by a non-solicitation agreement and a non-disclosure agreement ("NDA").

Less than a year after the proposed transaction fell apart, Truly began discussions with Providence's President, T. Fleming, about joining Truly as an employee. T. Fleming ultimately accepted employment with Truly in December 2020. Her husband, M. Fleming, also accepted

employment with Truly in December 2020. But they did not tell Providence. Instead, they continued working with Providence into February 2021. While the Flemings were still at Providence, many employees resigned to accept employment with Truly. T. Fleming was involved in senior management discussions about damage control and was even supposed to be part of the damage control efforts, yet she did not disclose that she too was leaving. By February 3, 2021, when the Flemings finally told the truth, the coup was almost complete. Truly succeeded in getting more than 20 Providence employees to change employers to join Truly.

T. Fleming, M. Fleming, and Sheffield owed duties to Providence to avoid soliciting employees for a competitor. The fact that more than 20 employees left for Truly without anyone saying a word to Providence management (other than the President, T. Fleming) speaks for itself. This was a carefully crafted coup and mass exodus aided by T. Fleming, M. Fleming, and Sheffield, each of whom had a duty to Providence to speak up against the coup. Instead, they helped it succeed. Truly and Hanks knew that T. Fleming, M. Fleming, and Sheffield had duties to Providence, yet they too willingly accepted the benefits of the breach of duties by T. Fleming, M. Fleming, and Sheffield. Truly even had access to Providence trade secrets from its prior due diligence which, when combined with the inside help from T. Fleming, M. Fleming, and Sheffield, enabled Truly to cherry-pick its new employees to expand its entry into the Texas market greatly.

Providence files this motion to enforce its non-compete against T. Fleming and M. Fleming because they were contractually bound not to work for a competitor and not to help a competitor solicit Providence employees, as Truly did. Providence files this motion against all Defendants in an attempt to stop any further raiding of its employees and client contacts. Much of the damage is done, and will be the subject of damage claims in this case. Providence is hopeful that appropriate injunctive relief will minimize any further, irreparable harm to its business.

# FACTUAL BACKGROUND

1.  In mid-2019, Truly entered into an NDA and non-solicitation agreement with Providence.[1] The NDA is effective April 25, 2019, and remains in place for two years.[2] The non-solicitation agreement was entered into via email on May 8, 2019, and continued in effect for one year from the time period if and when they parties were unable to complete a deal.[3] The parties called off their business discussions in late 2019.[4]

2.  While the parties were still discussing a potential transaction, Truly requested extensive financial information regarding Providence's business.[5] Truly requested information regarding Providence employees and offices, their profitability, salary information, customer data, and other information that could be used to assess the value of Providence's key employees and offices.[6] Providence closely guarded this internal data and considered it to be trade secrets.[7] If known to a competitor, it would have value to enable the competitor to assess potential employees to acquire, offices to pursue, and how much to pay for it.[8] Providence did not share this type of information publicly.[9] It did not share this information privately, except with senior management and those other managers who had a need to know.[10] Providence had policies and procedures to protect its confidential data, ironically, drafted in part by T. Fleming.[11]

---

[1] *See* D. Foster Decl. at ¶¶7-8 & Exs. 4 & 5.
[2] *See* D. Foster Decl. at ¶8 & Ex. 5.
[3] *See* D. Foster Decl. at ¶7 & Ex. 4.
[4] *See* D. Foster Decl. at ¶9.
[5] *See* D. Foster Decl. at ¶¶9, 15; D. Foster, Jr. Decl. at ¶¶5-9.
[6] *See* D. Foster Decl. at ¶¶9, 15; D. Foster, Jr. Decl. at ¶¶5-9.
[7] *See* D. Foster Decl. at ¶¶9, 15; D. Foster, Jr. Decl. at ¶¶4, 7, 8 & 10.
[8] *See* D. Foster Decl. at ¶9.
[9] *See* D. Foster Decl. at ¶9; D. Foster, Jr. Decl. at ¶¶7, 8, & 10.
[10] *See* D. Foster Decl. at ¶9; D. Foster, Jr. Decl. at ¶¶4, 7, & 8.
[11] *See* D. Foster Decl. at ¶¶9, 10 & Exs. 6, 7, 8, & 9.

