# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| PROVIDENCE TITLE COMPANY | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 4:21-cv-00147 |
| v. | § | |
| | § | |
| TRULY TITLE, INC., TRACIE L. | § | |
| FLEMING, MARK J. FLEMING, | § | |
| KIM SHEETS-SHEFFIELD, AND | § | |
| GRAHAM HANKS | § | |
| | § | |
| Defendants. | § | |
| | § | |

## DECLARATION OF DANIEL A. FOSTER

In accordance with 28 U.S.C. § 1746, Daniel A. Foster declares, under penalty of perjury, as follows:

1.      I am Daniel A. Foster.  I am over the age of twenty-one (21), of sound mind, and am competent to make this declaration.  The information contained herein is within my personal knowledge.

2.      I am the Chief Executive Officer and Chairman of the Board of Providence Title Company ("Providence"), the plaintiff in the above-captioned lawsuit. Providence has nearly thirty offices throughout the State of Texas, including an office in Frisco, Texas.  Providence services clients and customers from both within Texas and from out-of-state, working with people interested in buying and selling property in Texas.  Providence also works with and helps develop business opportunities for national title agencies relating to transactions in Texas.

3.      In mid-2019, Defendant Truly Title, Inc. ("Truly") approached Providence about a potential acquisition of Providence's business.  My recollection is that Graham Hanks, who

1

represented that he was the President of Truly's Texas operations, initiated the discussion. I was personally involved in the negotiations and exchange of information between Providence and Truly relating to that proposed transaction. Mike Tafoya, Mike Kirby, and Graham Hanks were all involved in the negotiations and evaluation of the proposed transaction on behalf of Truly. Truly's representatives explained to me that Truly was relatively new to the Texas title market, but it had existing offices in other states. They said that Truly was interested in discussing a transaction with Providence as a way of quickly growing its national footprint into Texas.

4.     Tracie L. Fleming ("T. Fleming") was also involved in the discussions and negotiations regarding the proposed transaction between Providence and Truly, including gathering information to be provided to Truly as part of the due diligence process. At the time, T. Fleming was Providence's Chief Operating Officer. In 2020, she was promoted to President of Providence. From 2019 through her departure from Providence in 2021, T. Fleming was a shareholder and member of Providence's Board of Directors. During that time period, her husband, Mark J. Fleming was a "Team Lead" for Providence in Johnson County, which means that he was a manager who oversaw many other employees.

5.     As a condition to becoming a Providence shareholder, T. Fleming entered into the shareholder's agreement. I am also a party to that agreement. A true and correct copy of the original Shareholder's Agreement is attached as Exhibit 1. A true and correct copy of the First Amendment to Shareholder's Agreement signed by T. Fleming is attached as Exhibit 2. A true and correct copy of the Second Amendment to Shareholder's Agreement signed by both T. Fleming and M. Fleming is attached as Exhibit 3.

6.     Kim Sheets-Sheffield ("Sheffield") was a long-time Providence employee who was the Team Lead for multiple offices and a member of "next gen" leaders who were being considered

2

to become potential owners of Providence. As such, she oversaw the work of many other employees and received more information and knowledge regarding the financial inner-workings of the company than were shared with other employees.

7.      Near the beginning of the discussions between Providence and Truly, Michael Tafoya (Truly's CEO) and I agreed to a non-solicitation agreement relating to employees. A true and correct copy of our agreement is attached as Exhibit 4 hereto. When I entered into this agreement with Tafoya, it is my understanding that the one-year non-solicitation period began if and when the parties were unable to reach an agreement on a deal. The parties called an end to their negotiations in November or December 2019.

8.      Providence and Truly also entered into a Mutual Non-Disclosure Agreement (the "NDA") relating to their discussions and a proposed transaction. A true and correct copy of that document is attached hereto as Exhibit 5.

9.      After entering into the non-solicitation agreement and NDA with Truly, Providence provided Truly with an extensive amount of confidential data regarding Providence's business during the due diligence process. This data included extensive financial information, including financial and profitability information regarding Providence's offices and employees. Truly had access to Providence customer information. It also received information regarding Providence's pricing of products and services, as well as its policies and procedures. Truly was also given access to information regarding Providence's expenses, including employee salaries. This type of information that was provided to Truly under the NDA is information that Providence kept confidential and as a trade secret. This information has commercial value to potential competitors, as it would enable those competitors to know which employees and customers to target for potential employment and business opportunities, as well as the amount of consideration that likely

3

would be required to entice employees to change employers.  At all times, Providence has taken reasonable steps to protect the confidentiality of this sensitive business information.  It is not generally known to the public.  Providence only allowed Truly to access this information under an NDA and non-solicitation agreement as part of due diligence on a potential sale transaction. Within Providence, this type of information was only accessible by senior management and certain managerial personnel, but only on a need-to-know basis.

10.     Providence maintained policies and procedures in place to protect its confidential and trade secret data.  Exhibits 6 and 7 are true and correct copies of some of Providence's corporate policies requiring all employees to protect Providence's confidential information, to protect Providence against corporate corruption, and to avoid solicitation of Providence's other employees for personal causes or the causes of others.  T. Fleming participated in drafting the policies that are attached as Exhibits 6 and 7.  As indicated by Exhibits 8 and 9, T. Fleming and M. Fleming signed written acknowledgements of these policies and their need to comply with them.  Sheffield also agreed to comply with these policies.  It is my understanding that these Providence policies were provided to Truly during due diligence.

11.     On February 3, 2021, I learned for the first time that T. Fleming and M. Fleming were leaving their employment with Providence to join Truly.  I learned about these departures when T. Fleming and M. Fleming tendered their resignations.  A true and correct copy of T. Fleming's resignation notice is attached as Exhibit 10.  A true and correct copy of M. Fleming's resignation is attached as Exhibit 11.  According to Truly's publicly-available posts on Linkedin, T. Fleming is now the Executive Vice President of Truly's Texas operations.  M. Fleming is now a senior vice president with Truly's Texas operations.  A true and correct copy of Truly's Linkedin post is attached as Exhibit 12.

4

12.     Prior to her resignation, T. Fleming was serving as Providence's President and as a member of the Board of Directors.  She was even personally involved in working with me and Providence's other senior officers and directors to address the situation and damages occurring as Providence employees started to depart for jobs with Truly.  To my knowledge, neither T. Fleming nor M. Fleming told any of Providence's senior officers, directors, or shareholders that they were planning to join Truly prior to T. Fleming's resignation on February 3, 2021.

13.     Defendants' efforts to raid Providence of its valuable employees, offices, and customers was successful.  From December 2020 into February 2021 (just one week after T. Fleming joined Truly as its Executive Vice President), Providence believes that all of the following former Providence employees joined Truly:  (1) M. Fleming, (2)  Sheffield, (3) Kristi Pugh, (4) Sarah Pierce, (5) Ariel M Immel, (6) Jessica Rodrick, (7) Lindsey Newman, (8) Pam Lowe, (9) Kami Wilson-Nichols, (10) Emily Elliott/Boyd, (11) Taylor Carver, (12) Tiffany Prueitt, (13) Mandy Zimmerhanzel, (14) Falon Carpenter, (15) Angela Cromeans, (16) Sheila Murray, (17) Rachel Shields, (18) Ashley Neighbors, (19) Danya N Peden, (20) Hannah Eberhart, and (21) Rachel Fleming (collectively the "Departing Providence Employees").  None of these employees told me that they were leaving or planning to leave Providence prior to turning in their resignations.  None of these employees told me that any of the others listed in this paragraph were planning to leave Providence prior to turning in their resignations.  To my knowledge, none of these employees told any senior officers, directors, or shareholders of Providence that they were planning to leave, or that there would be a mass departure, other than perhaps in discussions with T. Fleming while she was still an officer and director of Providence.

14.     T. Fleming, M. Fleming, and Sheffield had access to and were in possession of material, internal financial information regarding the Departing Providence Employees due to their

5

91356301v.1

positions with Providence. They had access to and knew the salaries of the Departing Providence Employees. They knew who they could trust to keep the planned departure quiet. They also knew who were loyal to Providence and likely to share the departure with other Providence officers, including me. T. Fleming, M. Fleming, and Sheffield also had access to material, confidential information regarding the profitability of these employees, so they knew who to try to cherry-pick for employment with Truly. Providence and I expected T. Fleming, M. Fleming, and Sheffield to keep Providence's trade secret and confidential information private, and not to disclose that information to Providence competitors, or to use that information for Providence's competitors.

15.     During the due diligence regarding a proposed transaction with Providence, Truly also gained access to information regarding Providence's trade secrets, including financial data, employee and office data, profitability assessments, salary data, and other valuable information, which could have been used to cherry-pick key Providence employees. In accordance with the NDA, Providence and I expected Truly and its representatives to preserve the confidentiality of Providence's trade secret and confidential information, and not to use it against Providence to hire away a large number of Providence employees.

16.     After the first group of the Departing Providence Employees left Providence to join Truly, Providence's officers and directors, including me, attempted to begin damage control efforts. I participated in discussions with Providence officers and directors, including T. Fleming, in late January and early February 2021 to discuss Providence's options to address these departures. The discussions in which T. Fleming participated included discussions regarding potential legal options and filing suit. During those discussions, T. Fleming never disclosed to me or the other officers and directors of Providence who participated in the discussions that she was

6

already under contract to join Truly.  She also did not disclose that her husband was already under contract to join Truly.

17.     Around this time period, I was diagnosed with COVID-19, and had to keep my distance from others.  I requested that T. Fleming and Steve Ramsay visit affected Providence offices to try to do damage control and to stop the departure of Providence employees.  T. Fleming accepted this task, again not disclosing the fact that she was already under contract to join Truly.  T. Fleming participated in damage control meetings at my direction.

18.     Soon after the first damage control discussions, I learned that Steve Ramsay was also diagnosed with COVID-19.  Accordingly, I asked Clarissa Christman to join T. Fleming to work on damage control in light of the employee departures to Truly.  Once again, T. Fleming accepted the task to work with Carissa on damage control without telling me that she was already under contract to join Truly.

19.     Had T. Fleming disclosed the fact that she was leaving for Truly, that M. Fleming was leaving for Truly, or that they had knowledge of other employees leaving for Truly, I would have taken additional steps to protect Providence against the departures and the breaches of duty by the Flemings, including by seeking injunctive relief before it was too late to stop any further departures.  By failing to disclose the material facts that they were leaving and knew others were leaving, the Flemings prevented Providence and me from taking additional steps to protect and preserve the value of our company.

20.     To make matters even worse, T. Fleming was involved in setting the salaries and bonuses of the Departing Providence Employees.  In January 2021, T. Fleming recommended and supported the denial of raises and bonuses to employees who have since left for Truly.  By failing to disclose her role and intent to leave Providence for Truly, T. Fleming prevented Providence and

91356301v.1

me from addressing any salary or bonus concerns relating to these employees, which hindered Providence's ability to retain these employees, many of whom had worked for Providence for many years.

21.     As a direct result of these employee departures, Providence has been left with offices and leases for space that is vacant or barely occupied. In Burleson, for example, Truly literally opened an office directly next door to Providence's now unoccupied Old Town office.

22.     Since the Departing Providence Employees joined Truly, I have learned that those employees are targeting the current and former customers of Providence. Ex. 13 contains an excerpt of an email sent by a former Providence employee who now works for Truly. I was not copied on the original email. Providence and I have yet to receive discovery from Truly that should show the extent to which this email and other similar ones were provided to Providence's current and former customers.

23.     The damage caused to Providence by the mass departure of employees to Truly has been enormous. Providence has lost valuable employees who should have been generating fees and revenues for Providence. Providence has likely lost customers who are now sending business to Truly and the Departing Providence Employees. Providence has vacant and under-utilized offices. In short, Defendants' actions have caused an enormous decrease in value of Providence as a business and entity. Providence is seeking injunctive relief to protect itself against further damage as a result of Defendants' actions and breaches of their duties.

I have reviewed the foregoing declaration and hereby declare under penalty of perjury that the foregoing is true and correct and within my personal knowledge.

8

Executed on this 22nd day of February, 2021 in Tarrant County, Texas.

Daniel A. Foster

9

# EXHIBIT 1

SHAREHOLDERS' AGREEMENT

THIS SHAREHOLDERS' AGREEMENT (the "Agreement") is made and entered into on this the 1st of June 2010, by and among Daniel A. Foster (sometimes referred to herein as "Foster"), Denise Smith, Lynda Tiedtke, Steve Ramsey, Paige Foster, and Providence Title Company, a Texas corporation, having its principal offices in Arlington, Texas (the "Corporation") with respect to all of the now or hereafter issued and outstanding shares of common or preferred stock or other issued and outstanding securities of the Corporation (including options, warrants and convertible instruments), presently or hereafter owned by each of the Shareholders (the "Stock"). Any reference to Stock owned by a Shareholder shall mean all of the Stock registered in that Shareholder's name and including, but not limited to, any community property interest of the Shareholder's spouse in such Stock

WITNESSETH

WHEREAS, Foster currently owns all of the issued and outstanding shares of Stock and the remaining named Shareholders intend to acquire forty percent (40%) of the currently issued and outstanding shares of Stock by purchase from Foster as provided herein; and,

WHEREAS, upon full execution of this Agreement the Corporation will become a "close corporation" as that term is defined in Subchapter O of the Texas Business Organizations Code, as amended (the "Code"); and,

WHEREAS, pursuant to the Code, the Shareholders desire to provide for the management of the business and affairs of the Corporation in the manner set forth herein; and

WHEREAS, the Shareholders and the Corporation further believe it to be in their best respective interests, collectively and individually, to enter into this Agreement to insure, to the greatest degree possible, the continuity of ownership and management of the Corporation desired by the parties hereto.

NOW, THEREFORE, in consideration of the above premises, the mutual promises and covenants herein contained, and for other good and valuable consideration, the full receipt and sufficiency of which are hereby expressly acknowledged and confessed by the parties hereto, it is hereby agreed as follows:

**ARTICLE ONE**

Definitions

Section 1.1.   Definitions of Certain Agreement Terms.   For purposes of this Agreement, the terms hereinafter set forth shall have the following definitions unless otherwise specifically stated.

