UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| PROVIDENCE TITLE COMPANY | § | |
| | § | |
| v. | § | CIVIL NO. 4:21-CV-147-SDJ |
| | § | |
| TRULY TITLE, INC., ET AL. | § | |

## MEMORANDUM OPINION AND ORDER

Providence Title Company ("Providence") and Truly Title, Inc. ("Truly") are competitors in the Texas title insurance market. In 2019, Truly and Providence unsuccessfully negotiated Truly's potential acquisition of Providence. Afterward, Truly successfully recruited a number of Providence's senior employees in North Texas, including Tracie Fleming, Mark Fleming, and Kim Sheets Sheffield. The departure of these key employees was accompanied by an exodus of Providence personnel to Truly from several of Providence's North Texas offices.

Providence maintains that the actions of Truly, Truly's president of Texas operations—Graham Hanks, the Flemings, and Sheffield associated with these events went well beyond free market competition, embracing instead the misappropriation of Providence's trade secrets, Truly's violation of nonsolicitation and nondisclosure agreements, Sheffield and the Flemings' breach of fiduciary duties, and the Flemings' joint breach of a shareholders' agreement. Based on these allegations, Providence asserts various causes of action against Truly, Hanks, the Flemings, and Sheffield, including claims asserted against all defendants under the Defend Trade Secrets Act ("DTSA") and the Texas Uniform Trade Secrets Act ("TUTSA"), a breach-of-fiduciary-duty claim against the Flemings and Sheffield, and

1

a claim against the Flemings for alleged breaches of the shareholders' agreement. Providence has also filed a motion for a preliminary injunction, seeking to enjoin Tracie and Mark Fleming from working for Truly, all Defendants from soliciting Providence employees and customers, and all Defendants from using Providence's alleged trade secrets. Defendants have filed motions to dismiss, contending that the Court lacks subject-matter jurisdiction over Providence's lawsuit.

Before the Court are Providence's Motion for Preliminary Injunction, (Dkt. #8), Truly and Graham Hanks's Motion to Dismiss for Lack of Subject-Matter Jurisdiction, (Dkt. #19), and Tracie Fleming, Mark Fleming, and Kim Sheets Sheffield's 12(b)(1) Motion to Dismiss, (Dkt. #28). The Court held a hearing on the motions. (Dkt. #56, #57, #63). Having considered the filings, the arguments and evidence presented at the hearing, and the applicable law, the Court concludes that the motions to dismiss should be **DENIED** and the motion for preliminary injunction should be **GRANTED in part** and **DENIED in part**.

## I. BACKGROUND

Providence is a title company operating only in Texas. Truly is a title company, operating in multiple states, that expanded into Texas in 2019. Providence asserts that, shortly after Truly's expansion into the Texas title market, the president of Truly's Texas operations, Defendant Graham Hanks, initiated discussions with Providence about the acquisition of Providence's business.

Providence and Truly engaged in acquisition negotiations throughout 2019 before ultimately deciding to cease such negotiations. To facilitate the parties' negotiations, Providence provided Truly with information regarding Providence's

business, including customer lists, employee-salary data, and information regarding the profitability of Providence's offices. To protect this information's confidentiality, Providence and Truly entered into nondisclosure and nonsolicitation agreements.

According to Providence, after the breakdown in the parties' negotiations, Truly began to use the information Providence provided to solicit Providence's employees and customers. Specifically, Providence alleges that less than one year after Providence and Truly ceased their acquisition talks, Truly began discussing with Defendants Tracie Fleming and Mark Fleming the possibility of their leaving Providence to work for Truly. At the time, Tracie Fleming was Providence's President and Mark Fleming was Providence's team lead for Providence's operations in Johnson County, Texas. Unknown to Providence, Truly had entered into employment agreements with Tracie Fleming and Mark Fleming by December of 2020. The agreements provided that Tracie Fleming would serve as Truly's Executive Vice President and Area Manager over the Greater Fort Worth Texas Area and that Mark Fleming would serve as a Senior Vice President. Providence did not learn of Truly's agreements with Tracie and Mark Fleming until the Flemings actually resigned from their positions with Providence approximately two months later.

Tracie Fleming is also a Providence shareholder. When she acquired Providence stock, she signed Providence's shareholders' agreement, which included a noncompete provision. Providence maintains that the noncompete provision was effective upon Tracie Fleming's resignation and that her present employment with Truly is in breach of the provision. Providence also contends that Mark Fleming is subject to the noncompete provision because, as Tracie Fleming's spouse, he signed

3

the shareholders' agreement to bind his community-property interest in her shares. Providence argues that, in working for Truly, Mark Fleming is also in breach of the noncompete provision of the shareholders' agreement.

Defendant Kim Sheets Sheffield, another one of Providence's team leads, also left Providence to work for Truly. Before leaving Providence, Sheffield sent a text message to Graham Hanks, informing him of the base salaries and commission percentages for five employees in her office, including herself. Tracie Fleming also sent a text message to Hanks informing him of recent increases in revenue brought in by Providence's Johnson County offices. Providence alleges that Truly was then able to use this information along with the files Providence provided during the acquisition negotiations—information Providence considers trade secrets—to aid in the solicitation of Providence's employees and customers. Providence also alleges that Sheffield and the Flemings assisted Truly in soliciting Providence employees and customers. In the roughly two months between Tracie Fleming's agreeing to work for Truly and her departure from Providence, nineteen additional employees left Providence for Truly.

Following these events, Providence filed suit, asserting a number of claims against Truly, Hanks, Tracie Fleming, Mark Fleming, and Sheffield. Providence contends that (1) all Defendants have misappropriated Providence's trade secrets in violation of the DTSA and the TUTSA, (2) the Flemings and Sheffield breached fiduciary duties to Providence and were aided and abetted in doing so by Truly and Hanks, (3) Truly breached nonsolicitation and nondisclosure agreements with Providence, (4) the Flemings breached a shareholders' agreement, and (5) all

defendants engaged in a civil conspiracy. In addition to monetary damages, Providence also seeks injunctive relief, including a preliminary injunction preventing the Flemings from working for Truly, all Defendants from soliciting Providence employees and customers, and all Defendants from using Providence's alleged trade secrets. Defendants contend that the Court lacks subject-matter jurisdiction over Providence's lawsuit and have filed dismissal motions under Rule 12(b)(1).

## II. DEFENDANTS' MOTIONS TO DISMISS

Before addressing the merits of Providence's request for preliminary injunctive relief, the Court must first ensure that it has subject-matter jurisdiction. *See Gohmert v. Pence*, __ F.Supp.3d ___, 2021 WL 17141, at *2 (E.D. Tex. 2021), *aff'd*, 832 F.App'x 349 (5th Cir. 2021) (per curiam). Providence maintains that the Court has federal-question jurisdiction under 28 U.S.C. § 1331 over Providence's DTSA claim and supplemental jurisdiction under 28 U.S.C. § 1367 over Providence's state-law claims. Defendants argue that Providence has failed to adequately allege, and that the evidence shows that Providence cannot plausibly allege, that its purported trade secrets are "related to a product or service used in, or intended for use in, interstate or foreign commerce" as required by the DTSA. 18 U.S.C. § 1836(b)(1). According to Defendants, the DTSA's interstate-commerce requirement is a limitation on the jurisdiction of federal courts, and Providence's failure to adequately plead the required nexus to interstate commerce deprives the Court of subject-matter jurisdiction over Providence's DTSA claim.[1] Defendants also contend that if the

---

[1] Providence does not dispute that the DTSA's interstate-commerce requirement is jurisdictional but contends that the requirement is satisfied here.

Court lacks jurisdiction over the DTSA claim, then the Court lacks supplemental jurisdiction over Providence's state-law claims.