3. Less than a year after the discussions over a proposed deal ended, Truly and T. Fleming started discussing employment opportunities.[12] These discussions were a violation of the non-solicitation agreement.[13] Moreover, T. Fleming and her husband were bound by non-compete agreements that they signed when T. Fleming acquired shares of Providence stock (and M. Fleming acquired his community property shares).[14] In direct violation of that non-compete, T. Fleming and M. Fleming accepted employment with Truly in December 2020.[15]

4. T. Fleming and M. Fleming delayed their start date for employment with Truly until February 2021.[16] But in late January 2021, T. Fleming participated in a conference with Providence's senior management to discuss salaries and raises for employees.[17] T. Fleming recommended no raises for the employees of the Burleson offices.[18] These are some of the key offices where Truly was recruiting employees in January and February 2021.[19]

5. Prior to the Flemings' resignation from Providence, other employees (many of whom reported to T. Fleming, M. Fleming, or both) started leaving Providence to accept employment with Truly.[20] More than 20 Providence employees switched to Truly and now report to T. Fleming at their new company.[21] As one former Providence employee put it, it is "same team, new company."[22]

---

[12] *See* M. Kirby Decl. at ¶¶2-3.
[13] *See* D. Foster Decl. at ¶7 & Ex. 4.
[14] *See* D. Foster Decl. at ¶5 & Exs. 1, 2, & 3.
[15] *See* M. Kirby Decl. at ¶¶5, 6.
[16] *See* D. Foster Decl. at ¶11 & Exs. 10 & 11.
[17] *See* D. Foster Decl. at ¶20; D. Foster, Jr. Decl. at ¶11.
[18] *See* D. Foster, Jr. Decl. at ¶11.
[19] *See* D. Foster, Jr. Decl. at ¶¶11-12.
[20] *See* D. Foster Decl. at ¶13.
[21] *See* D. Foster Decl. at ¶13.
[22] *See* B. Woltmann Decl. at ¶4 & Ex. 1.

6. T. Fleming, M. Fleming, and Sheffield kept quiet as they and their colleagues were planning to join Truly.[23] These insiders at Providence facilitated the coup. They breached their duties to Providence in helping to protect its business. T. Fleming was the President, a member of the Board of Directors, and a shareholder.[24] She participated in meetings to discuss options for Providence to address Truly's actions and the employee departures, including potential legal options and filing suit.[25] She also allegedly handled damage control efforts to address the other employees leaving for Truly.[26] Yet, she failed to tell her fellow officers, fellow directors, and fellow shareholders that she was already under contract to join Truly too, along with her husband.[27] Her silence facilitated the coup and hindered Providence's ability to take further actions to protect itself.[28] Truly knew (or must have known) that T. Fleming and others were staying silent to prevent Providence from protecting itself while Truly was cherry-picking key employees and offices.

7. As a direct result of Defendants' actions, Providence lost its entire staff from the Old Town (Burleson) and Keller office.[29] All but one employee left from the Burleson Johnson Avenue office to join Truly.[30] All but two employees left the Southlake office for Truly. And the entire Cleburne office has turned in its resignations effective tomorrow, to join Truly.[31] To add insult to injury, Truly opened its Burleson office with Providence employees immediately next door to Providence's now-empty Old Town (Burleson) office.[32]

---

[23] *See* D. Foster Decl. at ¶¶11-12; B. Woltmann Decl. at ¶3; D. Foster, Jr. Decl. at ¶3; S. Ramsey Decl. at ¶¶6-8.
[24] *See* D. Foster Decl. at ¶4.
[25] *See* D. Foster Decl. at ¶16; S. Ramsey Decl. at ¶4; C. Christman Decl. at ¶3.
[26] *See* D. Foster Decl. at ¶¶17-18; S. Ramsey Decl. at ¶¶4-5; C. Christman Decl. at ¶3.
[27] *See* D. Foster Decl. at ¶¶16-18; S. Ramsey Decl. at ¶6; C. Christman Decl. at ¶¶3-6.
[28] *See* D. Foster Decl. at ¶19.
[29] *See* D. Foster, Jr. Decl. at ¶12.
[30] *See* D. Foster, Jr. Decl. at ¶12.
[31] *See* D. Foster, Jr. Decl. at ¶12.
[32] *See* D. Foster Decl. at ¶21.