1.1.1. Bankruptcy Code.   The term "Bankruptcy Code" shall mean the Bankruptcy Reform Act of 1978, as amended.

1.1.2. Business Days.   The term "Business Days" shall mean days that are not Saturdays, Sundays, or Legal Holidays in the United States or the State of Texas.

1.1.4. Descendants means in general the person's legitimate children and more remote legitimate, lineal descendants who are living at the time such descendants must be ascertained in order to give effect to

1

such reference.  Such descendants shall include (i) any blood descendant and (ii) any person adopted into the line of descent (and such adopted person's own descendants) if, but only if, such person was adopted prior to attaining his or her majority by formal adoption proceedings in a court of record.

1.1.5. Event of Transfer.  The term "Event of Transfer" shall have the meaning set forth in Section 6.1.

1.1.6. Other Shareholders.  The term "Other Shareholders" shall, in Article Five, mean the Shareholders that are not the Offeror Shareholder, and in Article Seven, mean the Shareholders that are not the Shareholder whose Stock is subject to transfer or has been transferred.

1.1.7. Owned.  Stock referred to as being "owned" by any Person shall include all Stock owned (whether acquired before or after this date) as the separate property of such Person, all Stock owned as the community property of such Person and his or her spouse that is registered in the name of such Person, all Stock acquired by gift, partition or other transfer of community property Stock, and any shares into which any such Stock, or any portion thereof, may be converted.  A Person who owns Stock is sometimes referred to as an "Owner."  While a spouse of a Shareholder may own an interest in Stock that is deemed to be "owned" by such Shareholder under this definition, the term "Shareholder" as used in this Agreement does not apply to the spouse of any such named party to this Agreement unless such spouse also owns Stock.

1.1.8. Person.  The term "Person" means any individual, estate, partnership, corporation, trust, unincorporated association, limited liability company, joint venture or any other entity.

1.1.9. Shareholder.  The term "Shareholder" shall include all Persons who own Stock in the Corporation who are parties to this Agreement, and any Persons who subsequently become parties to this Agreement.

1.1.10.  Shareholder's Estate.  A "Shareholder's Estate" shall mean and include a deceased Shareholder's executor, administrator or similar personal representative (if one has qualified and is then acting), and his or her surviving spouse, heirs, beneficiaries, devisees and legatees to the extent, if any, that their action is required in order to effect a full and complete transfer of such deceased Shareholder's Stock pursuant to the terms of this Agreement.  The general agent of the persons and entities comprising a Shareholder's Estate shall be his or her duly appointed and qualified executor or administrator, or his or her surviving spouse where no such representative is appointed, and all notices and communications hereunder shall be effected to and through such general agent.

1.1.11.  Shareholder's Stock.  Stock referred to as being owned by a Shareholder at any point in time, sometimes referred to as "Shareholder's Stock," shall include any shares of Stock owned by such Shareholder at such time.

1.1.12.  Stock.  The term "Stock" shall have the meaning set forth in the introductory paragraph of this Agreement.

1.1.13.  Transfer. The term "Transfer" shall mean the sale, exchange, assignment, pledge, gift, hypothecation, transfer or other disposition (whether voluntary or involuntary) by a Shareholder of his or her Stock, either directly or indirectly, to any third party or any offer or attempt to accomplish any of the foregoing.

2

1.1.14. <u>Transferee</u>.   A "Transferee" or "Transferees" shall include any lineal descendant of a Shareholder, any custodian, guardian or other representative for a lineal descendant of a Shareholder, and the trustee of any trust created for the benefit of a Shareholder's lineal descendant(s) and any other party who succeeds to the ownership of any Stock originally owned by a Shareholder whether by purchase, assignment, gift, bequest, devise, levy, execution or any other means of transfer.   At such time as a Transferee shall become a Shareholder and become a signatory to this Agreement, he or she shall cease to be a "Transferee" hereunder.   The Shareholder from whom a Transferee acquired Stock, or the general agent of such Shareholder's Estate if such Shareholder is deceased, shall constitute the general agent for all of such Shareholder's Transferees, and all notices and communications hereunder shall be effect to and through such general agent.

### ARTICLE TWO
<u>Acquisition of Stock</u>

Section 2.1 <u>Purchase of Shares of Stock.</u>  Foster represents and warrants that he is the owner of 1,000,000 shares of fully paid and nonassessable common stock of the Corporation which represents all of the issued and outstanding shares of capital stock of the Corporation.   Contemporaneously with the execution of this Agreement by the Corporation and all of the Shareholders, Foster shall sell 400,000 shares of Stock to the other Shareholders for an aggregate purchase price of Four Hundred Thousand Dollars ($400,000.00) with the number of shares of Stock and the purchase price for each being shown opposite each Shareholder's name on Exhibit "A" attached hereto.   The purchase price for each Shareholder shall be paid by the delivery of a promissory note in the form of the Promissory Note attached hereto as Exhibit "B" the payment of which will be secured by the terms of a security agreement to be executed and delivered by each Shareholder in the form of the Security Agreement attached hereto as Exhibit "C." The shares of Stock acquired by Paige R. Foster shall constitute community property of Dan and Paige Foster.

### ARTICLE THREE
<u>Management</u>

Section 3.1 <u>Management</u>. There will be no board of directors of the Corporation.  In lieu thereof, during the term of this Agreement the management of the business and affairs of the Corporation shall be vested in a committee of Shareholders (the "Advisory Committee" or the "Committee") which shall have complete control of the Corporation as to those matters normally reserved for the directors and the shareholders of an "ordinary corporation" as that term is defined in Section 21.701 of the Code.  It is the express intent of the Shareholders that the power and authority of the Advisory Committee granted under this Agreement shall include, without limitation, all decisions with respect to mergers, consolidations, dissolution or the sale of substantially all of the assets of the Corporation.

Section 3.2 <u>Composition of Advisory Committee.</u>  The Advisory Committee shall be comprised of all Shareholders who are employed by or render services as an independent contractor for the Corporation ("Committee Members" or "Member(s)").  Each Committee Member shall possess one vote for each share of Stock owned.   Any action of the Committee shall require the affirmative vote or consent of those Committee Members holding more than 50% of all votes held by all Committee Members.  The Committee Member having the largest number of shares of Stock and present at any meeting of the

3

Committee shall serve as chairman and he or she shall appoint another member of the Committee as secretary of the meeting. Voting by proxy shall not be permitted. Neither may a Committee Member delegate his or her rights or duties to another under a power of attorney, durable or otherwise. If at any time, as certified in writing by two licensed physicians not related by blood or marriage to any Shareholder, a Committee Member, by reason of advanced age, mental or physical illness, infirmity, or other disability, is unable to properly care for himself and for his property, he shall be deemed incapacitated for purposes of this Agreement, whether or not a court of competent jurisdiction has declared him physically or mentally incapacitated or has appointed a guardian or conservator, and shall in such event shall cease to be a Committee Member during any such period of incapacity.

Section 3.3 <u>Ownership Compensation and Transfers of Shares.</u> During the term of this Agreement, the Ownership Compensation of all Committee Members shall be determined from time to time by the Committee taking into account the contribution by each Member to the success of the Corporation, financially and otherwise. The decision of the Committee in setting Ownership Compensation shall be final and determinative, in its sole discretion. "Ownership Compensation" is defined as all compensation payable to Members other than salaries and other compensation of Members paid regularly during the Corporation's fiscal year.) Following the end of the first fiscal year of the Corporation following execution of this Agreement, the Committee will establish the salaries and other compensation to be regularly paid together with the percentage of total Ownership Compensation for each Member for the following fiscal year. The percentage of Ownership Compensation for all Members shall total one hundred percent (100%). Immediately following such determination, all Committee Members whose percentage Ownership Compensation was reduced from his or her percentage Ownership Compensation for the prior fiscal year (or portion thereof) shall sell sufficient shares of Stock to those Members whose percentage Ownership Compensation was increased from the prior fiscal year (who shall be obligated to purchase such shares of Stock) in such a manner and such amounts such that the percentage Ownership Compensation of all Members is equal to their respective percentage ownership of Stock owned by all Members. The purchase price of each share of Stock sold and purchased under this provision shall be equal to the greater of One Dollar $1.00 per share of Stock or the per share book value of the Corporation as determined under the most recent annual financial statements prepared by the Corporation's accountant, provided, however, as to the Shareholders originally executing this Agreement, the purchase price shall be One Dollar $1.00 per share of Stock. Within a reasonable time following the end of any fiscal year the Committee shall determine the amount of money available for payment of Ownership Compensation and shall pay each Member an amount equal to his or her percentage of Ownership Compensation as determined by the Committee as applicable for the prior fiscal year. Any Shareholder who ceases to be a Member during a fiscal year shall not be entitled to participate in the distribution of Ownership Compensation and the percentage Ownership Compensation for such Shareholder shall be reallocated among the remaining Members on a pro rata basis. In connection with the sale of shares of Stock between Committee Members as required in this Section, if there is an outstanding Promissory Note to Foster at the time of the required purchase and sale then the purchaser shall assume the portion of such Promissory Note associated with the shares of Stock being sold (being the then outstanding balance on the Promissory Note divided by the number of shares of Stock originally purchased and pledged as security for the Promissory Note times the number of shares of Stock being purchased and sold) and Foster does hereby consent to such assignment. The Member of the Committee who purchases such shares of Stock shall become personally obligated for payment and performance as to the portion of such Promissory Note so assumed.

Section 3.4   <u>Loans and Guaranties.</u> Each Shareholder agrees to loan money to the Corporation in such amounts, at such times and on such terms as determined by the Advisory Committee from time to time.

4

Further, each Shareholder agrees to personally guarantee debts and obligations of the Corporation in such amounts and at such times as may be determined by the Advisory Committee. All mandatory loans shall be made on a pro-rata basis relative to proportionate ownership of the shares of Stock. A guaranty required hereunder may be a joint and several obligation of the Shareholders.

Section 3.5  Limitation of Liability.  No member of the Advisory Committee shall be liable to any other Shareholder or any third person or entity for any decision or action taken of any type or character whatsoever with respect to the Corporation unless caused by the gross negligence or willful misconduct of such member. No Shareholder who is not a member of the Advisory Committee shall be liable for any act or omission of the Corporation.

Section 3.6  Officers.  The Advisory Committee may from time to time appoint officers of the Corporation and delegate such duties and responsibilities to them as the Committee may determine.

Section 3.7  Rights as to Shares.   All shares of Stock of the Corporation shall be entitled to the same rights to share in current or liquidating distributions of money or property out of the Corporation.

Section 3.8  Action of Advisory Committee.  Any action taken at any meeting of the Advisory Committee may be taken without a meeting, without prior notice, and without a vote if a consent or consents in writing setting forth the action to be taken shall have been signed by the holder or holders of not less than the minimum number of votes that would be necessary to take such action at a meeting of the Committee.

Section 3.9  Lack of Formalities.  Neither the failure of the Corporation to observe the usual formalities or requirements prescribed for an ordinary corporation nor the performance of the terms of this Agreement shall be (i) a factor in determining whether to impose personal liability on the Shareholders for the Corporation's obligations, (ii) be grounds for invalidating this Agreement or, (iii) affect the status of this Corporation as a corporation under the Code or in law.

Section 3.10  Statement of Operation.  The Shareholders will cause the Corporation to execute and file a Statement of Operation with the Office of the Secretary of State of the State of Texas in the manner and as prescribed in Section 21.718 of the Code, and with any other appropriate filing office deemed necessary or appropriate by the Shareholders.

Section 3.11  Rights of Transferees.  In the event of the transfer and assignment of any of the shares of Stock by any of the Shareholders as permitted by this Agreement, such transferee or assignee shall have no rights in the management of the business and affairs of the Corporation, all such rights being invested in the Advisory Committee.

Section 3.12  Termination.  Termination of Corporation's status as a close corporation and termination or amendment of the provisions of this Article Three of this Agreement shall require the written consent of those Shareholders holding at least eighty percent (80%) of the shares of Stock. Upon termination, the Corporation shall file a Statement of Termination and the provisions of this Article Three of this Agreement shall become null and void, but the remainder of this Agreement shall survive such termination and continue to be effective as between, among, and against the Shareholders and the Corporation until terminated in accordance with other provisions hereof. No Shareholder shall have any right to dissent to such termination as such rights are provided with respect to transactions set forth in Section 21.460 of the Code. Upon such termination, there shall be constituted an interim board of

5

directors to be composed of the members of the Advisory Committee existing at such date of termination and such interim board shall, within 31 days from the effective date of termination, call a meeting of the Shareholders to elect a board of directors consisting of not less than one nor more than five directors to serve until the next annual meeting of shareholders or until their successors shall have been elected and qualified.

Section 3.14  Delivery of Agreement, etc.  In addition to the legends and other requirements provided under herein, the Corporation shall deliver a complete copy of this Agreement to each Shareholder and each and every permitted transferee thereof to whom any interest is conveyed, and each share certificate evidencing the Stock or any other shares of capital stock subsequently issued, shall state conspicuously on its fact or its back:

> "These shares are issued by a close corporation as defined by the Texas Business Organizations Code.  Under the Code, a shareholders' agreement may provide for management of a close corporation by the shareholders or in other ways different from an ordinary corporation.  This may subject the holder of this certificate to certain obligations and liabilities not otherwise imposed on shareholders of an ordinary corporation.  On any sale or transfer of these shares, the transferor is obligated to deliver to the transferee a complete copy of any shareholders' agreement."

Section 3.15  Construction.  This Agreement shall be the "shareholders' agreement" with respect to the Corporation as defined in Section 21.714 of the Code.

## ARTICLE FOUR

### Restrictions Against Transfer

Section 4.1. Transfer of Stock Restricted.  Each of the Shareholders agree that he or she will not in any way Transfer (as defined herein) any of his or her Stock, or any right or interest therein, without the prior written consent of the Corporation and the other Shareholders, except for Permitted Transfers as defined in Section 5.1 or other Transfer that meets the requirements of this Agreement.   Any purported Transfer in violation of any provision of this Agreement will be void and will not operate to transfer any right, title, or interest in the Stock to the purported Transferee, and will give the Corporation and the other Shareholders an option to purchase such Stock in the manner and on the terms and conditions provided in this Agreement.  The right of the Corporation to exercise its option to purchase the Stock is subject to the laws of the State of Texas governing the rights of a corporation to purchase its own shares.