## A. The DTSA's Interstate-Commerce Requirement Is Not Jurisdictional.

The DTSA provides that "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). Thus, the elements of a DTSA claim are (1) ownership of a trade secret that (2) has been misappropriated and that (3) relates to a product or service in interstate commerce. *See N. Am. Deer Registry, Inc. v. DNA Sols., Inc.*, No. 4:17-CV-00062, 2017 WL 2120015, at *6 (E.D. Tex. May 16, 2017). Defendants maintain that Providence has failed to adequately plead the interstate-commerce element of its DTSA claim. Although dismissal motions premised on a plaintiff's alleged failure to adequately plead the elements of a cause of action are typically made under Rule 12(b)(6), here, Defendants have asserted that Providence's purported failure to adequately plead the DTSA's interstate-commerce element deprives the Court of subject-matter jurisdiction under Rule 12(b)(1).

Section 1331 confers jurisdiction on federal courts any time a federal claim appears on the face of a plaintiff's complaint unless the claim is frivolous—i.e., "patently without merit." *Young v. Hosemann*, 598 F.3d 184, 188 (5th Cir. 2010) (quotation omitted). Otherwise, when a court determines that a plaintiff's asserted federal claim is invalid, the claim is dismissed on the merits. *Id.* (quoting *Williamson v. Tucker*, 645 F.2d 404, 415–16 (5th Cir. 1981) (en banc)). Accordingly, a

defendant challenging the adequacy of a plaintiff's pleading of a nonfrivolous, federal cause of action must move under Rule 12(b)(6), not Rule 12(b)(1). *See id.*

Providence's DTSA claim is a federal claim that appears on the face of Providence's complaint, and Defendants do not contend that Providence's DTSA claim is frivolous—nor could they. But because Defendants characterize the interstate-commerce element of a DTSA claim as a "jurisdictional element," Defendants assert that Providence's purported failure to adequately plead an interstate-commerce nexus means that there is no federal-question jurisdiction.

To be sure, some district courts have taken Defendants' approach and dismissed DTSA claims for lack of subject-matter jurisdiction after finding the interstate-commerce element lacking. *See, e.g., Gov't Emps. Ins. Co. v. Nealey*, 262 F.Supp.3d 153, 172 (E.D. Pa. 2017) (collecting cases); *Islands Hospice, Inc. v. Duick*, No. 19-00202-JMS-WRP, 2019 WL 4620369, at *3 (D. Haw. Sep. 23, 2019). However, courts "sometimes mischaracterize[] . . . elements of a cause of action as jurisdictional limitations." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161, 130 S.Ct. 1237, 176 L.Ed.2d 18 (2010). The Supreme Court has made clear that elements of a cause of action or other statutory limits on a plaintiff's right to recovery are not jurisdictional limitations unless the statute "clearly states" as much. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006). If the statute does not label an element as jurisdictional, then courts should not treat it as such. *Id.* at 516. And while courts sometimes refer to a statute's requirement for a nexus to interstate commerce as "jurisdictional," this is merely a shorthand for indicating that a nexus to interstate commerce is required for the federal statute to

govern—not an indication that courts lack adjudicatory authority over a case where the nexus is found lacking. *United States v. Vargas*, 673 F.App'x 393, 395 (5th Cir. 2016) (per curiam) (quoting *United States v. Moreland*, 665 F.3d 137, 144 n.3 (5th Cir. 2011) and *United States v. Sealed Appellant*, 526 F.3d 241, 243 (5th Cir. 2008)).

Nothing in 18 U.S.C. § 1836 indicates that the interstate-commerce element of a DTSA claim is jurisdictional. The element appears in the same sentence that establishes all the elements of a DTSA claim. *See* 18 U.S.C. § 1836(b)(1). This sentence is not phrased in terms of when a federal court may exercise its adjudicatory authority, but rather in terms of when a plaintiff "may bring a civil action." *Id.* In other words, the DTSA's interstate-commerce requirement constrains a plaintiff's entitlement to relief under the statute—not the adjudicatory authority of federal courts. Accordingly, the Court will construe Defendants' dismissal motions as seeking dismissal of Providence's DTSA claims under Rule 12(b)(6) rather than Rule 12(b)(1). *See Henderson v. Saf-Tech, Inc.*, No. H–13–1766, 2013 WL 6858503, at *2 (S.D. Tex. Dec. 30, 2013) (construing a Rule 12(b)(1) motion as a Rule 12(b)(6) motion).

## B. Providence Has Adequately Pleaded the DTSA's Interstate-Commerce Element.

Although the Court has jurisdiction over this case, the Court will consider Defendants' Rule 12(b)(6) objections to Providence's DTSA claim prior to addressing Providence's preliminary-injunction motion because, the DTSA claim being the only federal claim on which to base supplemental jurisdiction, dismissal of the DTSA claim could be dispositive of this entire action.

## 1. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Such a statement requires that the plaintiff provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Supreme Court has instructed that plausibility means "more than a sheer possibility," but not necessarily a probability. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). When assessing a motion to dismiss under Rule 12(b)(6), the facts pleaded are entitled to a presumption of truth, but legal conclusions that lack factual support are not entitled to the same presumption. *Id.* To determine whether the plaintiff has pleaded enough to "nudge[] [its] claims . . . across the line from conceivable to plausible," a court draws on its own "judicial experience and common sense." *Id.* at 679–80 (first quoting *Twombly*, 550 U.S. at 570, then citing *Iqbal v. Hasty*, 490 F.3d 143, 157–58 (2d Cir. 2007)) (internal quotation marks omitted). This threshold is surpassed when "a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

## 2. Discussion

Defendants challenge the sufficiency of Providence's complaint only with respect to the interstate-commerce element of Providence's DTSA claim. Defendants argue that the allegations in Providence's complaint do not support an inference that Providence's alleged trades secrets are "related to a product or service used in, or

intended for use in, interstate or foreign commerce"—a necessary element of Providence's claim under the DTSA. 18 U.S.C. § 1836(b)(1). Defendants argue that the phrase "used in . . . interstate commerce" requires that the trade secrets themselves flow in interstate commerce in order to establish a claim under the DTSA. Because Providence's complaint reveals that Providence does business only within the State of Texas and does not allege that any of Providence's purported trade secrets move in interstate commerce, Defendants argue that Providence has failed to properly allege a DTSA claim.

While Congress's constitutional authority to regulate interstate commerce is not strictly limited to activity "in" interstate commerce, Congress can so limit the reach of particular statutes if it chooses. *See McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 241–42, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980) (explaining that, though not constitutionally required, Congress sometimes limits the applicability of a statute to "activities demonstrably in commerce" (quotation omitted)). The extent of the activity regulated depends on the statute's language. When a statute specifies that it applies to activity "in commerce," the statute applies only to activity actually within the flow of interstate commerce as opposed to activity that merely affects interstate commerce. *See Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) (quoting *United States v. Am. Bldg. Maint. Indus.*, 422 U.S. 271, 276, 95 S.Ct. 2150, 45 L.Ed.2d 177 (1975)). The flow of interstate commerce is defined as "the generation of goods and services for interstate markets and their transport and distribution to the consumer." *Am. Bldg. Maint. Indus.*, 422 U.S. at 276.

The text of the DTSA indicates that its applicability is limited to activity that is actually in, as opposed to activity that merely affects, interstate commerce. The DTSA provides that it applies to trade secrets that are "related to a product or service *used in*, or intended for *use in*, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1) (emphasis added). Accordingly, to state a claim under the DTSA, a plaintiff must allege that its purported trade secrets relate to a product or service within the flow of interstate commerce.

Providence's complaint alleges that the following constitute trade secrets that have been misappropriated by Defendants: the financial performance of Providence's offices, the financial performance of Providence's employees, employee salaries, customer lists, marketing strategies, and policies. (Dkt. #1 ¶ 37). Providence's complaint further alleges that Providence provides title services to customers all over the United States who are interested in buying or selling property in Texas and that Providence works with out-of-state underwriting firms to provide title insurance. (Dkt. #1 ¶ 12, ¶40).

Defendants argue that these allegations are insufficient to establish the interstate-commerce nexus required for a DTSA claim because Providence has failed to allege that any of Providence's purported trade secrets, such as its financial information and customer lists, have been used in interstate commerce. Because Providence operates only in Texas, none of Providence's information regarding its financial or customer data ever traverses state boundaries in commerce. Thus, Defendants argue, Providence has failed to allege the requisite interstate-commerce nexus to state a DTSA claim.