8. Providence rushed to state court to try to stop Truly from taking its employees. Providence sued on February 4, 2021, and obtained a TRO on February 9, 2021.[33] This created a little breathing room to allow Providence to assess all of its options, gather its evidence, and make a more complete record (although Providence has not received any substantive discovery from Defendants). Thereafter, Providence has elected to pursue the claims asserted in this case, including its federal trade secret claim. Providence now seeks preliminary injunctive relief.

## LEGAL STANDARD

District courts have discretion to grant a preliminary injunction to prevent irreparable harm. *See* Fed. R. Civ. P. 65(a); *Canal Auth. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974). To obtain a preliminary injunction, Providence must show: "(1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest." *Id; see also Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 268 (5th Cir. 2012). All four elements are established by the facts and allegations asserted.

## ARGUMENT AND AUTHORITIES

**A.  Providence has a substantial likelihood of success on the merits.**

Providence has a substantial likelihood of success on the merits of all of its claims, but for purposes of this motion, Providence will focus on the Flemings breach of the non-compete, the trade secret claims against all Defendants, the breach of fiduciary duty claims, and the related aiding and abetting claims. Federal courts recognize that injunctive relief is appropriate to protect

---

[33] *See* Order entered on February 9, 2021.

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**                                                                         **Page 6**

plaintiffs from harms caused by these types of claims.[34]

### 1. T. Fleming and M. Fleming breached the non-compete.

Under Texas law, a non-compete agreement is "enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." TEX. BUS. & COM. CODE §15.50. The covenant is contained in the shareholder's agreement T. Fleming signed when she acquired shared of Providence stock and became an owner.[35] M. Fleming also agreed to this provision when he signed the shareholder's agreement as part of a second transaction in which his family acquired Providence stock.[36] The non-compete is part of an otherwise enforceable agreement. Indeed, upon tendering her resignation, T. Fleming even invoked the buy-out provisions in that agreement.[37]

The non-compete is straightforward and applies here. Under Paragraph 6.1 of the shareholder's agreement, T. Fleming and M. Fleming terminated their employment and triggered the right for Providence and/or its other shareholders to repurchase her stock.[38] When a shareholder withdraws from the company:

> for a period of twenty-four (24) months from the date of Closing [on the sale of her shares], he/she will not (i) serve as a partner, employee, consultant, officer, director, member, manager, agent, associate, investor, or otherwise, or (ii) directly or indirectly, own, purchase, organize, or take preparatory steps for the organization

---

[34] *See, e.g., AHS Staffing, LLC v. Quest Staffing Group, Inc.*, 335 F. Supp 3d 856, 865 (E.D. Tex. 2018) (granting a preliminary injunction to prevent the misappropriation of trade secrets by former employees and competitor); *Cyrus One LLC v. Levinsky*, No. 4:19-CV-00043, 2019 WL 4305613, *8 (E.D. Tex. Sept. 11, 2019) (granting a preliminary injunction to prevent the breach of a covenant not to compete for an employee leaving to join a competitor).
[35] *See* D. Foster Decl. at ¶5 & Exs. 1 & 2.
[36] *See* D. Foster Decl. at ¶5 & Exs. 1 & 2.
[37] *See Land Title Co. v. F. M. Stigler, Inc.,* 609 S.W.2d 754, 757 (Tex. 1980) (a party cannot accept benefits under an agreement while challenges the validity of other parts of that agreement); *see also Wright v. Calhoun,* 19 Tex. 412, 422 (1857) (an agreement "is good as a whole, or not good at all. It cannot be adopted in part or rejected in part.").
[38] *See* D. Foster Decl. Ex. 1 at ¶6.1.

of, or (iii) build, design, finance, acquire, lease operate, manage, invest in, work or consult for or otherwise affiliate hisself/herself with, any business in competition with or otherwise similar to Providence's business with the Texas counties of Tarrant, Dallas, Harris, or Bexar or any Texas counties contiguous to such stated counties.[39]

The non-compete lasts for twenty-four months from the date when stock is repurchased. This is a reasonable time.[40] This period gives Providence reasonable protection that the Flemings will not join a competitor and use confidential and trade secret information against Providence (which is what the Flemings are doing).