## ARTICLE FIVE

Section 5.1.   Permitted Transfers.  The following transfers of Stock shall be permitted transfers.

5.1.1.   Transfers with Consent.   Notwithstanding the provisions of Section 3.1, a transfer or disposition of any kind or character otherwise prohibited by this Agreement may be permitted if approved by a vote of sixty percent (60%) in interest of the Shareholders who are parties to this Agreement.  Any transferees pursuant to such a permitted transfer or disposition must execute a written acknowledgment that they have become Shareholders as if they had been original signatory parties to this Agreement and

6

that they agree to be bound by the terms hereof, and their spouses must consent in writing to the terms of this Agreement.

5.1.2.   Transfer of Shareholder's Spouse's Stock.   Notwithstanding any other provisions of this Agreement, a transfer of a Shareholder's spouse's Stock to such Shareholder shall be permitted by any method, including, but not limited to, (i) the intestate succession of a Shareholder to such Stock, (ii) a bequest of such Stock to a Shareholder under the terms of such Shareholder's spouse's last will and testament, or (iii) a sale by the estate of such Shareholder's spouse to such Shareholder.

If a Shareholder's spouse should attempt to transfer stock to any Person who would not be a permissible transferee under the provisions of this Agreement, such attempted transfer shall be subject first to a prior ninety (90) day purchase option held exclusively by the Shareholder who is the spouse of such transferor, and then (to the extent such Shareholder does not elect to acquire such Stock) to the first refusal provisions under this Article Three, as if the end of such ninety (90) day period constitutes the First Refusal Notice Date.  Such ninety (90) day exclusive option period shall commence as of the date that written notice of any such attempted transfer is delivered to the Corporation and to the Shareholder who is the spouse of such transferor.  Such prior option right may be exercised or released by the Shareholder by giving written notice of exercise or release to the Corporation.  If exercised, a closing date shall be selected by the Shareholder at any date and time within the thirty (30) day period following the giving of notice of exercise.  The Closing shall occur at the principal office of the Corporation at the date and time designated in such notice, and shall be consistent with the provisions of Article Six hereof as if the purchasing Shareholder were the sole purchasing Shareholder exercising a right of First Refusal under the remaining provisions of this Article Three.

Section 5.2.   Transfer Under Other Articles.   Notwithstanding any other provision of this Article Five, a Transfer pursuant to the provisions of Article Six shall be permitted without complying with the Right of First Refusal provisions of this Article Five.

Section 5.3.  Agreement of Minority Shareholders Regarding Sale by Majority Shareholders.   If a Majority Shareholder (meaning one or more Shareholders holding or voting more than 50% of the voting shares of the Corporation or upon approval of the Advisory Committee, if the Corporation remains a close corporation) approves a *bona-fide,* arms-length sale of (i) 80% or more of the Stock held by all Shareholders or (ii) substantially all of the assets of the Corporation, whether by way of merger, consolidation, sale of stock or assets, or otherwise, (each, an "Approved Sale") all Shareholders shall consent to and raise no objections against such Approved Sale, and if the Approved Sale is structured as (A) a merger or consolidation of the Corporation, or a sale of all or substantially all of the assets of the Corporation, each Shareholder shall waive any dissenters rights, appraisal rights or similar rights in connection with such merger, consolidation or asset sale, or (B) a sale of the Stock or a sale of all of the stock of a subsidiary of the Corporation, the Shareholders hereby agree to sell their respective pro rata portion of the Stock that is subject to the Approved Sale, on the terms and conditions approved by the Majority Shareholder.  The Shareholders shall take all necessary and desirable actions approved by the Majority Shareholder, in connection with the consummation of the Approved Sale, including the execution of such agreements and such instruments and other actions reasonably necessary to provide reasonable representations, warranties, indemnities, covenants, conditions, and other agreements relating to such Approved Sale, provided, however, that no Shareholder shall be required to give greater or more onerous representations, warranties, indemnities, or covenants than any other Shareholder.  The Shareholders shall be permitted to sell their Stock pursuant to an Approved Sale without complying with the provisions of Article Five of this Agreement.

7

5.3.1  All Stock to be transferred pursuant to this Section 5.3 shall be transferred on a pro rata basis (based on each Shareholder's percentage ownership of all Stock outstanding immediately before consummation of the Approved Sale) and on the same terms and conditions and equivalent value.

5.3.2.  The Corporation shall give each Shareholder written notice (the "Drag-Along Notice") of any Approved Sale within fifteen (15) days of such approval, which notice shall contain (a) the aggregate number of shares of Stock and persons who own those shares or the assets that the proposed transferee proposes to acquire in the Approved Sale, (b) the name and address of the proposed transferee and (c) the proposed purchase price, terms of payment and other material terms and conditions of the proposed transferee's offer.

## ARTICLE SIX

### Events of Transfer

Section 6.1.   Death or Other Events of Transfer.   Upon (a) the death of a Shareholder, (b) the termination of employment of any Shareholder with the Corporation, (c) the involuntary Transfer, Transfer by operation of law, gift or any other Transfer (including any Transfer by divorce proceeding, bankruptcy, foreclosure or any other taking of title pursuant to a pledge, encumbrance or similar credit transaction, (but excluding any Transfer that is permitted under Section 5.7), of any shares of Stock or of any right or interest therein by any Shareholder without the written consent of all of the parties hereto, or (d) the failure to make a required contribution to capital of the Corporation or to guaranty Corporate debt as required herein, then the Corporation and/or the Other Shareholders shall have the option to purchase the shares of Stock of such Shareholder or such transferred shares of Stock in the manner and on the terms and conditions provided herein.  (An event described in (a),  (b), (c) or (d)  above is referred to as an "Event of Transfer" and the shares of Stock so transferred upon the occurrence of any Event of Transfer or Stock held by a Shareholder or Shareholders' Transferee upon an Event of Transfer are referred to in this Agreement as the "Transferred Shares").  In the event of the death of a Shareholder, the executor, administrator or personal representative of such deceased Shareholder will promptly give written notice of such Shareholder's death to the Secretary of the Corporation and to the Other Shareholders. In case of an Event of Transfer as provided in (b) or (d) above, the Corporation shall cause written notice of such Transfer to the Other Shareholders.  In the case of an Event of Transfer as provided in (c) above, the Person or Persons acquiring such Transferred Shares will promptly give written notice of such Transfer to the Secretary of the Corporation and to the Other Shareholders.  In all such events, the Corporation will have the first right to elect to purchase all or any portion of the Transferred Shares for a period of ninety (90) days after notice is given of any Event of Transfer and the Other Shareholders will have the right to elect to purchase such Transferred Shares for a period of twenty (20) days after the expiration of such ninety (90) day period.

Section 6.2.   Transferees' Requirements.  If the Corporation and the Other Shareholders do not elect to purchase all of the Transferred Shares within ninety (90) days or twenty (20) days respectively from the date of the written notice referred to in Section 6.1 the holder(s) of the Transferred Shares and their respective spouse(s) will execute and become a party to this Agreement and will hold such shares of Stock subject to all the terms and conditions of this Agreement, and no further transfer of such Transferred Shares may be made except in accordance with the terms and conditions of this Agreement.

Section 6.3.   Involuntary Transfer to Spouse.  Notwithstanding anything to the contrary contained in this Agreement, the transfer to a spouse or a cohabitant of a Shareholder by judicial decree, petition or property settlement agreement of any shares of Stock, including any shares of Stock in which such spouse or cohabitant may have a community property or other property interest, shall first give the Shareholder whose Stock is subject to such Transfer the option for a period of thirty (30) days to acquire such Stock or interest from the spouse or cohabitant at the Purchase Price set forth by Article Five.  After such period, the Corporation, and the remaining Other Shareholders shall have the option to acquire the Stock in accordance with the procedures provided in this Article Six.

## ARTICLE SEVEN

### Purchase Price for Shares of Stock

Section 7.1.   Purchase Price and Tender of Stock.  The total Purchase Price for all the shares of Stock to be purchased pursuant to Article Six and, if applicable, to Article Five, shall be the stated value of the Corporation divided by the total issued and outstanding shares of common stock and multiplied by the number of shares of Stock being purchased pursuant to Article Six, with the stated value of the Corporation being determined by the Advisory Committee from time to time, or if such stated value has not been determined by such Committee within the prior three calendar years then the fair market value of such Stock as determined by an appraisal under the terms of this Section. Fair market value is defined as the price that such interest would change hands in an arms'-length transaction between a willing buyer and willing seller in a retail market, taking into account all applicable discounts for lack of control, lack of marketability, etc. as determined by an appraiser selected by the Corporation or Shareholder(s) purchasing the Stock and the Transferee.  If such appraiser cannot be agreed upon within 10 days, then each party shall choose an appraiser and they shall each submit an appraisal.  If the two appraisals are within 15% of each other then the average of the two values shall be the fair market value for these purposes, otherwise, the two appraisers shall select a third appraiser whose determination of fair market value shall be determinative.  The fees of the third appraiser shall be divided equally between the parties as shall the fees of any appraiser who is chosen by agreement of the parties.  If each party selects its own appraiser then each shall bear the fees of the one selected.  The foregoing notwithstanding, the Purchase Price referenced above shall not be less than the death benefits payable under any life insurance policy owned by the Corporation on the life of deceased Shareholder whose shares of Stock are being purchased pursuant to Article Six.

If the Corporation and/or the other Shareholders elect to purchase all of the Transferred Shares, the Seller Shareholder or any other Person to whom any such Transferred Shares have been transferred (the "Transferee") will sell all of such Transferred Shares, and such Selling Shareholder or Transferee will execute and deliver the certificates evidencing transfer of such Transferred Shares, to the Corporation and/or the other Shareholders, as appropriate, for the Purchase Price and on the terms and conditions set forth in this Article Five and in the manner set forth in Article Eight.  Any purchase by the Corporation of Transferred Shares as a result of the death of a Shareholder may be funded, at the Corporation's option, with proceeds of any policy of insurance that the Corporation has maintained on the life of the deceased Shareholder.

Section 7.2.   Valuation Date.  The Valuation Date for purposes of determining the fair market value of the Stock to be purchased shall be the date of the end of the last complete  calendar quarter immediately preceding the date that the Event of Transfer as described in Section 4.1 occurs.

9

Section 7.3. Compliance with IRS Requirements.  Any provision of this Agreement to the contrary notwithstanding, in all events the parties hereto intend that each share of Stock shall have equal rights in dividends and in liquidation proceeds.

## ARTICLE EIGHT

### Closing and Payment of Purchase Price

Section 8.1.   Closing Date and Location.  If no other Closing  is set by the Article hereof applicable to a purchase or sale hereunder, the closing of the purchase and sale of the shares of Stock (the "Closing") provided for in this Agreement will be held 10:00 a.m. at the offices of the Corporation on the thirtieth (30th) day following the expiration of the last option period to acquire Stock, or such other date and place as the parties may agree (the "Closing Date").

Section 8.2.   Manner of Payment.  At the Closing, the Shareholders purchasing such shares of Stock will pay their respective portions of the purchase price in cash (or immediately available funds) or, at the option of a purchasing Shareholder, by payment of 10% in cash (or immediately available funds) and the balance in the form of delivery of a promissory note payable in equal quarter annual payments over a five year period, bearing interest at a rate equal to one percent over the prime rate as reported by the Wall Street Journal from time to time, adjusted on a quarterly basis.  The purchase price must be paid at the Closing as provided herein, unless the terms of sale permit otherwise, or the parties hereto agree to permit another method of payment.  At the Closing, the  Offering Shareholder or other Person or Persons holding such shares of Stock will duly execute and deliver the certificates evidencing such shares of Stock to the purchaser, in proper form for transfer, free and clear of all liens, adverse claims and encumbrances, except as contained in this Agreement.

## ARTICLE NINE

### Subsequent Issuance of Stock by the Corporation
### and Restrictive Covenants

Section 9.1.   Future Stock Issuance.  The Corporation agrees that, as a part of the consideration to be received for the issuance of any additional Stock by the Corporation, the Corporation shall require the purchaser of such Stock, and the spouse of such purchaser (if any), to assume all of the rights, restrictions and obligations that are conferred and imposed upon the Shareholders and their spouses pursuant to the terms of this Agreement, such purchaser and his or her spouse to evidence their agreement to be so bound by becoming signatory parties to this Agreement in their respective capacities as Shareholder and spouse of a Shareholder.  The Shareholders agree to enter into an amendment to this Agreement providing that any such purchaser shall be deemed to be a Shareholder the Corporation, and that such purchaser's spouse shall be deemed to be a spouse consenting to the terms of this Agreement.

10

## ARTICLE TEN

### Notices

Section 10.1.  Notice Procedure.  All notices required to be given hereunder will be deemed to be duly given on the date of delivery if delivered in person or three (3) Business Days after the date of mailing if mailed by registered or certified mail, postage prepaid, return receipt requested, to the Secretary of the Corporation and to the Shareholders at the addresses indicated  on the signature page of this Agreement. The address of any Shareholder may be changed only by giving written notice of such change of address to all of the other parties hereto in the manner provided herein for giving notices.

## ARTICLE ELEVEN

### Stock Legend

Section 11.1.  Legend Required by this Agreement.  The Corporation and each Shareholder hereby agrees that all certificates representing shares of Stock of the Corporation that at any time are subject to the provisions of this Agreement will have endorsed upon them, in addition to any legend required by the Corporation's bylaws, in boldface type a legend in substantially the following form:

THE SHARES OF STOCK REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A SHAREHOLDERS' AGREEMENT ("AGREEMENT"), DATED June 1, 2010 AMONG THE SHAREHOLDERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THE CORPORATION, AND SAID SHARES MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED, HYPOTHECATED, OR OTHERWISE DISPOSED OF EXCEPT IN STRICT ACCORDANCE WITH THE TERMS OF THE AGREEMENT.  A COPY OF THE AGREEMENT WILL BE FURNISHED WITHOUT CHARGE TO THE HOLDER OF THIS CERTIFICATE UPON RECEIPT BY THE CORPORATION AT ITS PRINCIPAL PLACE OF BUSINESS OR REGISTERED OFFICE OF A WRITTEN REQUEST FROM THE HOLDER REQUESTING SUCH A COPY.