Although the DTSA's interstate-commerce element is not as broad as it constitutionally could have been, it is also not as narrow as Defendants contend. Contrary to Defendants assertions, the DTSA does not require that the alleged trade secrets themselves be used in interstate commerce. Rather, the DTSA requires that the trade secrets *relate to a product or service* that is used in interstate commerce. 18 U.S.C. § 1836(b)(1). It is the underlying product or service—not the trade secret— that must be used in or intended for use in interstate commerce in order to assert a claim under the DTSA. *See, e.g., United States v. Agrawal*, 726 F.3d 235, 245–46 (2d Cir. 2013) (holding that where a theft-of-trade-secrets statute required that the trade secret relate to a product in interstate commerce, the trade secret need not itself have been placed in interstate commerce); *Islands Hospice*, 2019 WL 4620369, at *4 (rejecting the argument that the DTSA requires that the trade secret itself be used in interstate commerce).

Providence's complaint alleges that Providence's purported trade secrets are used to effectively manage its business of providing title services. Providence shared its alleged trade-secret information with Truly because the information was deemed necessary for Truly to decide whether to expand its title services into Texas by acquiring Providence. Thus, Providence's alleged trade secrets relate to the only service Providence offers—title services. Accordingly, it is Providence's provision of title services that must be used in or intended for use in interstate commerce in order for Providence to satisfy the interstate-commerce element of its DTSA claim.

Defendants argue that despite Providence's service of out-of-state customers involved in Texas property transactions and Providence's work with out-of-state

underwriters, Providence's provision of title services is not in interstate commerce because Providence is located only in Texas and provides title services only for properties in Texas. However, as the Supreme Court has concluded, a real estate transaction is an interstate transaction when the funds for purchasing the real estate originate outside of the state where the property is located. *See Goldfarb v. Va. State Bar*, 421 U.S. 773, 783–84, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). Accordingly, title services, even when performed entirely within a state, are "an integral part of an interstate transaction." *Id.* at 784. And because title services are integral to an interstate transaction, the provision of title services is "within the stream of interstate commerce," satisfying the "in commerce" test. *McLain*, 444 U.S. at 244.

Because Providence alleges in its complaint that it provides title services to out-of-state purchasers of Texas properties and works with out-of-state underwriters on Texas title insurance policies, Providence's title services are integral to an interstate transaction and as such are "used in" interstate commerce. And because Providence's alleged trade secrets relate to Providence's provision of title services, such trade secrets are related to a service used in interstate commerce. Accordingly, Providence has adequately pleaded the interstate-commerce element of its DTSA claim, and Defendants' Rule 12(b)(1) motions construed as a Rule 12(b)(6) motions must be denied.

### III. PROVIDENCE'S MOTION FOR PRELIMINARY INJUNCTION

Having concluded that Providence's claims survive Defendants' motions to dismiss, the Court turns to Providence's request for a preliminary injunction. Providence seeks a preliminary injunction (1) enjoining Tracie Fleming and Mark

Fleming from violating the noncompete agreement, including by working for Truly; (2) enjoining all Defendants from soliciting Providence's employees and customers; and (3) enjoining all Defendants from using or publicly disclosing Providence's alleged trade secrets.

## A. Legal Standard

A preliminary injunction is an "extraordinary and drastic remedy." *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009) (quotation omitted). To issue such relief, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (quotation omitted). And only when the movant has "clearly carried the burden of persuasion" should a court grant preliminary injunctive relief. *Anderson*, 556 F.3d at 360.

In order to obtain a preliminary injunction, a movant must establish the following factors:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). If the movant fails to establish any one of these factors, the movant cannot obtain injunctive relief. *See Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 196 (5th Cir. 2003) (explaining that a preliminary injunction "should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements" (quotation omitted)).

## B. Discussion

### 1. Providence Is Entitled to a Preliminary Injunction Against Tracie Fleming but Not Mark Fleming.

Providence requests that the Court enjoin Defendants Mark Fleming and Tracie Fleming from working for Truly, allegedly in violation of a noncompete agreement. The noncompete provision stems from Providence's shareholders' agreement, which Tracie Fleming agreed to be bound by when she purchased shares of Providence. Mark Fleming, as Tracie Fleming's spouse, later signed the shareholders' agreement "to bind [his] community property interest" in Tracie Fleming's shares to the terms of the shareholders' agreement. (Dkt. #1-7 at 4).

The noncompete provision appears in Article 8 of the shareholders' agreement, which governs the repurchase of a departing shareholder's shares. The noncompete provision, found at Section 8.4, provides as follows:

> Non-Compete. Offering Shareholder agrees for a period of twenty-four (24) months from the date of the Closing (defined in Section 8.1) he/she will not (i) serve as a partner, employee, consultant, officer, director, member, manager, agent, associate, investor, or otherwise, or (ii) directly or indirectly, own, purchase, organize or take preparatory steps for the organization of, or (iii) build, design, finance, acquire, lease, operate, manage, invest in, work or consult for or otherwise affiliate hisself [sic]/herself with any business in competition with or otherwise similar to Providence's business within the Texas counties of Tarrant, Dallas, Harris, Bexar or any Texas counties contiguous to such stated counties. Breach of this covenant shall entitle the payees of the promissory notes given in payment for the Shares acquired under Section 8.2 herein to defer all payments for a period not to exceed twenty-four (24) months, without interest.

(Dkt. #1-6 at 5). As Tracie Fleming is a departing Providence shareholder, the process of repurchasing her shares has begun. Providence maintains that both Tracie Fleming's and Mark Fleming's employment with Truly are in breach of this

noncompete provision and that both parties should be enjoined from continuing their employment.

### i. Providence Is Entitled to a Preliminary Injunction Against Tracie Fleming.

#### a. Likelihood of Success on the Merits

Providence is likely to succeed on the merits of its breach-of-contract claim against Tracie Fleming for breach of the noncompete provision of the shareholders' agreement. Under Texas law, the elements of a breach-of-contract claim are (1) a valid contract, (2) performance, (3) breach, and (4) damages resulting from the breach. *Myan Mgmt. Grp., L.L.C. v. Adam Sparks Fam. Revocable Tr.*, 292 S.W.3d 750, 754 (Tex. App.—Dallas 2009, no pet.). The Texas Covenants Not to Compete Act imposes additional requirements to enforce a contract's noncompete provision. Specifically, the noncompete provision (1) must be ancillary to or part of an otherwise enforceable agreement; (2) must contain reasonable limitations as to time, geographical area, and scope of activity to be restrained; and (3) must not impose a greater restraint than necessary to protect the interests of the promisee. TEX. BUS. & COM. CODE § 15.50(a).

There is no dispute that Providence and Tracie Fleming were parties to the shareholders' agreement, that the shareholders' agreement as a whole is enforceable, and that the noncompete provision is a part thereof. There is also no dispute that Providence performed under the shareholders' agreement and that, if there is indeed a breach of an enforceable covenant not to compete, Providence has been damaged. Thus, whether Providence is likely to succeed on the merits depends on whether

Providence is likely to establish that Tracie Fleming breached the noncompete provision and whether the noncompete provision is reasonable under Texas law.

The dispute regarding whether Tracie Fleming is in breach of the noncompete provision turns on when the noncompete provision takes effect. The noncompete provides the following description of the time period for which it is in effect: "Offering Shareholder agrees for a period of twenty-four (24) months from the date of the Closing (defined in Section 8.1) he/she will not [compete with Providence]." (Dkt. #1-6 at 5). Providence contends that this language reflects only the expiration date of the noncompete agreement, i.e., that the noncompete is effective upon the date of signing and lasts up to twenty-four months from the date of closing on the repurchase of the departing shareholder's shares. Tracie Fleming argues that the noncompete does not go into effect until the date of closing on the repurchase of her shares and then expires twenty-four months later.