The non-compete is also reasonable in geographical scope.[41] Providence's operations are in Texas. The non-compete applies only in those counties where Providence maintains a presence. It does not even apply to the entire state. Given T. Fleming's role as President and a Director, she was involved in all aspects of Providence's business across the state. Her husband also held a significant managerial role. The geographical scope of the non-compete is necessary to prevent the Flemings from competing against Providence in locations where it does business.

  2. *T. Fleming, M. Fleming, and Sheffield breached their duties to Providence.*

Even before the Flemings non-compete kicked in due to their termination of employment, T. Fleming, M. Fleming, and Sheffield owed duties to Providence not to compete against it while still employed by Providence. The Fifth Circuit explains:

> There are, however, certain limitations on the conduct of any employee who plans to compete with his employer. … Of course, such a person may not act for his future interests at the expense of his employer by using the employer's funds or employees for personal gain or by a course of conduct designated to hurt the employer.

---

[39] *See* D. Foster Decl. Ex. 2 at ¶8.4.
[40] *See AMF Tuboscope v. McBryde*, 618 S.W.2d 105, 108 (Tex. App.—Corpus Christi 1981, pet. denied); *Arevalo v. Velvet Door, Inc.*, 508 S.W.2d 184, 185-186 (Tex. Civ. App.—El Paso 1974, writ ref'd n.r.e.); *Weber v. Hesse Envelope Co.*, 342 S.W.2d 652 (Tex. Civ. App. Dallas—1960, no writ).
[41] "Generally, a reasonable area for purposes of a covenant not to compete is considered to be the territory in which the employee worked while in the employment of his employer." *Cyrus One LLC*, 2019 WL 4305613, at *7 (quoting Curtis v. Ziff Energy Grp., Ltd., 12 S.W.3d 114, 119 (Tex. App.—Houston [14th Dist.] 2000, no pet.)).

*Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 284 (5th Cir. 2007) (quoting *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 202 (Tex. 2002)). The Fifth Circuit recognizes that:

> The employee may not (1) appropriate the company's trade secrets; (2) solicit his employer's customers while still working for his employer; (3) solicit the departure of other employees while still working for his employer[;] or (4) carry away confidential information, such as customer lists.

*Id.* (quoting *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 512 (Tex. App.—Houston [1st Dist.] 2003, no pet.)). These rules are well-established: "Throughout the duration of an agency relationship, an agent has a duty to refrain from competing with the principal and from taking action on behalf of or otherwise assisting the principal's competitors." RESTATEMENT (THIRD) AGENCY §8.04.

For the Flemings, these principles (when combined with the non-compete) established that they could not compete with Providence to assist Truly either during or after the termination of their employment for Providence. For Sheffield, these principles establish that she breached the duties she owed to Providence before joining Truly by participating in a coordinated departure to Truly. Twenty or more Providence employees do not just randomly leave employment in a short time period all heading to the same employer by mere coincidence. To pull off such a mass exodus without tipping off management required coordination and inside help. Thus, Providence has a strong likelihood of success on its breach of fiduciary duty claims.

   3.  *Truly aided and abetted the breach of fiduciary duties.*

Texas law recognizes a cause of action for aiding and abetting a breach of fiduciary duty: "where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tort-feasor with the fiduciary and is liable as such." *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509, 514 (Tex. 1942); *see also Southwest Tex. Pathology Assocs., L.L.P. v. Roosth*, 27 S.W.3d 204, 208 (Tex. App.—San Antonio 2000, pet.

dism'd w.o.j.). Truly participated in the breach of duties by offering employment to these former Providence employees. It could not have missed the facts.