Section 11.2.  Execution of Agreement by Transferee.  Under no circumstances will any sale or other Transfer of any shares of Stock subject to this Agreement be valid until the proposed transferee and the transferee's spouse or cohabitant has executed and become a party to an Agreement substantially similar to this Agreement and thereby becomes subject to all of its provisions, unless this requirement is waived by written consent of the parties; notwithstanding any other provisions of this Agreement, no such sale or other Transfer of any kind will in any event result in the nonapplicability of the provisions of this Agreement at any time to any of the shares of Stock subject to this Agreement.

## ARTICLE TWELVE

### Term

Section 12.1.  Termination of Agreement.  This Agreement will terminate upon the earlier of:  (a) the agreement of all parties hereto to terminate this Agreement, (b) the purchase by the Corporation of all the shares of Stock of all but one Shareholder, (c) the purchase by any one Shareholder of all of the issued and outstanding shares of Stock of the Corporation, (d) the agreement of the holders of 80% of all the issued and outstanding Stock of the Corporation or (e) twenty-one (21) years after the death of the last survivor of the Shareholders named herein and their now living lineal descendants.

11

Section 12.2.   Termination as to Article Three.   The earlier termination of the close corporation provisions of Article Three shall be governed by the provisions of Section 3.13 hereof.

## ARTICLE THIRTEEN

Section 13.1 Shareholder Compliance with Specific Performance.  The parties hereto shall not hinder or interfere with, or cause to be interfered with in any manner whatsoever, the operation of the terms of this Agreement, or the carrying out of any of the terms of this Agreement to the prejudice of any Shareholder.  In the event of the failure of the Corporation or the other Shareholders to comply with the provisions of this Agreement, this Agreement may be enforced by specific performance.

Section 13.2  Binding Effect.  This Agreement shall be binding upon the parties, their heirs, legal representatives, successors, and assigns.  The parties hereto covenant and agree that they and their heirs, legal representatives, successors, and assigns will execute any and all instrument, releases, assignments, and do all other things required of them or necessary to effectuate the purposes of this Agreement.

Section 13.3  Governing Law.  This Agreement shall be interpreted in accordance with the laws of the State of Texas without reference to Texas conflict of laws principles.

Section 13.4  Notices.  All notices, offers, acceptances, waivers, and other acts under this Agreement shall be in writing, and shall be sufficiently given if delivered to the addressee in person, or if mailed, postage prepaid, to the Shareholder or Shareholders at the addresses listed on the books of the Corporation.

Section 13.5  Amendment.  Save as provided in Section 3.12 with respect to termination or  amendment of this Agreement only as to Article Three, this Agreement may be amended at any time by the written consent of those Shareholders holding at least eighty percent (80%) of the Shares.

Section 13.6  Arbitration.  Other than with respect to Section 9.2(b) hereof, any dispute between the parties hereto relating to this Agreement or a deadlock of the Advisory Committee that cannot be resolved through negotiations, shall be decided by arbitration before the American Arbitration Association, the parties expressly waiving the rights to the judicial proceedings set forth in Section 21.751, et seq. of the Code.   When selecting the arbitrator, each party shall be permitted preemptory challenges and challenges for cause as permitted by the rules of the American Arbitration Association.  Potential arbitrators are required to disclose any circumstances which will preclude them from rendering an objective and impartial determination.  Each party shall be permitted to engage in arbitral discovery in the form of document production, information requests, interrogatories, depositions and subpoenas.  The arbitration panel shall have plenary authority to issue decisions and awards as provided by any statute which any other forum may award for a similar claim.  The arbitration panel shall issue a written decision on all claims with which it is presented.  The parties shall share equally the fee of the arbitration panel.  Any claim made under or relating to this Agreement which is not found to be arbitrable shall be decided by the courts of the State of Texas and any trial of such a claim shall be heard by the Judge of any such Court, sitting without a jury.  The parties agree to waive a jury trial to obtain a more rapid adjudication of that claim.

12

Section 13.7   Counterparts.  This Agreement may be executed in several counterparts, each copy of which shall serve as an original for all purposes, but all copies shall constitute but one and the same Agreement.

Section 13.8  Section Headings; Gender.  All section headings set forth in this Agreement are intended for convenience only and shall not control or affect the meaning, construction, or effect of this Agreement or of any of the provisions hereof.  All references in this Agreement to gender shall be interpreted in the applicable gender of the undersigned.

Section 13.9  Separability.  This Agreement is severable, and if for any reason any provision or provisions hereof are determined to be invalid, inoperative, or contrary to any existing or future law, the remainder of this Agreement shall be considered valid and operative and effect shall be given to the intent manifested by the portion held invalid or inoperative.

Section 13.10  Joinder.  The spouses of the Shareholders join in the execution and delivery of this Agreement for the express purpose of binding their respective community property interests, if any, in the shares of Stock.

Section 13.11.  Insurance.  The Corporation may desire to acquire insurance on the lives of any one or more Shareholders in order to provide funds to purchase Stock in the event of a Shareholder's death.  Each Shareholder agrees to cooperate with the Corporation in this endeavor and to assist it to the extent required in order to allow it to obtain such insurance.

Section 13.12.  Waiver.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach by any party.

Section 13.13.  Business Days.  Whenever the terms of this Agreement call for the performance of a specific act on a specified date, which date falls on a Saturday, Sunday or legal holiday, the date for the performance of such act shall be postponed to the next succeeding regular Business Day following such Saturday, Sunday or legal holiday.

Section 13.14  Legal Representation.  All parties to this Agreement acknowledge that the law firm of Law, Snakard and Gambill, P.C. has represented only Daniel A. Foster in connection with the preparation of this Agreement and that all other signatories are advised to seek separate, independent legal counsel with respect to their respective legal rights and obligations associated with this Agreement and the transactions contemplated herein.

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement to be effective as of the date first written above.

THE CORPORATION:

Providence Title Company

By: _____
        Daniel A. Foster, CEO

SHAREHOLDERS:

_____
Daniel A. Foster
815 Moore Rd.
Mansfield, Texas 76063

Owner of 600,000 Shares

_____
Paige R. Foster
815 Moore Rd.
Mansfield, Texas 76063

Owner of 100,000 Shares

_____
Denise Smith

_____
San Antonio, Texas

Owner of 100,000 Shares

14

_Lynda Tiedtke_

Fort Worth, Texas

Owner of 100,000 Shares

## CONSENT TO AGREEMENT

I, the spouse of Lynda Tiedtke, have been furnished a copy of that certain agreement captioned: SHAREHOLDERS' AGREEMENT entered into by and between Providence Title Company and all of its shareholders. I have read and fully understand the Shareholders' Agreement and have had an opportunity to discuss this Agreement with legal counsel, and by execution of this Consent to Agreement do consent to be bound by the provisions of such Agreements insofar as such provisions affect my present and future right, title, and interest in and to the shares of stock in Providence Title Company held in my spouse's name, as described in such Agreement, and in particular, but without limitation, I consent to the future sale, transfer or other disposition of the shares of stock in Providence Title Company held in the name of my spouse in such manner and on such terms as may be required under the provisions of the Agreement.

Dated:_____

_Eric Tiedtke, Spouse of Lynda Tiedtke_

1

Steve Ramsey

_____

Coppell, Texas

Owner of 100,000 Shares


CONSENT TO AGREEMENT


I, the spouse of Steve Ramsey, have been furnished a copy of that certain agreement captioned: SHAREHOLDERS' AGREEMENT entered into by and between Providence Title Company and all of its shareholders. I have read and fully understand the Shareholders' Agreement and have had an opportunity to discuss this Agreement with legal counsel, and by execution of this Consent to Agreement do consent to be bound by the provisions of such Agreements insofar as such provisions affect my present and future right, title, and interest in and to the shares of stock in Providence Title Company held in my spouse's name, as described in such Agreement, and in particular, but without limitation, I consent to the future sale, transfer or other disposition of the shares of stock in Providence Title Company held in the name of my spouse in such manner and on such terms as may be required under the provisions of the Agreement.


Dated:_____

Donna Ramsey, Spouse of Steve Ramsey


1

# EXHIBIT 2

8.2.13: Lynda Got copy

ORIGINAL

# FIRST AMENDMENT TO SHAREHOLDERS' AGREEMENT

THIS FIRST AMENDMENT TO SHAREHOLDERS' AGREEMENT (the "Amendment") is made by and among Tracie Fleming ("Fleming"), Providence Title Company, a Texas corporation (the "Corporation"), Daniel A. Foster ("Foster"), Paige Foster, Steve Ramsey ("Ramsey"), Lynda Tiedtke ("Tiedtke") and Denise Smith ("Smith") to be effective as of April 9, 2013.

## RECITALS

A.  Daniel A. Foster, Denise Smith, Lynda Tiedtke, Steve Ramsey, Paige Foster and the Corporation entered into one certain Shareholders' Agreement dated June 1, 2010 (the "Shareholders' Agreement"); and,

B.  Tracie Fleming now desires to purchase 60,000 shares of the common stock of the Corporation (the "Shares") from Sellers for an aggregate purchase price of $120,000.00; and,

C.  The Corporation has agreed to loan Fleming the sum of $120,000.00 to fund such purchase; and

D.  Fleming has agreed to pledge the Shares to secure payment of the amounts borrowed from the Corporation, all under the terms and conditions set forth herein; and,

E.  The parties further desire to make certain amendments and revisions to the terms of the Shareholders' Agreement.

NOW, THEREFORE, in consideration of the above premises, the mutual promises and covenants herein contained, and for other good and valuable consideration, the full receipt and sufficiency of which are hereby expressly acknowledged and confessed by the parties hereto, it is hereby agreed as follows:

1.  <u>Foster Sale.</u> Foster does hereby sell, assign and transfer to Fleming 40,000 shares of the common stock of the Corporation for a purchase price of $80,000.00 in cash, the receipt of which is hereby acknowledged by Foster.

---

2. <u>Paige Foster Sale.</u> Paige Foster does hereby sell, assign and transfer to Fleming 5,000 shares of common stock of the Corporation for a purchase price of $10,000.00 in cash which, at the direction of Paige Foster, has been paid to the Corporation and applied against her Promissory Note dated June 1, 2010 in the original principal amount of $100,000.00 and currently held by the Corporation as assignee.

3. <u>Ramsey Sale.</u>  Ramsey does hereby sell, assign and transfer to Fleming 5,000 shares of common stock of the Corporation for a purchase price of $10,000.00 in cash which, at the direction of Ramsey, has been paid to the Corporation and applied against his Promissory Note dated June 1, 2010 in the original principal amount of $100,000.00 and currently held by the Corporation as assignee.

4. <u>Tiedtke Sale.</u> Tiedtke does hereby sell, assign and transfer to Fleming 5,000 shares of common stock of the Corporation for a purchase price of $10,000.00 in cash which, at the direction of Tiedtke, has been paid to the Corporation and applied against her Promissory Note dated June 1, 2010 in the original principal amount of $100,000.00 and currently held by the Corporation as assignee.

5. <u>Smith Sale.</u>  Smith does hereby sell, assign and transfer to Fleming 5,000 shares of common stock of the Corporation for a purchase price of $10,000.00 in cash which, at the direction of Smith, has been paid to the Corporation and applied against her Promissory Note dated June 1, 2010 in the original principal amount of $100,000.00 and currently held by the Corporation as assignee.

6. <u>Corporate Consent.</u> By its signature below, the Corporation consents to the sale of the Shares to Fleming as provided herein and waives any restriction to such sale in the various Security Agreements under which the Shares are pledged or contained within the Shareholders' Agreement.

7. <u>Note and Security Agreement.</u> Fleming agrees to execute and deliver to the Corporation a promissory note containing the terms of the Promissory Note attached hereto as Exhibit "A" and a pledge and security agreement in the form of the Pledge and Security Agreement attached hereto as Exhibit "B", both of which are incorporated herein by reference.

8. **"S" Corporation Status.**   Fleming acknowledges that the Corporation has made an election to be taxed as an S Corporation under the Internal Revenue Code of 1984 and, accordingly, will be required to report the financial results of the Corporation's business on her personal income tax return and pay tax on such amounts and she agrees to execute and deliver such instruments as may be required to continue such election on behalf of the Corporation.

9. **Assumption of Shareholders' Agreement.**   Inasmuch as the Corporation and all of its shareholders have entered into the Shareholders' Agreement to define their respective rights, responsibilities and duties to each other, Fleming, acknowledging that she has received and reviewed a copy of the Shareholders' Agreement does hereby assume all of the duties and obligations of a shareholder under the Shareholders' Agreement to the same extent as if she had been an original signatory of such instrument.

10. **Warranties of Sellers.**   Each Seller warrants to Fleming that with respect to his/her common stock of the Corporation that make up the Shares, such Seller has good title to the his/her common stock making up a portion of the Shares, free of any liens, mortgages or encumbrances save as provided herein.

11. **Disclaimer of Warranties.**   Fleming acknowledges that she has received and reviewed such information as she deemed necessary in order to evaluate the merits and risks of its purchase of the Shares and that Fleming has such knowledge and experience in financial and business matters to be capable of evaluating the merits and risks associated with the purchase of the Shares.   Fleming has made and conducted due inquiry, including without limitation, an investigation of the Corporation and its operations, assets, liabilities and financial condition and is entering into this agreement based on her due diligence investigation and is not relying upon any representation or warranty of the Sellers (other than as provided in Section 10 hereof) or of the Corporation or any affiliate thereof or any officer, director, shareholder, contractor, manager, employee, agent, attorney  or advisor of any of them, nor upon the accuracy of any record, document, instrument, projection or statement made available or given to the Fleming in the performance of such due diligence or

otherwise.  Fleming acknowledges that she is acquiring the Shares on an "as is, with all faults" basis without any express or implied representation or warranty of any kind other than as expressly set forth herein.