Courts must enforce unambiguous contracts as written. *In re Davenport*, 522 S.W.3d 452, 457 (Tex. 2017). In doing so, courts must interpret the contractual provisions such that no term is rendered meaningless. *Id.* Providence's interpretation is untenable in light of the unambiguous language of the noncompete provision. There is no other plausible interpretation for the language providing that the departing shareholder agrees not to compete "for a period of twenty-four (24) months from the date of the Closing" other than that the provision goes into effect upon closing and expires twenty-four months later. Providence's suggested construction—that this language merely sets the noncompete provision's expiration date—would read the phrase "for a period of" out of the contract. The noncompete provision is in effect "for

a period of twenty-four (24) months." Providence seeks to alter the provision such that it is actually in effect for a period of twenty-four months plus the amount of time that passes between the signing of the agreement and the shareholder's departure. The Court declines to alter the noncompete provision's plain terms. *See id.* at 457–58.

Providence contends that its interpretation must be correct because the contrary view would lead to the "absurd" result that Tracie Fleming is free to compete with Providence for a few months immediately following her resignation but before the closing date on the repurchase of her shares. Avoiding the plain language of an instrument on the grounds that it would produce an absurd result is a high bar; the result must be "patently nonsensical"—not merely odd. *City of Fort Worth v. Rylie*, 602 S.W.3d 459, 467 (Tex. 2020) (quotation omitted). In this case, having the effective date of the noncompete provision begin on the closing date for the repurchase of Tracie Fleming's shares is not patently nonsensical. In fact, it is not even unusual. The noncompete provision is part of a shareholders' agreement—not an employment contract. The provision goes into effect as soon as a departing shareholder ceases to be a shareholder. Until then, a departing shareholder remains a shareholder and retains a financial interest in Providence. It is therefore not absurd that the noncompete provision of a shareholders' agreement would first go into effect on the date of closing on the repurchase of the departing shareholder's shares.

Having established that the noncompete provision goes into effect on the date of closing, the Court must next determine when that is. The noncompete provision indicates that its use of the phrase "from the date of the Closing" is a reference to the contractual definition of "Closing Date" found in Section 8.1 of the shareholders'

agreement. That section provides that the "Closing Date" will fall "on the thirtieth

(30th) day following the expiration of the last option period to acquire Stock, or such

other date . . . as the parties may agree." (Dkt. #1-5 at 10). The parties agree that the

date provided by Section 8.1 as the "Closing Date" for the repurchase of Tracie

Fleming's shares was May 24, 2021, although the actual transaction has not occurred

as the parties are still negotiating the purchase price for Tracie Fleming's shares. *See*

(Dkt. #89, #91, #92).

The parties now dispute whether the date that triggers the noncompete

provision is the "Closing Date" for the repurchase of the shares as defined in

Section 8.1 of the shareholders' agreement or the date when the transaction is

actually finalized.[2] As discussed above, the Court must interpret the noncompete

provision according to its unambiguous language. Any contractually defined terms

must be construed in accordance with the definition agreed upon by the parties in the

shareholders' agreement. *See Provident Life and Accident Ins. Co. v. Knott*, 128

S.W.3d 211, 219 (Tex. 2003). The phrase "Closing Date" is defined in the shareholders'

agreement, and there is no dispute that the "Closing Date" according to that

definition was May 24, 2021. What's more, the noncompete provision expressly

---

[2] On May 28, 2021, Providence filed a notice informing the Court that the closing date for purposes of the shareholders' agreement was May 24, 2021, although Providence and the Flemings had yet to finalize the transaction. (Dkt. #89). The Court ordered the Flemings to respond and inform the Court whether they agreed with Providence's characterization. (Dkt. #90). The Flemings responded that they agreed: although the transaction had not been finalized, the closing date for purposes of the noncompete provision was May 24, 2021. (Dkt. #91). One week later, the Flemings reversed their position and informed the Court that, while May 24, 2021, is the "Closing Date" as that term is defined in Section 8.1 of the shareholders' agreement, the closing date for purposes of triggering the noncompete provision is the date of the actual finalization of the transaction, which has not yet occurred. (Dkt. #92).

specifies that its reference to "date of the Closing" means the date provided in Section 8.1. *See* (Dkt. #1-6 at 5) ("Offering Shareholder agrees for a period of twenty-four (24) months from the date of the Closing (*defined in Section 8.1*) . . . ." (emphasis added)). Accordingly, the noncompete provision went into effect on May 24, 2021. Because the noncompete provision is currently in effect, Tracie Fleming is in breach of the agreement by maintaining employment with Truly in counties covered by the agreement.[3]

Tracie Fleming next contends that Providence is unlikely to prevail on the merits because the noncompete provision is unenforceable under the Texas Covenants Not to Compete Act. Specifically, Fleming argues that the geographical limitations in the noncompete provision are unreasonable and broader than necessary to preserve Providence's interests. The noncompete provision of the shareholders' agreement provides that it applies only in the Texas counties of Dallas, Tarrant, Harris, Bexar, and any Texas counties contiguous to these. (Dkt. #1-6 at 5). Tracie Fleming argues that this geographical limitation is unreasonably broad because she only ever opened Providence offices in Johnson County, Texas, and that is also where all of her clients are located. Thus, Fleming argues, a noncompete provision applicable beyond Johnson County is unreasonable and unnecessary to protect Providence's business interests.

---

[3] Tracie Fleming does not dispute that she is employed by Truly in counties included in the noncompete agreement. Tracie Fleming's position at Truly is titled Executive Vice President-Greater Fort Worth Texas Area Manager. (Dkt. #1-4, Ex. 1-A, at 7). Fort Worth, Texas, is in Tarrant County, Texas—one of the counties included in the noncompete agreement. *See* (Dkt. #1-6 at 5).

The permissible breadth of the geographic applicability of a noncompete provision depends both on the nature of the business and the degree of the employee's involvement in the business. *AmeriPath, Inc. v. Hebert*, 447 S.W.3d 319, 335 (Tex. App.—Dallas 2014, pet. denied). This often means that a noncompete provision should apply only in the locale where the employee worked. *Id.* (citing *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 660 (Tex. App.—Dallas 1992, no writ)). However, when an employee is involved in the higher levels of company management, greater geographic restrictions are often justified because the employee's knowledge of and experience with the company extend beyond the location where she worked. *See id.* In *AmeriPath*, the employee had worked only in the Dallas area, yet because the employee had been involved in the company's highest levels of management, the court held enforceable a noncompete agreement that prohibited the employee from working for competitors in any location if those competitors had operations within fifty miles of Dallas. *Id.* Because of the employee's management position, the court concluded that he would have extensive knowledge of his employer's Dallas operations that would be valuable to any competitor with operations in Dallas regardless of where the employee ended up being located. *Id.*

Similarly, given Tracie Fleming's role with Providence, it would be inappropriate to focus solely on the county where she opened offices and had clients to determine a reasonable geographic restriction for the noncompete provision. Tracie Fleming is a Providence shareholder who served on Providence's board of directors. She also served as Providence's Chief Operating Officer before being promoted to its President. As a result of her positions in the highest levels of the company, Tracie

Fleming was privy to confidential information and heavily involved in decision making related to the company at large, which operates throughout the State of Texas. Thus, Tracie Fleming's intimate knowledge of and experience with Providence's business, including its confidential information, would make her a valuable asset to a competitor anywhere Providence operates—not just in Johnson County. Accordingly, preventing Tracie Fleming from competing beyond Johnson County is necessary to protect Providence's interests served by the noncompete agreement.

Furthermore, the geographical limitations for the noncompete provision are much narrower than those in *AmeriPath*, which the court held to be reasonable for an employee who had served in the highest levels of management. *See* 447 S.W.3d at 335. The *AmeriPath* court held enforceable a noncompete provision prohibiting a company's former Managing Director from affiliating in any location with a competitor that had operations in the Dallas area. *See id.* Here, the noncompete provision prohibits Tracie Fleming from affiliating with Providence competitors only in certain Texas counties. The noncompete provision does not even extend to the entire state. Given Tracie Fleming's extensive roles in the highest levels of Providence management, the geographic limitations contained in the noncompete provision of the shareholders' agreement are reasonable.