Truly hired more than twenty employees from the same company.[42] It hired these employees a little over one year after being granted access to all of Providence's financial data and information regarding employee profitability, even though it was bound by a two-year NDA prohibiting the use of information it received during the due diligence process.[43] Truly knew who it was hiring and the benefits they could provide. It started talking to T. Fleming about switching employers in mid-2020 while it was still bound by a non-solicitation agreement.[44] Truly hired T. Fleming and M. Fleming in December 2020, but delayed their start date at least until February 2021, which allowed T. Fleming and M. Fleming to continue drawing a salary and resources from Providence while working on the inside knowing of the mass defection.[45] T. Fleming even kept quiet about her lack of loyalty when participating in discussions with Providence management about employee salaries and how to address the problems Truly was creating for Providence's business.[46] T. Fleming even participated in employee meetings to allegedly try to damage control even though she was under contract with Truly.[47]

These facts show a strong likelihood of success on the merits of Providence's aiding and abetting claim. Texas courts have upheld punitive damage awards against competitors who have pulled off coups like this, even smaller ones. *See Fidelity Nat. Title Ins. Company v. Heart of Texas Title Co.*, 2000 WL 13037 (Tex. App.—Austin Jan. 6, 2000, pet. denied).

---

[42] *See* D. Foster Decl. at ¶13.
[43] *See* D. Foster Decl. at ¶¶8, 9, 15; D. Foster, Jr. Decl. at ¶10.
[44] *See* M. Kirby Decl. at ¶¶2-3.
[45] *See* M. Kirby Decl. at ¶¶4-6; D. Foster Decl. at ¶11.
[46] *See* D. Foster Decl. at ¶¶12, 16-20; D. Foster, Jr. Decl. at ¶11; C. Christman Decl. at ¶¶3-6; S. Ramsey Decl. at ¶6.
[47] *See* D. Foster Decl. at ¶¶12, 16-20; C. Christman Decl. at ¶¶3-6; S. Ramsey Decl. at ¶6.

*4.     Defendants misappropriated Providence trade secrets.*

Providence also has a strong likelihood of success on its misappropriation of trade secret claims. Under the Defend Trade Secrets Act ("DTSA"), Providence must show "(1) a trade secret; (2) misappropriation; and (3) use in interstate commerce." *SPBS, Inc. v. Mobley*, 2018 WL 4185522, *3 (E.D. Tex. Aug. 31, 2018). Providence's state law claim requires proof of the same elements, except no connection with interstate commerce is required. *Id.* The DTSA also prohibits conspiracies and attempts to misappropriate trade secrets. 18 U.S.C. §1832(a)(4) & (5) & §1836.

Providence's confidential financial data, including data about employee performance and profitability, office performance and profitability, salaries, salary structures, customers, etc., are trade secrets. *See* 18 U.S.C. §1839(3) (defining trade secrets to include financial data); TEX. CIV. PRAC. & REM. CODE §134A.002(6) (same). Both federal and Texas law require Providence to show that:

> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. §1839(3); TEX. CIV. PRAC. & REM. CODE §134A.002(6).

The record establishes that Providence took reasonable steps to protect the confidentiality of its financial, employee, office, salary, profitability, and customer-related information.[48] Providence does not disclose that information publicly or to competitors.[49] It has procedures in place requiring employees to preserve the confidentiality of Providence's data.[50] And Providence

---

[48] *See* D. Foster Decl. at ¶¶9, 15; D. Foster, Jr. Decl. at ¶¶4, 7, 8 & 10.
[49] *See* D. Foster Decl. at ¶¶9, 15; D. Foster, Jr. Decl. at ¶¶4, 7, 8 & 10.
[50] *See* D. Foster Decl. at ¶¶9, 10 & Exs. 6, 7, 8, & 9; D. Foster, Jr. Decl. at ¶4.