12. <u>Revisions to Shareholders' Agreement.</u>   The Shareholders' Agreement is revised and amended in the following respects:

    a.  A new Section 4.2 is added to read as follows: "Section 4.2.  <u>Maintenance of S Corporation Status.</u>   Any provision contained herein to the contrary notwithstanding, no Transfer shall be permitted if such Transfer would cause the loss of  the Corporation's status as an S Corporation under the Internal Revenue Code."

    b.  Section 5.2 of the Shareholders' Agreement is deleted in its entirety because there is no Right of First Refusal provision.  Similarly, the parenthetical in Section 6.1 reading, "(but excluding any Transfer that is permitted under Section 5.7)" is deleted in its entirety because there is no Section 5.7.

    c.  The following provision is added to Section 8.2:

        • "Any sums owing to Shareholders or the Corporation shall be paid in full at Closing by Offering Shareholder."

    d.  The following provisions are to be added new Sections 8.3 and 8.4 respectively:

**8.3** <u>Non-Solicitation</u>.  Offering Shareholder agrees that for a period of one year following the effective date of this Agreement he/she will not, either as an employee or any other manner or capacity, directly or indirectly, solicit the employment, employ, hire (or cause to be hired) or engage as an employee, consultant, or independent contractor, any Providence employee nor will he/she discourage employees of Providence from continuing their employment. In the event of a breach or threatened breach of the provisions of this covenant by Offering Shareholder, Providence or its successor shall be entitled to an

injunction restraining Offering Shareholder from such breach or threatened breach.

**8.4** Non-Compete.   Offering Shareholder agrees for a period of twenty-four (24) months from the date of the Closing (defined in Section 8.1) he/she will not (i) serve as a partner, employee, consultant, officer, director, member, manager, agent, associate, investor, or otherwise, or (ii) directly or indirectly, own, purchase, organize or take preparatory steps for the organization of, or (iii) build, design, finance, acquire, lease, operate, manage, invest in, work or consult for or otherwise affiliate hisself/herself with, any business in competition with or otherwise similar to Providence's business within the Texas counties of Tarrant, Dallas, Harris, or Bexar or any Texas counties contiguous to such stated counties.   Breach of this covenant shall entitle the payees of the promissory notes given in payment for the Shares acquired under Section 8.2 herein to defer all payments for a period not to exceed twenty-four (24) months, without interest.

Providence Title Company

By: Daniel A. Foster, CEO

Lynda Tiedtke

Daniel A. Foster, Individually

Paige Foster

Denise Smith

Steve Ramsey

Tracie Fleming

EXHIBIT 3

## SECOND AMENDMENT TO SHAREHOLDERS' AGREEMENT

THIS SECOND AMENDMENT TO SHAREHOLDERS' AGREEMENT (the "Amendment") is made by and among Tracie Fleming ("Fleming"), Providence Title Company, a Texas corporation (the "Corporation"), Daniel A. Foster ("Foster"), Paige Foster, Steve Ramsey ("Ramsey"), Denise Smith ("Smith") and Brianne J. Woltmann ("Woltmann") to be effective as of January 1, 2014.

## RECITALS

A.      Daniel A. Foster, Denise Smith, Tracie Fleming, Steve Ramsey, Paige Foster and the Corporation entered into one certain Shareholders' Agreement dated June 1, 2010 (the "Shareholders' Agreement") as amended effective April 9, 2014; and,

B.      Linda Tiedtke has withdrawn from the Corporation and her shares have been sold to the remaining shareholders with promissory notes executed by the shareholders for payment of the purchase price; and,

C.      Brianne J. Woltmann wishes to purchase 60,000 shares combined from Daniel and Paige Foster, Ramsey and Smith for the total purchase price of $240,000.00, part of which has been paid; and,

D.      The Corporation has agreed to assume payment of the remaining shareholder's notes to Lynda Tiedtke for the purchase price of Lynda Tiedtke's shares being transferred to Woltmann and to loan Woltmann the remaining purchase price for same; and,

E.      Tracie Fleming now desires to purchase an additional 10,000 shares of the common stock of the Corporation (the "Shares") from Foster for an aggregate purchase price of $40,000.00, part of which has been paid; and,

F.      The Corporation has agreed to loan Fleming the additional sum of $40,000.00 to fund such purchase; and,

G.      The Corporation has agreed to assume payment of Fleming's note to Lynda Tiedtke for the purchase price of 10,000 shares; assume payment of Foster's loan to Lynda Tiedtke for the purchase of Tiedtke's shares being transferred to Fleming, extend and renew

Fleming's original note to Providence; and loan Fleming the balance of the purchase price; and,

H.  Fleming and Woltmann have agreed to pledge the Shares to secure payment of the amounts borrowed from the Corporation, all under the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the above premises, the mutual promises and covenants herein contained, and for other good and valuable consideration, the full receipt and sufficiency of which are hereby expressly acknowledged and confessed by the parties hereto, it is hereby agreed as follows:

1.  <u>Foster Sale.</u> Foster does hereby sell, assign and transfer to Fleming 10,000 shares of the common stock of the Corporation for a purchase price of $40,000.00 and 30,000 shares of the common stock of the Corporation to Woltmann for a purchase price of $120,000.00, both in the form of the Corporation's assumption of Foster's remaining debt to Lynda Tiedtke and cash, the receipt of which is hereby acknowledged by Foster.

2.  <u>Paige Foster Sale.</u> Paige Foster does hereby sell, assign and transfer to Woltmann 10,000 shares of common stock of the Corporation for a purchase price of $40,000.00 in the form of the Corporation's assumption of the remaining debt to Lynda Tiedtke, the receipt of which is hereby acknowledged.

3.  <u>Ramsey Sale.</u> Ramsey does hereby sell, assign and transfer to Woltmann 10,000 shares of common stock of the Corporation for a purchase price of $40,000.00 in the form of the Corporation's assumption of the remaining debt to Lynda Tiedtke, the receipt of which is hereby acknowledged.

4.  <u>Smith Sale.</u> Smith does hereby sell, assign and transfer to Woltmann 10,000 shares of common stock of the Corporation for a purchase price of $40,000.00 in the form of the Corporation's assumption of the remaining debt to Lynda Tiedtke, the receipt of which is hereby acknowledged.

5.  <u>Corporate Consent.</u> By its signature below, the Corporation consents to the sale of the Shares to Fleming and Woltmann as provided herein and waives any restriction to such

sale in the various Security Agreements under which the Shares are pledged or contained within the Shareholders' Agreement.

6. <u>Note and Security Agreement.</u> Fleming and Woltmann agree to execute and deliver to the Corporation promissory notes containing the terms of the Promissory Note attached hereto as Exhibit "A" and pledge and security agreements in the form of the Pledge and Security Agreement attached hereto as Exhibit "B", both of which are incorporated herein by reference.

7. <u>"S" Corporation Status.</u>   Woltmann acknowledges that the Corporation has made an election to be taxed as an S Corporation under the Internal Revenue Code of 1984 and, accordingly, will be required to report the financial results of the Corporation's business on her personal income tax return and pay tax on such amounts and she agrees to execute and deliver such instruments as may be required to continue such election on behalf of the Corporation.

8. <u>Assumption of Shareholders' Agreement.</u>   Inasmuch as the Corporation and all of its shareholders have entered into the Shareholders' Agreement to define their respective rights, responsibilities and duties to each other, Woltmann, acknowledging that she has received and reviewed a copy of the Shareholders' Agreement does hereby assume all of the duties and obligations of a shareholder under the Shareholders' Agreement to the same extent as if she had been an original signatory of such instrument.

9. <u>Warranties of Sellers.</u>  Each Seller warrants to Fleming and Woltmann that with respect to his/her common stock of the Corporation that make up the Shares, such Seller has good title to the his/her common stock making up a portion of the Shares, free of any liens, mortgages or encumbrances save as provided herein.

10. <u>Disclaimer of Warranties.</u>  Fleming and Woltmann acknowledge that they have received and reviewed such information as they deemed necessary in order to evaluate the merits and risks of its purchase of the Shares and that they have such knowledge and experience in financial and business matters to be capable of evaluating the merits and risks associated with the purchase of the Shares.  Fleming and Woltmann have made and conducted due inquiry, including without limitation, an investigation of the Corporation

and its operations, assets, liabilities and financial condition and is entering into this agreement based on their due diligence investigation and are not relying upon any representation or warranty of the Sellers (other than as provided in Section 10 hereof) or of the Corporation or any affiliate thereof or any officer, director, shareholder, contractor, manager, employee, agent, attorney or advisor of any of them, nor upon the accuracy of any record, document, instrument, projection or statement made available or given to the Fleming in the performance of such due diligence or otherwise.  Fleming and Woltmann acknowledge that they are acquiring the Shares on an "as is, with all faults" basis without any express or implied representation or warranty of any kind other than as expressly set forth herein.

Providence Title Company

By: Daniel A. Foster, CEO

Brianne J. Woltmann

Daniel A. Foster, Individually

Paige Foster

Denise Smith

Steve Ramsey

Tracie Fleming

---

**_SIGNING TO BIND THEIR COMMUNITY INTEREST TO THE ORIGINAL SHAREHOLDER'S AGREEMENT AS NOW AMENDED:_**

Mark Fleming

Carlos Woltmann

Donna Ramsey

---

# EXHIBIT 4

| | |
|---|---|
| **From:** | Michael Tafoya |
| **Sent:** | Thursday, May 9, 2019 12:01 PM CDT |
| **To:** | Dan Foster |
| **Cc:** | Mike Kirby |
| **Subject:** | Re: Information request |

Thank you Dan,

This email confirms that Truly Title, Inc. hereby agrees to a one year non-solicitation of Providence Title employees.


Have a great afternoon!


**Mike**


**Michael J Tafoya**
Chief Executive Officer
Truly Title, Inc.
O (972) 268-7943 M (307) 699-9938Toll Free: (844) 4UTRULY
www.trulytitle.com  | mtafoya@trulytitle.com



**From:** Dan Foster <dfoster@protitletx.com>
**Date:** Thursday, May 9, 2019 at 8:00 AM
**To:** Michael Tafoya <mtafoya@trulytitle.com>
**Cc:** Mike Kirby <mkirby@trulytitle.com>
**Subject:** Re: Information request

Mike - happy to provide all information requested but some items provide more info than I would want to give a competitor in the event we don't get a deal done.  As I said before, to drill down deeper to offices/employees I would want a one year non-solicitation to let info get stale. I believe 2 years is the norm, but would be satisfied with one.

As to ownership:  Dan & Paige 62%, Steve, Tracie and Denise Smith 10% each and Brianne 8%. All property is leased.  Only one lease involves a separate entity owned by Providence owners and some employees.  As to EO's, do you want assistants, too, or only closers?

Sent from my iPad

On May 8, 2019, at 2:41 PM, Michael Tafoya <mtafoya@trulytitle.com> wrote:

Good afternoon Dan,

There is great interest from our board of directors, however there was some information we would like obtain prior to issuing an LOI.

Please find attached the information requested.

Looking forward to your response.

**Mike**


**Michael J Tafoya**
Chief Executive Officer
Truly Title, Inc.
O (972) 268-7943 M (307) 699-9938Toll Free: (844) 4UTRULY
www.trulytitle.com | mtafoya@trulytitle.com
<image001.jpg>


Attention: Beware of cyber-crime! If you receive an e-mail or any other communication that appears to be generated from a Truly Title, Inc. employee that contains new, revised or altered bank wire instructions, consider it suspect and call our office at a number you trust. Our wire instructions do not change.

This email and all attachments, hereinafter referred to as "message", may contain confidential, proprietary or legally privileged information intended only for the recipient(s) as named and identified above. If you are not an intended recipient, you are hereby notified that reading, disseminating, distributing or copying this message is strictly prohibited. If you have received this message by mistake, please immediately notify us by replying to the message, and then promptly delete and destroy this message and all copies, in whatever form. Thank you for your consideration.

<pre-LOI Due Diligence Request 1.2.pdf>

# EXHIBIT 5

## MUTUAL NON-DISCLOSURE AGREEMENT

This Mutual Non-Disclosure Agreement ("Agreement") dated April 25, 2019 (the "Effective Date"), is between **Truly Title, Inc., a Wyoming Corporation** ("TRULY") with principal offices at 2901 N Dallas Parkway, Suite 130, Plano, TX 75093 and **Providence Title**, a Texas corporation ("PT"), with principal offices located at 5001 US Hwy 287 S, Suite 105, Arlington TX 76017.

### RECITALS

**WHEREAS**, PT and TRULY have agreed to enter into certain discussions regarding the potential acquisition of PT, and related possibilities (the "Transaction");

**WHEREAS**, the parties will disclose certain information and documentation that is non-public, confidential and/or proprietary in nature during discussions regarding the Transaction;

**THEREFORE**, in consideration of the mutual covenants, agreements, and representations made and contained herein, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereby agree as follows.

This Agreement is subject to the attached terms and conditions and supersedes all prior representations, understandings or agreements between the parties with respect to the subject matter hereof.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date.

Providence Title

By: _____

Printed Name _Dan Foster_

Title _CEO_

Truly Title, Inc.

By: _____

Michael J Tafoya

CEO

Address for legal notice:

Providence Title
5001 US Hwy 287 S, Suite 105
Arlington TX 76017
ATTN:  General Counsel

Truly Title, Inc.
2901 N Dallas Parkway, Suite 130
Plano, TX 75093
ATTN: Michael Tafoya

Confidential – Mutual NDA – Providence Title

# TERMS AND CONDITIONS

# FOR MUTUAL NON-DISCLOSURE AGREEMENT

For the purpose of this Agreement, the "Discloser" is the party disclosing its Confidential Information and the "Recipient" is the party receiving and/or accessing such Confidential Information, or any of their respective employees, shareholders, agents, attorneys, accountants, affiliates or subsidiaries.