The Court also concludes that the activity and time limitations are reasonable. A limitation on the scope of activity to be restrained is reasonable if it bears some relation to the work of the employee. *Wright v. Sport Supply Grp., Inc.*, 137 S.W.3d 289, 298 (Tex. App.—Beaumont 2004, no pet.). Exclusions that prevent subsequent

employment in an entire industry are unenforceable. *Id.* While the scope of activity barred by the noncompete provision in this case broadly includes any affiliation whatsoever with a competitor, the Court concludes it is not unreasonable in light of Tracie Fleming's position with Providence. As Providence's President and as a member of its board of directors, Tracie Fleming was involved in all aspects of Providence's business. Thus, any affiliation with the business of another title company relates to her work at Providence. And the geographic limitations limiting the noncompete provision to certain Texas counties prevent the noncompete from acting as an unlawful industry-wide exclusion; Tracie Fleming is not barred from affiliating with a Providence competitor outside of the enumerated counties.

Additionally, Texas courts routinely hold that two years is a reasonable duration for noncompete provisions. *Redi-Mix Sols., Ltd. v. Express Chipping, Inc.*, No. 6:16-cv-298-RWS-KNM, 2016 WL 7634050, at *9 (E.D. Tex. Dec. 2, 2016) (collecting cases), *report and recommendation adopted*, 2017 WL 26083 (E.D. Tex. Jan. 3, 2017). The twenty-four-month duration of the noncompete provision is therefore reasonable.

Because Providence is likely to establish that the activity, time, and geographical limitations of the noncompete provision are reasonable, Providence is likely to establish that the noncompete provision is enforceable under the Texas Covenants Not to Compete Act. And because the Court concludes that the noncompete provision was triggered on May 24, 2021, Providence is likely to establish that Tracie Fleming is in breach of the covenant by working for Truly in counties covered by the agreement. Providence has therefore established that it is likely to

succeed on the merits of its breach-of-contract claim against Tracie Fleming for breach of the noncompete provision of the shareholders' agreement.

### b. Threat of Irreparable Injury

Providence faces a substantial threat of irreparable injury absent a preliminary injunction. Establishing a threat of irreparable injury requires a showing that injury is imminent and cannot be easily undone with money damages. *McKissock, LLC v. Martin*, 267 F.Supp.3d 841, 858 (W.D. Tex. 2016) (quoting *Humana Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986)). The injury associated with a breached noncompete covenant is the epitome of irreparable harm. *Id.* (quoting *Sirius Comput. Sols. Inc. v. Sparks*, 138 F.Supp.3d 821, 841 (W.D. Tex. 2015)). For this reason, enforcement of valid noncompete covenants by injunction is the rule rather than the exception in Texas courts. *Sirius*, 138 F.Supp.3d at 841 (quoting *Travelhost, Inc. v. Brady*, No. 3:11-CV-454-M-BK, 2012 WL 555191, at *5 (N.D. Tex. Feb. 1, 2012)), *report and recommendation adopted as modified*, 2012 WL 556036 (N.D. Tex. Mar. 1, 2012).

The harm caused by losing the benefit of a covenant not to compete can be difficult to quantify. When a former employee breaches a noncompete agreement, the employee's familiarity with the confidential information of her prior employer can provide a significant competitive advantage resulting in lost business and goodwill for the former employer. *See Transperfect Translations, Inc. v. Leslie*, 594 F.Supp.2d 742, 757 (S.D. Tex. 2009). These injuries can be sufficient to establish irreparable harm. *Id.*

Tracie Fleming was Providence's President and served on its board of directors. She was privy to all of Providence's confidential information. She was heavily involved in Providence's business strategy, including in confidential negotiations regarding potential mergers or acquisitions. She is now working for a direct competitor that provides the exact same services as Providence. Thus, even if Fleming acts in good faith, it would be highly unlikely that she would be able to perform her employment without relying on or revealing her in-depth knowledge of Providence's business for Truly's competitive advantage. *See id.* ("Where there is a high degree of similarity between the employee's former and future employer, it becomes likely, although not certain, that the former's confidential information will be used and disclosed in the course of his work."). And while Providence's total economic losses can possibly be measured, it is unlikely that anyone will be able to discern the amount of loss attributable to the competitive advantage Truly gained from Providence's former President's breaching her noncompete agreement.

The evidence also reveals that Providence is likely to experience reputational harm as a result of Tracie Fleming's abrupt departure to begin competing against Providence. Providence was engaged in acquisition negotiations that have stalled as a result of Tracie Fleming's competing against Providence and the resulting damage to Providence's reputation in the industry. And if Providence continues to lose goodwill as Tracie Fleming uses her intimate knowledge of Providence's business to provide Truly a competitive advantage, as is likely to happen, Providence's reputational harm will only increase.

Tracie Fleming argues that Providence does not face the threat of irreparable harm because the noncompete provision itself provides Providence with an exclusive remedy and that remedy is sufficient to compensate Providence for any harm caused by the breach. The portion of the noncompete provision referenced by Tracie Fleming provides: "Breach of this covenant shall entitle the payees of the promissory notes given in payment for the Shares acquired under Section 8.2 herein to defer all payments for a period not to exceed twenty-four (24) months, without interest." (Dkt. #1-6 at 5). In other words, when Providence repurchases a departing shareholder's shares, the provision permits Providence to defer payment for twenty-four months without interest if the departing shareholder breaches the noncompete provision.

Contrary to Tracie Fleming's assertions, this deferred-payment provision is not the exclusive remedy for breach of the noncompete covenant. "It is well-settled that upon breach of contract, a party may pursue any remedy which the law affords in addition to the remedy provided in the contract." *Blackstone Med., Inc. v. Phoenix Surgicals, L.L.C.*, 470 S.W.3d 636, 653 (Tex. App.—Dallas 2015, no pet.). A contractual remedy is not exclusive unless it is clear that the parties intended as much, which typically requires that the contract specify that the remedy is exclusive. *Burrus v. Tornillo DTP VI, L.L.C.*, No. 08–13–00333–CV, 2015 WL 8526539, at *2 (Tex. App.—El Paso Dec. 11, 2015, pet. denied). Nothing in the language of the noncompete provision here indicates that it provides the deferred-payment option to the exclusion of remedies provided by law for breach of contract. The provision merely provides that Providence may defer payment on the repurchased shares if the

noncompete agreement is breached. Its language is permissive rather than exhaustive, stating only that a breach "entitle[s]" Providence to defer payment. It cannot be inferred from the deferred-payment provision's permissive language that the parties clearly intended an exclusive remedy.

Tracie Fleming argues that she and Providence's Chief Executive Officer, Dan Foster, always understood the deferred-payment remedy to be exclusive. She also argues that other provisions of the shareholders' agreement expressly include injunctive relief as a remedy, indicating that the parties intended to exclude injunctive relief by omitting it in the noncompete provision. Neither argument is persuasive. The parties' purported, subsequent understanding of the exclusive nature of the deferred-payment remedy does not satisfy the requirement under Texas law that the contract clearly indicate the parties' intent to make the remedy exclusive. If the parties did intend for the deferred-payment remedy to be exclusive as Tracie Fleming claims, they failed to indicate that intent in their contract. Moreover, the parties were not required to expressly provide for the availability of injunctive relief in the contract. Injunctive relief is a common-law, equitable remedy. As explained above, under Texas law, all legal remedies are available to enforce a contract unless the contract clearly indicates otherwise. The noncompete provision contains no such indication.

Tracie Fleming also argues that even if not an exclusive remedy, the deferred-payment provision provides an adequate remedy such that any injury to Providence is not irreparable. The Court disagrees. Providence faces a substantial threat of unquantifiable harm in the form of loss of future business and goodwill and harm to

27

its reputation stemming from its former president's sudden departure to work for a competitor in violation of an enforceable noncompete agreement. The deferred-payment provision does not provide any sort of damages or compensation to Providence. It merely allows Providence to pay Tracie Fleming for her shares of Providence stock at a later date, albeit without interest. Tracie Fleming provides no explanation as to how the temporary retention of funds adequately compensates Providence for losing the entire benefit of the noncompete agreement.