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**                                                                                               **Page 11**

only shares its highly sensitive data with senior management or on a need-to-know basis for other managers.[51] Truly only gained access to this trade secret information under an NDA and as part of due diligence for a proposed acquisition of all of Providence's business.[52] And Truly asked lots of questions about the information it learned because it was not readily understood by others.[53]

Providence's trade secrets have independent financial value from not generally being known or readily ascertainable.[54] If competitors had the employee, profitability, office, salary, and customer information that Truly obtained during due diligence and that T. Fleming, M. Fleming, and Sheffield gained through their employment, they could do what Truly did here—cherry-pick Providence's profitable employees who had strong customer relationships.[55] Courts have had little trouble finding that trade secret protection applies to similar types of data.[56]

Defendants used Providence's trade secrets to pursue and convince profitable employees to switch employment to Truly without tipping off senior management to the mass departure.[57] Use of the trade secrets enabled Truly to choose who to hire and who not to hire. Use of the trade secrets enabled all Defendants to determine who should be included in their plan, and who they

---

[51] *See* D. Foster Decl. at ¶¶9, 15; D. Foster, Jr. Decl. at ¶¶4, 7, & 10.
[52] *See* D. Foster Decl. at ¶¶8, 9, 15 & Ex. 5; D. Foster, Jr. Decl. at ¶10.
[53] *See* D. Foster Decl. at ¶¶9, 15; D. Foster, Jr. Decl. at ¶9.
[54] *See* D. Foster Decl. at ¶¶9, 14, 15.
[55] *See* D. Foster Decl. at ¶¶14.
[56] ***See, e.g., Radiant Global Logistics, Inc. v. Furstenau***, F. Supp. 3d 1112, 1126-27 (E.D. Mich. 2019) granting preliminary injunction against former employees barring disclosure or use of employer's confidential information/trade secret, including salaries of Radiant employees and some additional personal information of employees); *First Foundation Inc. v. Giddings*, No. CV-20-00359-DOC-KES, 2020 WL 1082641, *1-4 (C.D. Cal. Mar. 7, 2020) (granting preliminary injunction preventing the use of a confidential document including the list of current employees, their salaries and bonuses, and possible strategies for hiring them); *see also VocalSpace, LLC v. Lorenso*, 2010 WL 11527374, *4 (E.D. Tex. Jan. 29, 2010) (claim for misappropriation of "various forms and records, salary and compensation information, price lists, pricing information, customer and licensee lists, work-in-progress information, sales information and future product information" was not preempted).
[57] *See* D. Foster Decl. at ¶¶13-14.

should avoid for fear that the plan would be discovered and stopped.[58] Trade secret protection prevents this type of misuse of confidential financial and business data.

The use was also in interstate commerce and impacted interstate commerce.[59] Providence's employees provide services to out-of-state property owners.[60] The employees work with national insurance companies.[61] Truly is a national company attempting to grow its presence by expanding its Texas operations.[62] These activities establish the interstate commerce element required for Providence DTSA claims. *See Allstate Insurance Company v. Hineman*, 2017 WL 7596917, *1-2 (S.D. Tex. Oct. 11, 2017) (refusing to dismiss claims based on misappropriation of a customer list for an insurance carrier when the disputed business was primarily in Texas).

**B.     Providence will suffer irreparable harm with an injunction.**

Breach of the non-compete by T. Fleming and M. Fleming is "inherently irreparable." *Cyrus One LLC*, 2019 WL 4305613, at *7. Without injunctive relief, Providence will be deprived of the benefit of its bargain when it entered into a non-compete with T. Fleming and M. Fleming. The Flemings need to be held to their contract and ordered to stop working for Truly now.

Providence will also be irreparably harmed if Defendants' continue using Providence's trade secrets to solicit Providence employees and customers. The NDA between Truly and Providence is still in place even though Truly has been violating it for months by using Providence data to pursue Providence employees, offices, and customers. And even after Providence employees joined Truly, they have pursued business from Providence's customers.[63] Given that all Defendants have breached the duties owed to Providence both under the NDA and as a matter

---

[58] *See* D. Foster Decl. at ¶14.
[59] *See* D. Foster Decl. at ¶2.
[60] *See* D. Foster Decl. at ¶2.
[61] *See* D. Foster Decl. at ¶2.
[62] *See* D. Foster Decl. at ¶3.
[63] *See* B. Woltmann Decl. at ¶ 4 & Ex. 1.

of law to move more than twenty employees (including Providence's President) to a competitor, an injunction is needed to stop the harm. It will prevent Truly from further profiting off of the breaches and earning ill-gotten gains.