1. <u>Confidential Information.</u>  Any information, whether electronic, oral or written, that is furnished, released or otherwise made available by one party to the other, whether intentionally or unintentionally, which relates to the Transaction or the Discloser's business affairs is "Confidential Information".  Confidential Information is proprietary and confidential to the Discloser and shall be used by the Recipient only for purposes of furthering the Transaction in accordance with the terms of this Agreement. Confidential Information includes, without limitation: technical specifications and operating manuals; information relating to and descriptions of current, future, or proposed products and services; financial information; information related to mergers or acquisitions; passwords and security procedures; computer programs, software, and software documentation; customer information and/or prospective client lists; employee information; records; policies and standards; and trade secrets.

2. <u>Consumer Information.</u> If and to the extent any Confidential Information consists of nonpublic personal information as defined under the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 *et seq.* (1999),  or consumer reports, as defined at 15 U.S.C. § 1681a, then such information, both collectively and individually, will be considered "Consumer Information" and will be protected, used and disposed of in accordance with Exhibit A, attached hereto and incorporated herewith. To the extent any provision of Exhibit A exceeds or conflicts with the provisions of these Terms and Conditions, the provisions of Exhibit A will control.

3. <u>Protection and Use of Confidential Information.</u>  Recipient agrees to protect the Confidential Information of Discloser with the same degree of care that it uses to protect its own confidential information, but in no event, less than a reasonable standard of care. Recipient will only use Confidential Information to advance or enable the Transaction in a manner agreed upon by the Parties. If Recipient receives Confidential Information that is unrelated to the Transaction or disclosed inadvertently, Recipient will not use such Confidential Information for any purpose. Recipient will not disclose, release, or otherwise make available to any third party, any Confidential Information of the Discloser except where necessary to further the Transaction or under those circumstances defined in Section 4 below.   In the event Recipient provides Confidential Information to any third party, Recipient will ensure that such third party is fully aware of these confidentiality obligations and will direct their full compliance with them. Recipient will remain fully responsible for any disclosure of Confidential Information or any violation of these confidentiality obligations by its third-party recipients. Recipient agrees that it shall not make copies of the Confidential Information except as necessary for the Transaction and will not incorporate the content or substance of Confidential Information onto any other media.  All copies made, in any medium whatsoever, shall retain all confidential and proprietary markings of the original and shall be covered by the terms and conditions of this Agreement.

4. <u>Disclosure.</u>   The confidentiality obligations imposed under this Agreement will not restrict disclosure of Confidential Information where the Recipient can demonstrate that such Confidential Information: (a) was or becomes generally available to the public (other than through unauthorized disclosure by the Recipient but this exclusion does not apply to Consumer Information); (b) becomes available to the Recipient from a third-party source other than the Discloser, provided that such third-party source is not itself bound by an obligation of confidentiality or otherwise prohibited from disclosing such Confidential Information by a legal, contractual or fiduciary obligation to the Discloser; (c) was rightfully in the Recipient's possession prior to receipt from the Discloser; (d) is independently developed by the Recipient prior to receiving such Confidential Information hereunder and without breach of this Agreement or any of the Discloser's proprietary rights; or (e) is required to be disclosed (i) under an order from a court, administrative agency, or governmental body; (ii) by subpoena or other legal process; (iii) by law or regulation; or (iv) by demand of auditors, examiners or regulators who are under a duty of confidentiality. If Confidential Information is required to be disclosed by the Recipient under subsection 4(e) above, such Confidential Information may be disclosed pursuant to such requirement so long as the Recipient provides the Discloser with written notice of the required disclosure promptly upon receipt of notice of the required disclosure, to the extent such notice is permitted by law, and coordinates with the Discloser in an effort to limit the nature and scope of such required disclosure.

5.  <u>Remedy</u>.  Each party acknowledges and agrees that any breach or threatened breach of any of the provisions of this Agreement may result in immediate and irreparable harm and that remedies at law in such event may be inadequate. Upon any actual or threatened violation of this Agreement by the Recipient, the Discloser will have the right to terminate this Agreement immediately and/or seek injunctive relief to restrain such disclosure or use, in addition to any other rights or remedies which the Discloser may have at law or in equity. The prevailing party in any suit at law or equity commenced pursuant to this Agreement shall be entitled to recover reasonable costs and expenses of prosecuting or defending suit, including attorneys' fees and court costs, from the non-prevailing party.

6.  <u>Ownership</u>.  All Confidential Information and will remain the property of Discloser. By disclosing the Confidential Information, Discloser does not grant any express or implied license or other rights to or under its copyrights, trademarks, trade secrets or other proprietary rights.

7.  <u>No Representations or Warranties</u>.  Discloser makes no warranty, express or implied, as to the accuracy or completeness of the Confidential Information disclosed to the Recipient hereunder. Discloser shall not be liable to Recipient due to Recipient's use of any Confidential Information. Unless otherwise specified in writing and duly authorized, any proposals, estimates or forecasts provided by either party to the other are merely informative in nature, shall not constitute commitments or offers, are subject to change, and shall not be relied upon.

8.  <u>Securities Laws</u>.  Each party hereto acknowledges that it is aware that U.S. securities laws, subject to certain limited exceptions, prohibit any person who has received material, non-public information about a company from purchasing or selling securities of such company or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities on the basis of such information.

9.  <u>Term and Termination</u>.  The term of this Agreement will commence on the Effective Date as stated above and will remain in force through the second (2nd) anniversary of the Effective Date, unless terminated in accordance with provisions of the Agreement. Either party may terminate this Agreement at any time upon ten (10) days' prior written notice to the other party. With respect to any particular Confidential Information (except for Consumer Information which will continue to be controlled by Exhibit A), the Recipient's obligations under this Agreement will expire two (2) years after the Recipient's receipt of that Confidential Information unless sooner terminated or superseded by mutual agreement of the parties.

10. <u>Right to Terminate Discussions</u>.  The provision of Confidential Information and discussions held in connection with the Transaction will not prevent either party from pursuing similar discussions or transactions with third parties or obligate either party to continue discussions with the other party or to take, continue or forego any action relating to the Transaction.  Either party may terminate discussions regarding the Transaction at any time, without any liability or obligation whatsoever, except as expressly set forth in this Agreement.

11. <u>No Announcement</u>.  Neither party will make or issue, or cause to be made or issued, any announcement or statement regarding activities under this Agreement for dissemination to the general public or any third party without the prior written consent of the other party.

12. <u>No Joint Venture</u>.  This Agreement is not intended to and shall not be construed as creating a joint venture, partnership, or other form of business association between the parties.  Neither party shall have the power or authority to bind or obligate the other party.

13. <u>Governing Law</u>.  This Agreement will be governed by and construed in accordance with the laws of the Texas, without regard to any principles of conflicts of law.

14. <u>Only Agreement</u>.  This Agreement constitutes the entire and exclusive statement of the agreement between the Parties with respect to the confidentiality of information provided in connection with the Transaction.

15. <u>Notices</u>.  Any notices required or permitted hereunder will be in writing and sent to a party at the address for legal notices for such party set forth on page one above (or to such other address of which either party may notify the other in a notice that complies with the provision of this section).  Notices shall be effective upon receipt and shall be sent (i) by private carrier or reputable overnight carrier with package tracing capability; (ii) by personal service; or (iii) by registered or certified mail, postage prepaid, return receipt requested.

16. <u>No Waiver</u>.  No waiver of any provision of this Agreement will be valid unless such waiver is in writing and signed by the party against whom it is sought to be enforced.  No waiver at any time of any provision of this Agreement will be deemed to be a waiver of any other provision of this Agreement.

Confidential – Mutual NDA – Providence Title

17. <u>Invalidity, Assignment, and Modification</u>.  If any provision of this Agreement is held for any reason to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability will not affect any other provisions of this Agreement and this Agreement will be construed as if such invalid, illegal or unenforceable provision had not been contained herein. This Agreement will be binding on TRULY and Client and their successors and permitted assigns.  Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party.  This Agreement may be modified only by a written instrument executed by TRULY and Client.

18. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together constitute one and the same instrument. For purposes hereof, a facsimile copy of this Agreement, including signature pages hereto, will be deemed to be an original.

### END OF TERMS AND CONDITIONS

Confidential – Mutual NDA – Providence Title

**Exhibit A**
**To Mutual Non-Disclosure Agreement**

**Consumer Information Confidentiality, Security, and Disposal Requirements**

This Exhibit A to the Mutual Non-Disclosure Agreement sets forth the confidentiality, security and disposal requirements for Consumer Information that is furnished to TRULY by Client or that TRULY accesses in connection with the Transaction, regardless of whether such information is in paper, electronic, digital, or other form.

**Confidentiality**
Consumer Information will remain the property of Client. TRULY will not provide Consumer Information in any form to any third party (including any employees, consultants, subcontractors, agents and representatives that are performing on behalf of TRULY under this Agreement) without Client's prior written consent and TRULY will remain fully responsible for any such disclosure.  Consumer Information will not be: (i) used by TRULY other than as necessary to further the purposes of the Transaction; (ii) sold, assigned, or otherwise provided to third parties by TRULY; or (iii) commercially exploited by or on behalf of TRULY.

**Security**
TRULY will maintain safeguards and take all measures necessary to achieve the following objectives (i) ensure the security and confidentiality of Consumer Information, (ii) protect against any anticipated threats or hazards to the security or integrity of Consumer Information, and (iii) protect against unauthorized access to or use of Consumer Information that could result in substantial harm or inconvenience to any customer. Upon written request, TRULY will provide Client with all information that Client reasonably requests regarding its compliance with the above security measures, including, but not limited to, where and how Consumer Information is stored, who has access to Consumer Information and why, and what security measures are taken to ensure that Consumer Information is protected from unauthorized access, alteration, disclosure, erasure, manipulation, and destruction while in the possession or under the control of TRULY.  In the event of any unauthorized or inadvertent release of Consumer Information, or any malicious activity that threatens the security of Consumer Information in TRULY's possession, TRULY shall immediately notify Client of said release or malicious activity and provide all other relevant information. The Parties shall work together and use best efforts to remedy the situation and prevent any further security threat.

**Disposal**

Upon the earlier of Client's request or termination of this Agreement, TRULY will return Consumer Information to Client or destroy it as instructed by Client. If Client directs TRULY to destroy the records and files containing Consumer Information, all such paper records will be shredded or otherwise destroyed in a manner that renders them unreadable and unable to be reconstructed.  All such electronic or digital records and files will be erased or otherwise rendered unreadable in a way that prevents the records and files from being practicably read or reconstructed, and any associated residual or archival data must also be destroyed. TRULY will promptly confirm the destruction of said records and files to Client in writing. Upon request, TRULY will provide Client all information that Client reasonably requests regarding the disposal of records and files containing Consumer Information, including, but not limited to, such portions of the TRULY's information security policies and procedures as TRULY can provide without compromising the security of Consumer Information. TRULY will cause its employees, consultants, subcontractors, agents, and representatives to comply with the provisions of this Agreement. TRULY accepts Client's right to terminate this Agreement and all services from TRULY immediately without notice if TRULY is found in violation of this Exhibit A or privacy or data protection laws.

Confidential – Mutual NDA – Providence Title

# EXHIBIT 6

# Standards of Conduct Policy

## Purpose

The Standards of Conduct Policy is designed to detect and prevent unethical conduct and violations of laws/regulations at Providence Title.

## Policy

All Providence Title employees are responsible for following the standards defined in this document.

## Attendance

Each employee is required to be present and ready to work on time from the start to the end of each workday, according to his or her work schedule assigned by management. If an employee is unable to report to work for any reason, he or she is required to inform the manager or designee no later than 30 minutes from the commencement of the scheduled start time, unless otherwise directed by management. An employee must also notify the manager or designee as soon as possible if he or she needs to leave for any reason before the conclusion of the scheduled workday.

If an employee fails to report to work without proper notice for 3 consecutive scheduled workdays, Providence Title will presume the employee has voluntarily resigned and the employee will be terminated from employment, unless state or local law defines a longer period prior to termination.

## Attire and Personal Representation

All Providence Title locations observe a business casual dress code unless otherwise directed by management. With appropriate notice, professional business attire may be required (for example, for special events or customer meetings). Employee attire must project an appropriate image for conducting business with customers. Management reserves the right to determine the appropriateness of the attire and personal representation.

Each employee must maintain proper hygiene and utilize good judgment in determining dress and appearance. If an employee's personal representation poses an issue (for example, inappropriate attire, body odor, or offensive perfume/cologne), management may address the concerns with the employee. If an employee is asked to leave work to address a personal representation issue, time lost is not considered paid work time.

## Confidentiality

Each employee is responsible for using his or her best judgment to safeguard and manage confidential information at all times. Examples of appropriate behavior related to protecting confidential information include, but are not limited to

- Only disclosing confidential information to individuals with an authorized business need for access (for example, to perform job responsibilities)
- Holding conversations including sensitive information in enclosed areas
- Using sealed envelopes to mail confidential information with acknowledgement of receipt requested
- Disposing of confidential information through appropriate method (for example, shredding printed documents and wiping computer media) when no longer needed to support operations and/or to meet state, legal, or tax requirements

## Discrimination

Each employee is required to abide by all state and federal equal employment opportunity regulations.

Providence Title                                    Standards of Conduct Policy

## Harassment

Harassment is prohibited and will not be tolerated in the workplace or in any work-related setting including, but not limited to

- Business trips
- Business meetings
- Business-related social events

Harassment may consist of conduct including, but not limited to verbal, non-verbal, or physical conduct designed to threaten, intimidate, or coerce other employees to the extent that the conduct is regarded as unwelcome, impairs the employee's ability to perform his or her job, or creates a hostile work environment. Examples of harassing conduct include offensive epithets; slurs or negative stereotyping; threatening, intimidating, or hostile acts; and jokes or written/graphic material that denigrates or shows hostility or dislike toward an individual or group.

## Sexual Harassment

It is against Providence Title policy for any employee, male or female, to sexually harass another employee by making unwelcome sexual advances or making sexual favors or other verbal or physical conduct of a sexual nature as a condition of an employee's continued employment; making submission to or rejections of such conduct the basis for employment decisions affecting the employee; or creating an intimidating, hostile, or offensive work environment by such conduct.