The Court therefore concludes that Providence faces a substantial threat of irreparable injury unless Tracie Fleming is preliminarily enjoined from breaching the noncompete provision of the shareholders' agreement.

### c. Balancing the Harms

Providence must next show that the harm it faces without a preliminary injunction outweighs the harm that a preliminary injunction will cause Tracie Fleming. *See Sirius*, 138 F.Supp.3d at 842. The Court has concluded that, without a preliminary injunction, Providence faces a substantial threat of irreparable harm to its business prospects, goodwill, and reputation. Tracie Fleming argues that a preliminary injunction would cause significant harm to her because it would prevent her from working for an employer for whom she has worked for five months.

However, any harm to Tracie Fleming is mitigated by the reasonable limitations on the noncompete provision. *See id.* at 842 (concluding that the reasonableness of the restrictions in a noncompete provision decrease the harm of an injunction). An injunction enforcing the noncompete provision does not bar Tracie

Fleming from working in the title industry—for Truly or otherwise—except in a handful of Texas counties.

The harm to Tracie Fleming is further mitigated by the fact that she received consideration in exchange for her agreement not to compete with Providence. She received shares of Providence stock and was a Providence shareholder for years in exchange for her agreement. Given the limited duration of the noncompete agreement and the length of litigation, Providence risks losing the benefit of the noncompete agreement entirely without a preliminary injunction. Tracie Fleming, on the other hand, would retain her benefit of the bargain. Accordingly, the Court finds that the risk of harm to Providence in the absence of an injunction outweighs the risk of harm to Tracie Fleming caused by an injunction.

### d. The Public Interest

An injunction should not issue if it would disserve the public interest. *See Janvey*, 647 F.3d at 595. Enforcing contracts serves the public interest. *McKissock*, 267 F.Supp.3d at 860 (quoting *Daily Instruments Corp. v. Heidt*, 998 F.Supp.2d 553, 571 (S.D. Tex. 2014)). Furthermore, the Texas legislature indicated with the Covenants Not to Compete Act that the public is not disserved by enforcement of reasonable noncompete agreements. *Transperfect*, 594 F.Supp.2d at 758. Tracie Fleming knew when she agreed to become a Providence shareholder that she would be subject to a noncompete provision when she ceased being a Providence shareholder. Knowing this, she accepted her benefit of the bargain and entered the agreement. Requiring Tracie Fleming to now uphold her end of the bargain does not disserve the public interest.

Because Providence has established each factor required to obtain a preliminary injunction, Providence is entitled to a preliminary injunction enjoining Tracie Fleming from breaching the noncompete provision of the shareholders' agreement.

### ii. Providence Is Not Entitled to a Preliminary Injunction Against Mark Fleming.

Mark Fleming is not a Providence shareholder. (Dkt. #66 at 340:21–341:2). The shareholders' agreement and its amendments never indicate that any Providence shares were transferred to Mark Fleming. Nor does the shareholders' agreement include Mark Fleming in the list of parties to the agreement. *See* (Dkt. #1-7 at 1). Nonetheless, Providence argues that Mark Fleming is bound by all terms of the shareholders' agreement because he, along with other spouses of Providence shareholders, signed the second amendment to the shareholders' agreement "to bind their community property interest to the original shareholders' agreement as now amended." (Dkt. #1-7 at 4).

Providence's theory fails because it is at odds with the plain, unambiguous language of the shareholder's agreement. *See Compass Bank v. Calleja-Ahedo*, 569 S.W.3d 104, 114 (Tex. 2018) ("Contracts, like statutes, should be construed based on their plain language."). The first paragraph of the second amendment to the shareholders' agreement identifies the parties bound by all the terms of the shareholders'' agreement, and Mark Fleming is not among them. *See* (Dkt. #1-7 at 1). By the agreement's plain language, the effect of Mark Fleming's signature, which appears apart from the signatures of the parties to the agreement, was solely "to bind

[his] community property interest" to the terms of the agreement—not to bind himself personally. In other words, he agreed that the terms of the agreement applicable to Tracie Fleming's shares would apply to his community property interest in her shares.[4]

Because the plain language of the shareholders' agreement indicates that Mark Fleming is not bound by the noncompete provision, Providence is not likely to succeed on the merits of its breach-of-noncompete-agreement claim against Mark Fleming. Accordingly, Providence is not entitled to a preliminary injunction against Mark Fleming enforcing the noncompete provision.

### 2. Providence Is Not Entitled to a Preliminary Injunction Enjoining All Defendants from Soliciting Providence's Employees and Customers.

Providence also requests that the Court enjoin all Defendants from soliciting Providence's employees and customers during the pendency of this litigation. Providence argues that the claims supporting this injunction are both Truly's alleged breach of a nondisclosure agreement and all Defendants' alleged misappropriation of Providence's trade secrets. However, under the nondisclosure agreement, Truly's obligations with respect to Providence's confidential information expired two years following Truly's receipt of such information. (Dkt. #1-3 at 3). Providence has not pointed to any documents or information that it claims to have provided Truly less than two years ago. Accordingly, only Defendants' alleged theft of Providence's trade

---

[4] Because the shareholders' agreement affords Providence the right to repurchase the shares of a departing shareholder, it appears that the purpose of binding Mark Fleming's community interest to the shareholders' agreement was simply to prevent him from interfering with the repurchase of Tracie Fleming's shares in the event that she left Providence. *See* (Dkt. #65 at 149:1–8).

secrets could serve as the basis for this particular injunctive relief. Because Defendants have allegedly used Providence's trade secrets to aid in the solicitation of Providence employees and customers, Providence argues that Defendants should be entirely enjoined from soliciting Providence's employees and customers.

As an initial matter, the requested injunction extends well beyond any alleged misappropriation of trade secrets. Providence has included in its motion a separate request for injunctive relief barring Defendants from using Providence's trade secrets. The request for an injunction against solicitation extends further and asks the Court to enjoin Defendants from any solicitation of Providence's employees or customers whatsoever—regardless of whether Defendants use Providence's trade secrets to do so. Providence fails to explain how an injunction resting on a misappropriation-of-trade-secrets claim can extend to activity unrelated to the alleged misappropriation.

And even if the injunction is limited to Defendants' using Providence's alleged trade secrets to solicit Providence's employees and customers, Providence has nevertheless failed to show that it is entitled to a preliminary injunction.

### i. Likelihood of Success on the Merits

Providence has not clearly met its burden of establishing that it is likely to succeed on the merits of its trade-secrets claims. To establish a likelihood of success on the merits, a plaintiff is not required to prove that its success on the merits is guaranteed. *Janvey*, 647 F.3d at 595–96 (citations omitted). That is, to a establish a likelihood of success on the merits, a plaintiff need not produce the kind of evidence that would be required to prevail at summary judgment. *See id.* However, a plaintiff

must nevertheless establish a substantial likelihood that it will ultimately prevail on its claims. *Id.* at 599. Simply establishing that there is more than zero chance of success is insufficient. *Humana Ins. Co. v. Tenet Health Sys.*, No. 3:16-cv-2919-B, 2016 WL 6893629, at *13 (N.D. Tex. Nov. 21, 2016) (quoting *Fla. Med. Ass'n, Inc. v. U. S. Dep't of Health, Ed. & Welfare*, 601 F.2d 199, 203 n.3 (5th Cir. 1979)).

The alleged trade secrets Providence's motion principally focuses on are the documents and data provided to Truly in the course of the parties' acquisition negotiations, including Providence's financial and employee data. However, even if these files constitute trade secrets, Providence has failed to establish that Truly's future use of the files would constitute misappropriation.