Courts routinely recognize the need for injunctive relief to protect against misuse of trade secret information. *See AHS Staffing, LLC v. Quest Staffing Group, Inc.,* 335 F. Supp 3d 856, 873 (E.D. Tex. 2018). Truly should not be allowed to gain the value of Providence's trade secrets either directly under the NDA or indirectly by hiring Providence employees to share information regarding the employees, offices, profits, customers, etc. Providence has spent years developing its offices, finding the right employees, evaluating their profitability, and assessing their customer relationships. Defendants have already breached duties owed to Providence and misused trade secret information for Truly's benefits. They should be enjoined from continuing to pursue this course of behavior.

**C.    The balance of equities and the public interest favor injunctive relief.**

The balance of the equities and the public interest both favor the grant of injunctive relief. When balancing the competing claims of injury, the Court should engage in "an evaluation of the severity of the impact on defendant should the temporary injunction be granted and the hardship that would occur to plaintiff if the injunction should be denied." *Cyrus*, 2019 WL 4305613, *7 (citations omitted). When determining whether an exercise of discretion to grant injunctive relief is appropriate, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* These inquiries are related. *AHS Staffing*, 335 F. Supp. 3d at 874.

There is a strong public policy favoring the enforcement of contracts. *Cyrus*, 2019 WL 4305613, *7. There is also a strong public policy in favor of preventing parties from profiting off

of another's trade secrets. *AHS Staffing*, 335 F. Supp. 3d at 874. Providence will be irreparably harmed. No one is being harmed if the Flemings are held to the terms of the non-compete they signed. Moreover, Truly is not harmed if it is prohibited from using Providence trade secrets to try to solicit any more Providence employees. At most, an injunction would merely slow Truly's expansion by improper means without impacting its current business. This is not the type of harm that justifies allowing irreparable harm to continue to impact Providence. *Id.* at 873-74.

## CONCLUSION

Due to the injuries it has suffered and will continue to suffer without immediate injunctive relief, Providence respectfully requests that the Court hold a hearing on the motion and enter a preliminary injunction enjoining (a) T. Fleming and M. Fleming from violating their non-compete, including by working for Truly, (b) enjoin all Defendants from continuing to solicit Providence employees and customers, and (c) enjoin all Defendants from using any of Providence's trade secrets, including its data regarding finances, employee, offices, salaries, and customers, or publicly disclosing such information. Providence is willing to post a bond in the amount to be determined by the Court. Providence prays for such other and further relief to which it may be entitled.

Respectfully submitted,

*/s/ W. Scott Hastings*
W. Scott Hastings
  Texas Bar No. 24002241
  *shastings@lockelord.com*
Haley M. Owen
  Texas Bar No. 24121042
  *haley.owen@lockelord.com*
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, Texas  75201-6776
Telephone: (214) 740-8000
Facsimile:  (214) 740-8800

**ATTORNEYS FOR PLAINTIFF
PROVIDENCE TITLE COMPANY**

## CERTIFICATE OF CONFERENCE

Counsel for Defendants have not yet formally appeared in this matter.  However, the undersigned counsel has conferred with counsel who has been representing the Defendants (other than Sheffield) relating to this matter to inquire whether they would agree to injunctive relief consistent with what is requested in this motion.  Defendants' counsel stated they are opposed to the type of relief requested herein.  The identity of counsel for Sheffield is not yet know.

*/s/ W. Scott Hastings*
W. Scott Hastings

## **CERTIFICATE OF SERVICE**

I certify that on February 23, 2021, I served this document on known counsel for Defendants via email as follows:

| | |
|---|---|
| John C. Sokatch<br>Christopher D. Kratovil<br>Alison R. Ashmore<br>DYKEMA GOSSETT PLLC<br>Comerica Bank Tower,<br>1717 Main Street, Suite 4200,<br>Dallas, Texas 75201<br>**Counsel for Truly Title, Inc.**<br>**and Graham Hanks** | Russell A. Devenport<br>McDonald Sanders, P.C.,<br>777 Main Street, Suite 2700<br>Fort Worth, Texas 76102<br>**Counsel for Tracie Fleming**<br>**and Mark Fleming** |

*/s/ W. Scott Hastings*
W. Scott Hastings