## Misconduct

Violation of any policy at Providence Title (whether stated herein or provided elsewhere by Providence Title) is considered misconduct. Although it is impossible to identify every possible instance of misconduct, the following is a partial list of infractions that Providence Title considers misconduct:

- Unprofessional or otherwise inappropriate behavior
- Falsification of any documentation required for employment including, but not limited to, employment applications and time reporting records (one's own or another's)
- Theft, fraud, gambling, or carrying prohibited weapons or explosives as defined in the Weapons section of this document, or violation of criminal laws on company premises
- Interfering with the performance of fellow employees
- Falsification of any claims of inappropriate conduct
- Insubordination or refusal to comply with instructions or failure to perform reasonable duties as assigned
- Excessive unauthorized absenteeism or abuse of attendance, paid time off, or leave of absences
- Unauthorized or improper use of business expenses (for example, reimbursement or Providence Title -issued purchasing card)
- Failure to adhere to any rules designated by management regarding pets (other than service animals), dependents, or other visitors in the work place
- Impersonation of any person or entity including, but not limited to, a Providence Title employee or officer, or false statement or misrepresentation of an affiliation with a person or entity
- Representation of personal opinions as those of Providence Title or purporting to represent Providence Title without explicit authorization
- Failure to comply with Providence Title  procedures or standards

## Retaliation

An employee may not retaliate or attempt to retaliate against an employee who has, or who is associated with an employee who has

- Reported a suspected or alleged misuse of company property or assets at Providence Title

Providence Title                                    Standards of Conduct Policy

- Appeared as a witness, cooperated in, acted as investigator, or otherwise supported the investigation of any complaint against the company
- Filed or made a good faith complaint of alleged discrimination, harassment, sexual harassment, or violations of other federal, state, or local laws

## Reporting Incidents and Potential Violations

Providence Title encourages the reporting of all perceived incidents of discrimination, harassment, misconduct, or retaliation, regardless of the offender's identity or position. All reports of suspected incidents shall be taken seriously and investigated. To the extent practicable, Providence Title will keep reports confidential; however, absolute confidentiality is not promised and cannot be assured.

Any employee or other individual who believes he or she has been subjected to, witnessed, or made aware of discrimination, harassment, sexual harassment, misconduct, or retaliation should immediately report the incident to management. Complaints may be anonymous, if so preferred; however, if the reporting person is not identified, the Providence Title might not be able to respond appropriately to the reported concern. There is no penalty for reporting an alleged incident in good faith.

Any employee who has been found by the Providence Title to have engaged in conduct inconsistent with policy will be subject to disciplinary and/or legal actions, up to and including termination.

## Media Inquiries and Press Releases

Requests from media outlets should be immediately forwarded to the management. Under management discretion, officers of the company may have a direct relationship with local publications about positive community issues, articles, and advertisements where employees have assurance that adverse issues, claims, or investigations of the company or the closing or real estate industries are not involved.

All press releases must be managed by Providence Title and approved by the appropriate parties. All information released to the public must meet the standards for Providence Title strategies, management philosophies, style, and material concerns.

## Outside Employment

Outside employment requires prior written management approval. Outside employment must not interfere with job performance or efficiency, involve the use of Providence Title resources or time, pose a conflict of interest, or in any way harm the business or reputation of Providence Title.

## Security, Access, and Identification

Access needs for each employee are determined by management. If provided, employees are required to wear security badges while on work premises for identification and/or access purposes. Employees must follow any precautions provided to ensure security badges and Providence Title keys are protected and secure at all times. Where available, access may be monitored by card readers, video cameras, or other monitoring devices.

## Smoking

Smoking is not allowed in any Providence Title buildings. Employees may only smoke in designated areas and must adhere to local and state regulations regarding smoking.

## Social Media

While using social media outlets during or outside of work hours and on Providence Title or non-Providence Title equipment, employees must comply with all Providence Title policies.

Providence Title                                              Standards of Conduct Policy

These actions are permitted only with explicit prior written permission from management and Providence Title Marketing:

- Maintaining or posting social media content that implies Providence Title sponsorship or support
- Using Providence Title time, facilities, resources, or supplies to maintain or post content to social media outlets
- Maintaining or posting any logos or trademarks of Providence Title or related entities on social media outlets

Actions of prohibited behaviors related to the use of social media include, but are not limited to:

- Concealing or attempting to conceal one's identity, such as through the use of an alias, while making any reference to Providence Title, its Officers, members of the Board of Directors, related entities, employees, or clients
- Expressing views on behalf of Providence Title, unless the content is provided verbatim from materials approved by the Providence Title for that purpose

Management reserves the right to require an employee to cease maintaining or posting to any social media outlet containing content in any way associated with Providence Title that it deems inappropriate.

## Solicitation

An employee may not solicit for personal causes or events or distribute non-work-related information during work time or using company resources without prior management approval. Each employee should avoid making any other employee feel uncomfortable or compelled to participate or contribute through solicitation, and no employee should feel obligated to participate in these efforts. In addition, information posted on Providence Title bulletin boards, including electronic bulletins, must be of interest to the workplace, appropriate, limited to designated areas, and approved by management.

## Phone and Mobile Device Usage

Each employee must limit phone usage for personal reasons (for example, calling, texting, emailing, and Web browsing) during working hours and comply with all applicable rules established by management. Whenever possible, personal use should be restricted to meal or rest periods. On work premises, disruptive ringers that may be overheard by customers or employees must not be used and professionalism must be maintained while on calls. Using Providence Title landlines to make personal long-distances calls is prohibited.

While driving a vehicle, employees are discouraged from using a mobile device (for example, calling, texting, emailing, and Web browsing) to conduct Providence Title business, and are responsible for using their best judgment in compliance with state and local laws. For safety reasons, an employee should pull off the road to a safe location before taking or making a call, retrieving or sending messages, and reading or responding to e-mails.

## Camera and Video Recorder Usage

In restricted-access or other areas where there is an expectation of privacy (such as restrooms), every employee is prohibited from using a camera or video recorder including those available as mobile phone features. Unauthorized or unwelcome recording or photography of any Providence Title business, information or individuals is prohibited on work premises or work events.

Video cameras may be operated on work premises to help ensure the safety and security of individuals and business operations.

## Weapons

Consistent with applicable law, every employee is prohibited from carrying a weapon during the course of performing their jobs, whether or not they are on Providence Title property. This applies even if

Providence Title                                          Standards of Conduct Policy

employees are licensed to carry a handgun. Furthermore, this policy prohibits weapons at any company-sponsored function such as a party or picnic.

With approval of the highest ranking official of Providence Title, management may grant an exception to an employee to carry a weapon while working.

Any form of weapon or explosive restricted under federal, state, or local law is prohibited. Where required by law, Providence Title permits storage of firearms in personal vehicles.

An employee should contact his or her manager or Providence Title Human Resources with any questions about whether an item is considered a weapon under this policy. An employee is expected to verify ahead of time that an item is not defined as a weapon under this policy before having it in his or her possession while working, and the employee is solely responsible for any prohibited item.

## Violation of Policy

Failure to adhere to all requirements stipulated in this policy and all related documents may result in disciplinary actions, up to and including

- Immediate removal of any applicable hardware/software/access to the Providence Title computer network or business systems
- Formally reporting the incident to Providence Title Advisory Team.
- Termination of employment
- Any other action deemed necessary by Providence Title Advisory Team.

## Review

Providence Title  has voluntarily adopted this policy for its sole and exclusive use. This policy and all related documents will be reviewed annually or as needed based on prevailing business conditions.

## Approved

Dan Foster, CEO

John Kulasa, President

## Revision History

| Version Number | Revised Date | Effective Date | Approved By | Brief Change Summary |
|---|---|---|---|---|
| 1 | 11/24/15 | 11/24/15 | T. Fleming | |
| | | | | |
| | | | | |

EXHIBIT 7

# Anti-Fraud/Corruption Policy

## Purpose

This document establishes the corporate policy and standards for ensuring the highest ethical standards at Providence Title by providing a corporate framework aimed at the prevention, detection, and mitigation of known or suspected fraud, corruption, or related misconduct.

## Policy

Fraud and corruption will not be tolerated by Providence Title employees either within the company or in conjunction with, or targeted towards Providence Title employees, customers, partners, suppliers, or vendors.

All complaints of suspected fraudulent behavior will be investigated.

Every effort will be made to ensure appropriate accountability for business processes and when fraud/corruption is suspected or detected, sufficient resources shall be employed to gather evidence to support disciplinary action, prosecution, and/or the recovery of losses and costs wherever possible.

## Definitions

**Corruption**—Activity in which someone acts in an official capacity, contrary to the interests of their sponsoring company/organization, for personal gain or for some form of improper gain/advantage for someone else.

**Fraud**—Knowingly using false statements of fact with the intent to deceive resulting in financial or personal gain or damage to another individual or organization. The theft of property belonging to Providence Title, a person, or persons internal to the company, but where deception is not used is also considered *fraud* for the purposes of this policy.

The terms *fraud* and *corruption* are not restricted to monetary or material benefits.

## Risk Assessments

On an as-needed, but no less than annual basis, the Providence Title Advisory Team, in consultation with Providence Title department managers, will generate a report reviewing the effectiveness of the policy concerning the company's susceptibility to fraudulent and/or deceptive practices.

## Responsibilities

All Providence Title employees have a responsibility to

- Understand and apply all fraud-related policies/procedures
- Assist with the prevention and detection of fraud, corruption, or related misconduct
- Report suspected fraud, corruption, or related misconduct

## Preventative Measures

Fraud prevention accounting procedures must be developed and maintained in relation to all escrow account reconciliations, cash management, credit card usage, and commercial transactions.

Fraud prevention/awareness strategies shall include, but are not limited to

- Requiring background checks for applicants where required by the duties of a particular position
- Contacting employment references
- Checking/verifying transcripts, qualifications, and other certification documentation

Providence Title                                           Anti-Fraud/Corruption Policy

- Requiring on-boarding and continuing training/staff development on
  - Fraud prevention and detection
  - The protection of non-public personal information (NPPI)
  - Ethics
- Requiring vendors/contractors to abide by all Providence Title fraud-related policies/procedures

## Detection and Reporting

Providence Title will cooperate with the police and/or appropriate governmental agencies in any investigation of suspected fraud or corruption. Irrespective of any police investigation or action, Providence Title management will form its own view under employment law as to what actions might be appropriate for those involved in the fraud or related misconduct.

All reports for suspected fraud, corruption or related misconduct should be made in good faith. Retaliation and retribution will not be tolerated against any employee who reports suspected fraudulent or corrupt activities. Persons who make reports which are malicious, knowingly false, or unjustly likely to damage the reputation of another may face disciplinary action.

## Violation of Policy

Failure to adhere to all requirements stipulated in this policy and all related documents may result in disciplinary actions, up to and including

- Immediate removal of any applicable hardware/software/access to the Providence Title computer network or business systems
- Formally reporting the incident to the Advisory Team.
- Termination of employment
- Any other action deemed necessary by the Advisory Team.

## Review

Providence Title has voluntarily adopted this policy for its sole and exclusive use. This policy and all related documents will be reviewed annually or as needed based on prevailing business conditions.

## Approved

Dan Foster, CEO

John Kulasa, President

## Revision History

| Version Number | Revised Date | Effective Date | Approved By | Brief Change Summary |
|---|---|---|---|---|
| 1 | 11/24/15 | 11/24/15 | T. Fleming | |
| | | | | |
| | | | | |

# EXHIBIT 8

Providence Title                                        Acknowledgment

# Acknowledgment

I acknowledge that I have read the documents listed below.

*Tracie Fleming*                                          2·19·16

Printed Name                    Signature                    Date

Account Management Policy

Anti-Fraud Corruption Policy

Anti-Virus Malware Policy

Application Security Policy

Background Investigations Policy

Backup and Media Retention Policy

Business Continuity Policy

Customer Complaint Policy

Data Retention Policy

External Audits Policy

Fair Housing Compliance Policy

Foreign Corrupt Practices Act – Offshore Tasks Policy

Instant Messaging Policy

IT Security and Computer Usage Policy

Managing Exceptions Policy

Mobile Devices Policy

Non-Public Information Security and Disposal Policy

Notary Services Policy

Password Policy

Privacy and Information Security Audit and Oversight Policy

Remote Access Policy

Security Incident Response Policy

Security Training and Awareness Policy

Social Media Policy

Standards of Conduct Policy

Title Insurance and Settlement Services Policy

EXHIBIT 9

Providence Title                                              Acknowledgment

# Acknowledgment

I acknowledge that I have read the documents listed below.

_Mark Fleming_                _[signature]_                11-30-16
Printed Name                  Signature                   Date

Account Management Policy
Anti-Fraud Corruption Policy
Anti-Virus Malware Policy
Application Security Policy
Background Investigations Policy
Backup and Media Retention Policy
Business Continuity Policy
Customer Complaint Policy
Data Retention Policy
External Audits Policy
Fair Housing Compliance Policy
Foreign Corrupt Practices Act -- Offshore Tasks Policy
Instant Messaging Policy
IT Security and Computer Usage Policy
Managing Exceptions Policy
Mobile Devices Policy
Non-Public Information Security and Disposal Policy
Notary Services Policy
Password Policy
Privacy and Information Security Audit and Oversight Policy
Remote Access Policy
Security Incident Response Policy
Security Training and Awareness Policy
Social Media Policy
Standards of Conduct Policy
Title Insurance and Settlement Services Policy

EXHIBIT 10

February 3, 2021

Dan Foster, Paige Foster, Steve Ramsey, Brianne J. Woltmann and Daniel Foster Jr.
Via Email Only

Re: Resignation

Dan, Paige, Steve, Brianne and Daniel:

This letter is to inform you of my resignation from Providence Title, effective February 3, 2021. I appreciate everything each of you have done for me over the years, however the time has come for me to move on.

Due to the complexity of unwinding my ownership interests across Providence Title, Cobalt Real Estate Tax Solutions, and Providence Houston Place, I have asked Justin Rader to handle all the negotiations for me. You can reach him at 817-933-0044 or justinrader@gmail.com.