Misappropriation for purposes of the DTSA is defined at 18 U.S.C. § 1839(5).[5] Most relevant here, misappropriation includes acquiring a trade secret that one knows was obtained through "improper means"; using a trade secret in breach of a duty to maintain the trade secret's secrecy or to limit the trade secret's use; and using a trade secret that was obtained from a person who had a duty to preserve the trade secret's secrecy or to limit its use. 18 U.S.C. §§ 1839(5)(A), (B)(ii)(II), (III).

Providence provided Truly with the documents and data that Providence maintains are trade secrets as part of the due-diligence process during the parties' acquisition negotiations. Truly therefore did not acquire the alleged trade secrets through "improper means." *See id.* § 1839(6)(B) (excluding lawful means of acquisition from the definition of "improper means"). Truly did, however, have a duty

---

[5] The Texas Uniform Trade Secrets Act contains an identical definition of misappropriation. *See* TEX. CIV. PRAC. & REM. CODE § 134A.002(3).

under the parties' nondisclosure agreement to maintain the confidentiality of the information provided by Providence and to limit its use to the parties' acquisition negotiations. (Dkt. #1-3 at 2). But the nondisclosure agreement went into effect on April 25, 2019, and Truly's obligations with respect to any information received from Providence expired two years after Truly's receipt of that information. (Dkt. #1-3 at 1, 3). Providence has not pointed to any specific files or documents to show that Providence provided them to Truly less than two years ago. Thus, Providence has not shown that Truly has any continuing obligation to maintain the secrecy or limit the use of the alleged trade secrets that Providence provided during the parties' acquisition negotiations. Because Providence has not shown that Truly obtained the alleged trade secrets provided by Providence through improper means or that Truly has a continuing obligation to maintain the secrecy or limit the use of the alleged trade secrets, Providence has not shown that Defendants' future use of the provided information to solicit Providence employees or customers would likely constitute misappropriation.

Providence also maintains that its trade secrets were misappropriated when Defendants Tracie Fleming and Kim Sheets Sheffield provided information regarding the compensation of certain Providence employees and the profitability of certain Providence offices to Truly shortly before ending their employment with Providence. Providence presented evidence that Tracie Fleming texted Defendant Graham Hanks the sum revenue numbers from certain months for Providence's Johnson County offices, (Dkt. #52-5, Ex. D-2 at 1, 8); (Dkt. #51-4, Ex. C-4 at 118:15–120:5), and that Kim Sheets Sheffield texted Graham Hanks the compensation structures for the

Providence employees she supervised, (Dkt. #52-5, Ex. D-4 at 2); (Dkt. #51-4, Ex. C-1 at 29:15–22). However, Providence has failed to meet its burden to establish a likelihood that the information provided by Fleming and Sheffield constituted trade secrets.

Business information constitutes a trade secret under the DTSA if (1) "the owner [of the information] has taken reasonable measures to keep such information secret;" and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3)(A)–(B).[6] Notably, business information is not necessarily a trade secret simply because it is confidential. *See Brand Servs., L.L.C. v. Irex Corp.*, 909 F.3d 151, 158 (5th Cir. 2018) (acknowledging that not all confidential business information qualifies as a trade secret under the similarly worded Louisiana Uniform Trade Secrets Act); *see also H&E Equip. Servs. v. St. Germain*, No. 19-134-SDD-EWD, 2020 WL 1678327, at *6 (M.D. La. Apr. 6, 2020) ("Confidential information and trade secrets are not the same."); *St. Clair v. Nellcor Puritan Bennett LLC*, No. CV–10–1275–PHX–LOA, 2011 WL 5335559, at *2 (D. Ariz. Nov. 7, 2011) ("[C]onfidentiality alone does not transform business information into a trade secret."); *Sw. Whey, Inc. v. Nutrition 101, Inc.*, 117 F.Supp.2d 770, 777 (N.D. Ill. 2000) ("[G]eneralized confidential business information does not constitute a protectable trade secret." (quotation omitted)). The

---

[6] Business information must meet the same requirements to qualify as a trade secret under the TUTSA. *See* TEX. CIV. PRAC. & REM. CODE § 134A.002(6)(A)–(B).

DTSA and the TUTSA make plain that, in addition to being confidential, business information alleged to be a trade secret must have independent economic value and that value must be derived from the fact that the information is secret.

Although there is little applicable precedent in this Circuit interpreting the DTSA or the TUTSA's "independent economic value" requirement,[7] the only Fifth Circuit case to address the phrase "independent economic value" in conjunction with trade secrets supports the conclusion that the information provided by Fleming and Sheffield likely does not qualify as a trade secret. In *Reingold v. Swiftships, Inc.*, the Fifth Circuit considered whether a ship mold met the Louisiana Uniform Trade Secrets Act's requirement that a trade secret derive independent economic value from not being generally known to others who could obtain economic value from the trade secret's disclosure or use. 126 F.3d 645, 650 (5th Cir. 1997). The ship mold at issue, which was constructed over a period of nine months at a cost of $1 million, consisted of a ninety-foot frame with a cavity that could be used to shape fiberglass into a ship hull. *Id.* The owner of the ship mold used the mold to build ship hulls, which he then sold to customers. *Id.* at 646. The owner also leased the mold to the defendant in the case for the purpose of building commercial ship hulls. *Id.* at 647.

The Fifth Circuit had little trouble concluding that the ship mold in *Reingold* derived independent economic value from the fact that it was not generally known to others. The fact that a competitor paid to lease the mold, the Fifth Circuit found, was strong evidence of the mold's independent economic value. *Id.* at 650. The competitor

---

[7] Congress passed the DTSA in 2016, and Texas was one of the more recent states to adopt the Uniform Trade Secrets Act, passing the TUTSA in 2013.

could not have made those specific ship hulls without the mold, and because that was the only mold of its kind in the market, the competitor had to pay the owner for the privilege to use it. In other words, the independent economic value the owner obtained from having a unique, not-generally-known ship mold was apparent: the owner could create ship hulls that his competitors could not, unless the owner licensed use of the mold to a competitor, for which the owner could obtain compensation.

Providence is not likely to succeed in showing that the information provided by Fleming and Sheffield to Hanks had independent economic value and that such economic value is derived from the information's secrecy. Sheffield provided Hanks with the base salaries and commission structures for five employees on her team, including herself, without identifying the employees by name. (Dkt. #52-5, Ex. D-4 at 2). Fleming provided Hanks with numbers indicating the increased revenue achieved in recent months by Providence's Johnson County offices. (Dkt. #52-5, Ex. D-2 at 1, 8). Unlike the information at issue in *Reingold* relative to the business of constructing ship hulls, the information provided by Sheffield and Fleming to Hanks does not concern strategies, technologies, or business models developed or employed by Providence to enhance its provision of title insurance services or otherwise to compete in the title insurance market in a way Providence's competitors cannot. Instead, the employee salary and office revenue data at issue constitute the types of generic business data kept by companies that, while often considered confidential, do not provide any independent economic value that is derived from being kept secret.

Providence's stated concern with Truly's knowledge of the salary and commission information of certain Providence employees and the revenue information for certain Providence offices is that Truly could know which offices would be good candidates to target to solicit employees and what salaries to offer Providence employees that would be attractive. Thus, Providence argues, the information derives independent economic value from its secrecy because, if not kept secret, the information could aid competitors in soliciting Providence employees.

Providence conflates the fact that a business might have good reason to keep certain information confidential with the separate requirement that the information have independent economic value that is derived from its confidentiality. In a general sense, there is "value" to a business in keeping all confidential business information secret; that's the motivation for classifying such information as confidential. But just because a business benefits from keeping certain information confidential does not necessarily mean that the information has independent economic value derived from its confidentiality. Otherwise, all confidential business information would constitute a trade secret and the additional statutory requirement that the information have independent economic value would be rendered meaningless.[8]

---

[8] For this reason, commentators have criticized courts for not giving enough scrutiny to whether an alleged trade secret actually has independent economic value. *See* Camilla A. Hrdy & Mark A. Lemley, *Abandoning Trade Secrets*, 73 STAN. L. REV. 1, 9 (2021) ("[M]any courts essentially read 'independent economic value' out of the statute by allowing plaintiffs to rely on weak inferences and assertions of hypothetical value rather than meaningful evidence."). *See also* Sharon K. Sandeen*, The Evolution of Trade Secret Law and Why Courts Commit Error When They Do Not Follow the Uniform Trade Secrets Act*, 33 HAMLINE L. REV. 493, 525 (2010) ("The economic value requirement of the UTSA was not simply a definitional flourish but was specifically designed to increase the plaintiff's burden of proof in order to ensure that a claim for relief was not provided for illusory information or information of little import.").