I have left all Providence Title property in my office and/or Mark's office on Johnson Avenue. I am happy to schedule a time that works for everyone to clean out the personal possessions in my office.

My forwarding address, should you need it, is below:

Tracie Fleming
221 Sherry Lane
Burleson, Texas 76028

Tracie Fleming

EXHIBIT 11

| | |
|---|---|
| **From:** | Mark Fleming |
| **To:** | Patty Ash |
| **Subject:** | Resignation |
| **Date:** | Wednesday, February 3, 2021 4:51:48 PM |

Patty,

I am resigning my position with Providence Title effective immediately. I appreciate the opportunity I have been given to work here and I wish everyone the very best. My keys to all of the offices will be left on the desk here at Johnson Avenue.

**\*\*Our Offices will be closed on Monday February 15th in observance of President's Day\*\***

**Mark Fleming**
Johnson County Area Team Lead

C: 817-308-9302 | T: 817-289-2500 | F: 817-289-2501
mfleming@protitletx.com





615 SW Johnson Avenue
Burleson, TX 76028
protitletx.com | Facebook | Twitter

**IMPORTANT REQUIREMENT:**  In accordance with local ordinance, Providence Title requires the use of a face mask or cloth covering.  We also ask that you continue to practice social distancing when possible.
**IMPORTANT NOTICE:**  While continuing to offer the same great level of service, additional cleaning and distancing measures remain in effect for the health and safety of our team members, customers, and partners.

### BEWARE OF CYBER-FRAUD
*WARNING – FRAUDULENT FUNDING INSTRUCTIONS – Email hacking and fraud are on the rise to fraudulently misdirect funds. Please call your Escrow Officer immediately using contact information found from an independent source, such as the sales contract or internet, to verify any funding instructions received. We are not responsible for any wires sent by you to an incorrect bank account.*
Please be advised that wiring instructions may also be confirmed or provided in person at your local Providence Title branch.
This communication, including attachments, is for the exclusive use of addressee and may contain proprietary, confidential or privileged information. If you are not the intended

# EXHIBIT 12

2/18/2021
Truly Title, Inc: People | LinkedIn

 Search

 Home |  My Network |  Jobs |  Messaging |  Notifications | Me ▾ | Work ▾   Try Premiu for 1 M

Truly Title, Inc

More | Visit website ☑ | Follow

**Home** | **About** | **Posts** | **Jobs** | **People**




more effectively

Discover the right solution for you business.

Learn more

## Truly Title, Inc

Not all title and closing services are equal...there is Truly a difference.

Financial Services · Plano, Texas · 427 followers

See all 47 employees on LinkedIn

Follow | Visit website ☑ | More

**Home** | **About** | **Posts** | **Jobs** | **People**

## 47 employees

Search employees by title, keyword or school

‹ Previous   Next ›

### Where they live    + Add

48 | United States

25 | Dallas/Fort Worth Area

13 | Greater Salt Lake City Area

3 | West Palm Beach, Florida Area

### Where they studied    + Add

3 | University of Utah

2 | Tarleton State University

2 | Brigham Young University

1 | University of Arizona

Show more ⌄

### People you may know



**Josh Liszewski, ...** · 3rd
SVP/Texas Counsel/Escrow Manager

Connect



**Tracie Fleming, ...** · 3rd
Executive Vice President -Texas

Message

**Keisha Tolbert** · 3rd
VP, Escrow Officer at Truly Title, Inc

Connect

 Messaging

🔍 Search messages

 T-Mobile For Business
Sponsored · Stay in the kno...

 Beth Drake-Koelbel
Beth: Scott, I hope you are d...

 Scott Hammel, CFP® C...
Scott Hammel,: I never heard ...

 Eric Chung
Eric: Thanks for connecting during...

 Jodie Slater Hastings
Jodie sent an update

 Jeffrey Patterson
Jeffrey: I reached out last week, I...

 Greg Scheig
Greg: Scott- It has been a while si...

Sean Luner
Sean: Scott, Congratulations in yo...

Andrew Ragavanis
Andrew: I am a Partner Recru...

Ethan Shaw, Esq.
Ethan: Scott, I am just followi...

Geoff Scollard
Geoff: Hi Scott, I'm reaching ...

  



in   🔍 Search                    Home   My Network   Jobs   Messaging   Notifications   Me   Work   Try Premium for 1 M…

Truly Title, Inc

                                          More   Visit website 🗗   Follow

Home    About    Posts    Jobs    People

President at Truly Title Texas       Administrative Assistant at Truly    Escrow Assistant, Notary Public at
                                     Title, Inc                           Truly Title
                                      1 shared connection    1 shared connection

[ Message ]                          [ Connect ]                          [ Connect ]

                                  

**Mike Kirby** · 3rd                 **Claire Hanks** · 3rd               **Mark Fleming** · 3rd
President at Truly Title, Inc.       Truly Title, Inc. · Vice President of   Senior Vice President at Truly Title,
                                     Texas Operations                     Inc

[ Message ]                          [ Message ]                          [ Message ]

                                  

**Luisa Ayala** · 3rd                **Michael Tafoya** · 3rd             **Rob Wahlen** · 3rd
Bilingual Escrow Officer at Truly    Chief Executive Officer/ Founder /   President at Truly Title, Inc.,
Title, Inc                           Director of Dream Fulfillment a…     m:312/543-3611

[ Connect ]                          [ Message ]                          [ Message ]

 Messaging   5

🔍 Search messages

 T-Mobile For Business
Sponsored · Stay in the kno…

 Beth Drake-Koelbel
Beth: Scott, I hope you are d…

 Scott Hammel, CFP® C…
Scott Hammel,: I never heard …

 Eric Chung
Eric: Thanks for connecting during…

 Jodie Slater Hastings
Jodie sent an update

Jeffrey Patterson
Jeffrey: I reached out last week, I…

Greg Scheig
Greg: Scott- It has been a while si…

Sean Luner
Sean: Scott, Congratulations in yo…

Andrew Ragavanis
Andrew: I am a Partner Recru…

Ethan Shaw, Esq.
Ethan: Scott, I am just followi…

Geoff Scollard
Geoff: Hi Scott, I'm reaching …

                                 

**Lisa Almaguer** · 3rd             **Danya Peden** · 3rd                **Crystal Bond** · 3rd
SVP Multicultural Markets/ Sr.      Vice President | Branch Manager |    President, Utah at Truly Title, Inc
Escrow Officer/ Bilingual           Escrow Officer at Truly Title, Inc

[ Message ]                          [ Message ]                          [ Message ]

               

**Susan Podsednik** · 3rd           **Kerri Damone** · 3rd               **Ray Byrns** · 3rd
Vice President/Sales Executive      Vice President at Truly Title, Inc   Vice President of Sales at Truly
                                                                         Title, Inc

[ Message ]                          [ Connect ]                          [ Message ]

2/18/2021                                    Truly Title, Inc: People | LinkedIn



in   🔍 Search                    Home   My Network   Jobs   Messaging   Notifications   Me        Try Premium
                                                                                                  for 1 M...

Truly Title, Inc                                        More    Visit website 🔗        Follow

Home    About    Posts    Jobs    **People**

**Kali Copeland** · 3rd          **Robin Hanks** · 3rd          **Navette Davis** · 3rd
VP/Sales Executive at Truly Title,   VP, Sales Executive at Truly Title    Escrow Assistant at Truly Title, Inc
Inc

[ Connect ]                      [ Message ]                    [ Message ]

                               

**Ed Houston** · 3rd             **Lupita Ortiz** · 3rd          **Mandy Zimmer...** · 3rd
We are hiring in the Chicago area,   Escrow Officer at Truly Title, Inc    Escrow Officer at Truly Title, Inc
Title Examiners, Escrow Closers...

[ Message ]                      [ Message ]                    [ Message ]

                               

**Stacie Ross** · 3rd            **Audrey Boudre...** · 3rd      **Luis Garcia** · 3rd
SVP|Branch Manager|Escrow         Senior Escrow Officer at Truly Title,   Escrow Assistant at Truly Title, Inc
Officer at Truly Title, Inc       Inc

[ Message ]                      [ Message ]                    [ Message ]

                             

**Jessica Fleming ...** · 3rd    **LinkedIn Member**             **Megan Williams** · 3rd
Escrow Officer at Truly Title, Inc   Sales and Marketing Associate at    Escrow Officer at Truly Title, Inc
                                  Truly Title, Inc

[ Message ]                                                      [ Message ]

                

**gentry brown** · 3rd           **Danielle Jarvis** · 3rd       **Ron Wells** · 3rd
Information Technology Specialist    Escrow Officer at Truly Title, Inc    Senior Software Developer,
at Truly Title, Inc                                                  Architect

 Messaging

🔍 Search messages                              ⚙

 T-Mobile For Business
        Sponsored · Stay in the kno...

 Beth Drake-Koelbel
        Beth: Scott, I hope you are d...

 Scott Hammel, CFP® C...
        Scott Hammel,: I never heard ...

 Eric Chung
        Eric: Thanks for connecting dur...

        Jodie Slater Hastings
        Jodie sent an update

        Jeffrey Patterson
        Jeffrey: I reached out last week, I ...

        Greg Scheig
        Greg: Scott- It has been a while si...

        Sean Luner
        Sean: Scott, Congratulations in yo...

        Andrew Ragavanis
        Andrew: I am a Partner Recru...

        Ethan Shaw, Esq.
        Ethan: Scott, I am just followi...

        Geoff Scollard
        Geoff: Hi Scott, I'm reaching ...

2/18/2021

Truly Title, Inc: People | LinkedIn



Truly Title, Inc

More    Visit website 🗗    Follow

Home    About    Posts    Jobs    **People**



**Crystal Keele** · 3rd
Branch Manager at Truly Title, Inc



**Rick Gates** · 3rd
Utah Sales Manager at Truly Title, Inc.



**Charity Laser** · 3rd
Utah Marketing Sales Manager at Truly Title, Inc

Message

Message

Message



**Jaelyn Simons** · 3rd
Escrow/Title Officer at Truly Title, Inc.

**Johnny Matusik** · 3rd
Texas Title Plant Supervisor at Truly Title, Inc



**Katie DeJong** · 3rd
Escrow Assistant at Truly Title, Inc

Message

Message

Message



**Shelley Jones** · 3rd
Title Agent/Sales Executive at Truly Title, Inc



**Bon Casas** · 3rd
Sales Executive at Truly Title, Inc



**Lesa McSwain** · 3rd
Escrow Assistant at Truly Title, Inc

Connect

Message

Connect



**Jacqueline Han...** · 3rd
Processor and Closer at Truly Title, Inc



**Natalie Summe...** · 3rd
Quantum Touch Practitoner at Energetic Essence



**Tiffany Jones** · 3rd
SoftPro Admin at Truly Title, Inc

Message

Message

Message







 Messaging

🔍 Search messages

 **T-Mobile For Business**
Sponsored · Stay in the kno...

 **Beth Drake-Koelbel**
Beth: Scott, I hope you are d...

 **Scott Hammel, CFP® C...**
Scott Hammel,: I never heard ...

 **Eric Chung**
Eric: Thanks for connecting during...

 **Jodie Slater Hastings**
Jodie sent an update

 **Jeffrey Patterson**
Jeffrey: I reached out last week, I...

 **Greg Scheig**
Greg: Scott- It has been a while si...

**Sean Luner**
Sean: Scott, Congratulations in yo...

**Andrew Ragavanis**
Andrew: I am a Partner Recru...

**Ethan Shaw, Esq.**
Ethan: Scott, I was just followi...

**Geoff Scollard**
Geoff: Hi Scott, I'm reaching ...

2/18/2021                              Truly Title, Inc: People | LinkedIn



in    🔍 Search              Home   My Network   Jobs   Messaging   Notifications   Me   Work    Try Premium for 1 M...

Truly Title, Inc                                          More    Visit website ⧉    Follow

Home    About    Posts    Jobs    People



Messaging

🔍 Search messages

**T-Mobile For Business**
Sponsored · Stay in the kno...

**Beth Drake-Koelbel**
Beth: Scott, I hope you are d...

**Scott Hammel, CFP® C...**
Scott Hammel: I never heard ...

**Eric Chung**
Eric: Thanks for connecting during...

**Jodie Slater Hastings**
Jodie sent an update

**Jeffrey Patterson**
Jeffrey: I reached out last week, I ...

**Greg Scheig**
Greg: Scott· It has been a while si...

**Sean Luner**
Sean: Scott, Congratulations in yo...

**Andrew Ragavanis**
Andrew: I am a Partner Recru...

**Ethan Shaw, Esq.**
Ethan: Scott, I am just followi...

**Geoff Scollard**
Geoff: Hi Scott, I'm reaching ...

# EXHIBIT 13

| From: | Brianne Woltmann |
| Sent: | Thursday, February 11, 2021 8:23 PM CST |
| To: | Advisory |
| Subject: | FW: Your Title Team has moved to Truly Title |

If you are interested to see it, this is the message that they are sending out to clients about the move.
Personally, I love that they made an error in the following sentence: "Your title team are here and ready to assist."


Hi!

We have changed title companies. We are now with Truly Title! Your title team are here and ready to assist. Same team, just new company!

Kim is TRULY excited to show you our app and FREE farming tool!

I have also included some examples of the marketing materials that we have!
You can also follow this link:  Truly Title and see all of the options currently available!
Or . .if you need something different, let me know! We can work to create materials to help YOU grow your business!

If there are any current orders or future orders that you want us to handle, please let us know. Our title turn time is 1-2 days so getting title back and the file ready won't be an issue.

We look forward to working with you again SOON! Let us know how we can help! Have a wonderful day!

Thank you!


**Kami Wilson-Nichols** | Escrow Officer | Truly Title, Inc.
550 Reserve Street Suites 106 & 231, Southlake, TX 76092
m: (972) 345-3065  I o: (817) 527-2174 I f: +1 (817) 755-0943

www.trulytitle.com  | kami.nichols@trulytitle.com

<image001.png>


Attention: Beware of cyber-crime! If you receive an e-mail or any other communication that appears to be generated from a Truly Title, Inc. employee that contains new, revised or altered bank wire instructions, consider it