In essence, Providence contends that its employees are economically valuable and that Providence's salary and revenue information, in turn, derives value from its potential use to aid in the solicitation of Providence employees. However, a trade secret must have *independent* economic value. Under Providence's theory, its salary and revenue information is not *independently* valuable; rather, the information is valuable only to the extent that it can be used successfully to aid in the solicitation of valuable Providence employees. If a competitor used Providence's salary information to solicit a Providence employee whose performance is poor and whom the competitor ended up overpaying, the competitor would have gained no economic value from the salary information. Likewise, if a competitor with access to Providence's salary and revenue information nonetheless failed in its solicitation efforts, the information would not have any economic value to the competitor. In sum, whether the information Fleming and Sheffield provided to Truly has any economic value at all is wholly contingent on the relative economic value and performance of the Providence employees in question and whether the use of the information results in the successful solicitation of those employees. Information that depends entirely on other factors for its economic value cannot be said to have independent economic value.

Because Providence has not shown a likelihood that Truly's present use of the files Providence provided in the parties' acquisition negotiations would constitute misappropriation and because Providence has not shown a likelihood that the information provided to Graham Hanks by Tracie Fleming and Kim Sheets Sheffield constitutes trade secrets, Providence has not shown that it is likely to succeed on the merits of its trade-secrets claims for purposes of a preliminary injunction. And

because the trade-secrets claims are the only causes of action that could arguably support an injunction against soliciting Providence's customers and employees, Providence is not entitled to this relief.

## ii. Threat of Irreparable Injury

Additionally, Providence is not entitled to an injunction enjoining Defendants from soliciting Providence's employees and customers because Providence has not established that it would suffer imminent and irreparable harm without the requested injunction. In fact, in Providence's own words regarding the loss of employees and customers, "[m]uch of the damage is done, and will be the subject of damage claims in this case." (Dkt. #8 at 2). Harm is considered irreparable only when money damages cannot serve as adequate compensation for the harm. *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989).

Providence argues that a plaintiff can seek damages and injunctive relief for the same injury if the damages will not "fully repair" the injury. (Dkt. #51 at 8) (quoting *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986)) (internal quotation marks omitted). Providence is correct that its pursuit of money damages does not automatically bar Providence from seeking injunctive relief. However, the burden remains with Providence to establish that the damages it seeks are by themselves inadequate to compensate for Providence's alleged injury. Providence has failed to meet that burden.

Providence has not explained, let alone shown, how the damages it seeks for lost customers and employees are inadequate compensation. Providence has not claimed that it is unable to calculate its business losses as a result of losing certain

employees and customers. In fact, Providence maintains that its alleged trade secrets include information on the profitability of its employees and offices. If Providence maintains this information as a matter of course, it should not be difficult for Providence to calculate its losses from the departures of those employees and any related office closures. The ability to obtain damages for lost employees has led other courts to conclude that, absent proof that a particular employee provided unique services, "the loss of employees does not constitute an irreparable harm." *Terex Corp. v. Cubex, Ltd.*, No. 3:06-CV-1639-G, 2006 WL 3542706, at *10 (N.D. Tex. Dec. 7, 2006) (citation omitted). Providence has not attempted to show that any of its employees provide unique services. Therefore, Providence has an adequate remedy at law to address the loss of its employees.

Because Providence has failed to clearly meet its burden of establishing that it faces imminent and irreparable harm, Providence would not be entitled to the requested injunction even if Providence otherwise met the requirements for a preliminary injunction.

### 3. Providence Is Not Entitled to a Preliminary Injunction Enjoining All Defendants from Using Providence's Alleged Trade Secrets.

Finally, Providence requests that the Court "enjoin all Defendants from using any of Providence's trade secrets, including its data regarding finances, employees, offices, salaries, and customers, or publicly disclosing such information." (Dkt. #8 at 15).[9]

---

[9] The requested injunction is vague. For example, the injunction would prohibit Defendants from "using" any of Providence's "data regarding finances" or "data regarding offices." It is not immediately clear what Defendants would be enjoined from doing. *See* FED. R. CIV. P. 65(d)(1)(C).

As discussed herein, *see supra* Part III.B.2.i., Providence has not shown a likelihood of success on the merits of its misappropriation-of-trade-secrets claims sufficient to warrant a preliminary injunction. Even if any of the due-diligence files provided by Providence to Truly constitute trade secrets, any present or future action by Truly with respect to those files is unlikely to constitute misappropriation because Truly did not obtain the files through improper means and Truly no longer has any duty to preserve their confidentiality or limit their use. Furthermore, Providence is unlikely to establish that the employee-compensation and office-revenue information provided to Graham Hanks by Tracie Fleming and Kim Sheets Sheffield constitutes a trade secret under the DTSA and the TUTSA because the information does not have independent economic value derived from its confidentiality.

Providence also failed to establish an imminent threat of irreparable injury caused by Defendants' use of any of Providence's alleged trade secrets. The only harm Providence maintains that it faces as a result of Defendants' alleged use of Providence trade secrets is the loss of employees and customers. *See, e.g.*, (Dkt. #8 at 13) (identifying the purportedly irreparable harm as Defendants' "using Providence's trade secrets to solicit Providence employees and customers"). According to Providence, the economic value of its alleged trade secrets derives entirely from the potential for competitors to use the trade secrets to facilitate the solicitation of Providence employees and customers. *See, e.g.*, (Dkt. #65 at 233:14–234:15) (explaining that Providence considers the information at issue to be trade secrets because, if known, it would help competitors solicit Providence employees and

42

customers). Indeed, Providence characterizes this entire case as being about "raiding the officers and employees of a competitor." (Dkt. #1 ¶ 1).

As explained above, Providence has not established that the loss of employees and customers constitutes an irreparable harm because Providence has failed to show that those losses cannot be adequately compensated with the money damages Providence seeks. Accordingly, if Providence is successful on its trade-secrets claims, Providence has an adequate remedy at law for its identified injury.

Because Providence has failed to meet its burden of establishing its entitlement to a preliminary injunction enjoining Defendants from using its alleged trade secrets, Providence's request must be denied.

## IV. CONCLUSION

Construing Defendants' motions to dismiss under Rule 12(b)(1) as motions to dismiss under Rule 12(b)(6), the Court concludes that Providence has adequately pleaded that its alleged trade secrets are related to a product or service in interstate commerce as required by the DTSA. It is therefore **ORDERED** that Defendants' motions to dismiss, (Dkt. #19, #28), are **DENIED**.

The Court further concludes that Providence has established that it is entitled to a preliminary injunction enjoining Defendant Tracie Fleming from violating the noncompete provision of the shareholders' agreement but that Providence is not entitled to any of the other preliminary injunctive relief it requests. It is therefore **ORDERED** that Providence's Motion for Preliminary Injunction, (Dkt. #8), is **GRANTED in part** and **DENIED in part**.

It is further **ORDERED** that Defendant Tracie Fleming is hereby **ENJOINED** from maintaining employment in any capacity with Truly Title, Inc., or with any other competitor of Providence Title, Inc., within the Texas counties of Tarrant, Dallas, Harris, Bexar, or any Texas counties contiguous to those counties pending the resolution of this case.

It is further **ORDERED** that, pursuant to Federal Rule of Civil Procedure 65(c), Providence shall post a bond in the amount of $5,000.00, by depositing this amount with the Clerk of the Court within three business days of this order.

**So ORDERED and SIGNED this 1st day of July, 2021.**

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE