UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| PROVIDENCE TITLE COMPANY | § | |
| | § | |
| v. | § | CIVIL NO. 4:21-CV-147-SDJ |
| | § | |
| TRULY TITLE, INC., ET AL. | § | |

## MEMORANDUM OPINION AND ORDER

Providence Title Company ("Providence") and Truly Title, Inc. ("Truly") are competitors in the Texas title insurance market. In 2019, they unsuccessfully negotiated Truly's potential acquisition of Providence. After negotiations failed, Truly successfully recruited a number of Providence's senior employees in North Texas, including its then-president, Tracie Fleming.[1] Fleming was accompanied by an exodus of Providence personnel to Truly.

The facts and background of this case are more fully set out in the Court's previous Memorandum Opinion and Order. *Providence Title Co. v. Truly Title, Inc.*, 547 F.Supp.3d 585, 593–94 (E.D. Tex. July 1, 2021). Providence maintains that the actions of Truly, Truly's president of Texas operations—Graham Hanks, Fleming, and others associated with these events went well beyond free-market competition, and instead embraced the misappropriation of Providence's trade secrets, Truly's violation of nonsolicitation and nondisclosure agreements, Fleming's and others' breach of fiduciary duties, and Fleming's breach of a shareholders' agreement.

---

[1] Tracie Fleming's husband Mark Fleming is also a party to this case. Because the claims and counterclaims discussed in this order pertain only to Tracie Fleming, the Court will refer to her as "Fleming."

1

Based on these allegations, Providence asserts various causes of action against Fleming. Fleming in turn brings counterclaims against Providence and has counter-sued third-party defendants Daniel Foster, Providence's CEO, and his law firm, Ramsey & Foster LP[2] (together, the "Third-Party Defendants"), asserting claims for fraud, negligence, breach of fiduciary duty, and tortious interference, among others.

Before the Court are Providence's Motion to Dismiss Counterclaims Asserted by Tracie L. Fleming, (Dkt. #117), and the Third-Party Defendants' Motion to Dismiss Third Party Claims Asserted by Tracie L. Fleming, (Dkt. #132). Having considered the motions, the responsive briefing, and the applicable law, the Court concludes that the motions to dismiss should be **GRANTED.**

Also before the Court is Tracie L. Fleming's Amended Motion for Leave to File (i) Restated Original Answer & First Amended Counterclaim and (ii) First Amended Third Party Claim Against Daniel Foster and Ramsey & Foster LP. (Dkt. #167).[3] Having considered the motion, the responsive briefing, and the applicable law, the Court concludes that Fleming's motion for leave to amend should be **GRANTED in part** and **DENIED in part.**

---

[2] The Court notes that the Ramsey & Foster law firm is inconsistently referred to as Ramsey & Foster PC and Ramsey & Foster LP. Because the entity identifies itself as Ramsey & Foster LP in its dismissal motion, the Court will refer to it as such.

[3] Additionally before the Court is Tracie L. Fleming's [Original] Motion for Leave to File (i) Restated Original Answer & First Amended Counterclaim and (ii) First Amended Third Party Claim Against Daniel Foster and Ramsey & Foster LP. (Dkt. #139). Because Tracie Fleming has filed an amended motion, her original motion, (Dkt. #139), will be **DENIED as moot.**

# I. Background

## A. Providence's Claims Against Fleming

Providence and Truly negotiated Truly's potential acquisition of Providence throughout 2019 before ultimately deciding to cease such negotiations. According to Providence, after the breakdown in the parties' negotiations, Truly began to use the information Providence provided to solicit Providence's employees and business contacts, allegedly in violation of the nondisclosure and nonsolicitation agreements Providence and Truly executed. Fleming, who was then Providence's president, a member of its board of directors, and a shareholder, resigned from Providence and was hired as Truly's executive vice president.

Prior to these events, Fleming executed Providence's First Amendment to Shareholders' Agreement, (Dkt. #1-6), effective as of April 9, 2013, whereby she acquired Providence shares and acknowledged that she had "received and reviewed a copy of the Shareholders' Agreement" and thereby "assume[d] all of the duties and obligations of a shareholder under the Shareholders' Agreement to the same extent as if she had been an original signatory of such instrument." (Dkt. #1-6 ¶ 9). For clarity, the Court will refer to the original Shareholders' Agreement, as amended by the First Amendment to Shareholders' Agreement, as the "Shareholders' Agreement."

As relevant here, Article 8 of the Shareholders' Agreement, which governs the repurchase of a departing shareholder's shares, includes a noncompete provision in Section 8.4 that provides:

> <u>Non-Compete.</u> *Offering Shareholder agrees for a period of twenty-four (24) months from the date of the Closing* (defined in Section 8.1) *he/she*

> will not (i) serve as a partner, employee, consultant, officer, director, member, manager, agent, associate, investor, or otherwise, or (ii) directly or indirectly, own, purchase, organize or take preparatory steps for the organization of, or (iii) build, design, finance, acquire, lease, operate, manage, invest in, *work or consult for or otherwise affiliate hisself [sic]/herself with any business in competition with or otherwise similar to Providence's business within the Texas counties* of Tarrant, Dallas, Harris, Bexar or any Texas counties contiguous to such stated counties. Breach of this covenant shall entitle the payees of the promissory notes given in payment for the Shares acquired under Section 8.2 herein to defer all payments for a period not to exceed twenty-four (24) months, without interest.

(Dkt. 1-6 § 8.4) (emphases added). Providence maintains that Fleming's present employment with Truly violates the noncompete provision.

Following the breakdown in acquisition negotiations and Fleming's and other Providence employees' departure from Providence to Truly, Providence filed suit, asserting various claims against Fleming. Providence contends that Fleming (1) misappropriated Providence's trade secrets in violation of the Defend Trade Secrets Act and the Texas Uniform Trade Secrets Act, (2) breached fiduciary duties to Providence, (3) breached the Shareholders' Agreement, and (4) engaged in a civil conspiracy.

Early in this litigation, Providence sought a preliminary injunction against Fleming. After briefing and a hearing, the Court granted Providence's request and enjoined Fleming from maintaining employment in any capacity with Truly, or with any other Providence competitor, within the Texas counties of Tarrant, Dallas, Harris, Bexar, or any other Texas counties contiguous to those counties pending the resolution of this case, consistent with the noncompete provision. *Providence Title*,

547 F.Supp.3d at 613. Fleming has appealed the preliminary injunction entered by the Court. (Dkt. #109).

## B. Fleming's Counterclaims and Third-Party Claims

Fleming now brings counterclaims against Providence and a third-party complaint against the Third-Party Defendants. In her counterclaim and third-party complaint, Fleming explains that she began working for Providence in 2008 and became a shareholder in 2013 after executing the Shareholders' Agreement.

Pursuant to the Shareholders' Agreement, she purchased 60,000 Providence shares—some of which she purchased from Foster, Providence's majority shareholder. (Dkt. #1-6). Thus, Foster was a "Seller" under the Shareholders' Agreement.

In addition to the noncompete provision discussed above, the Shareholders' Agreement also disclaimed warranties and representations of the sellers in Paragraph 11, which provides:

> <u>Disclaimer of Warranties.</u> Fleming acknowledges that she has received and reviewed such information as she deemed necessary in order to evaluate the merits and risks of its purchase of the Shares and that Fleming has such knowledge and experience in financial and business matters to be capable of evaluating the merits and risks associated with the purchase of the Shares. *Fleming has made and conducted due inquiry*, including without limitation, an investigation of the Corporation and its operations, assets, liabilities, and financial condition *and is entering into this agreement based on her due diligence investigation and is not relying upon any representation or warranty of the Sellers* (other than as provided in Section 10 hereof [detailing warranties of title to stock]) *or of the Corporation or any affiliate thereof or any officer, director, shareholder, contractor, manager, employee, agent, attorney, or advisor of any of them*, nor upon the accuracy of any record, document, instrument, projection of statement made available or given to Fleming in the performance of such due diligence or

otherwise. Fleming acknowledges that she is acquiring the Shares on an "as is, with all faults" basis without any express or implied representation or warranty of any kind other than as expressly set forth herein.

(Dkt. #1-6 ¶ 11) (emphases added).

Additionally, Section 13.14 of the Shareholders' Agreement states the following regarding legal representation:

Legal Representation. All parties to this Agreement acknowledge that [a named law firm] has represented only Daniel A. Foster in connection with the preparation of this Agreement and that *all other signatories are advised to seek separate, independent legal counsel* with respect to their respective legal rights and obligations associated with this Agreement and the transactions contemplated herein.

(Dkt. #1-5 § 13.14) (emphasis added). Section 13.1 of the Shareholders' Agreement provides that if the corporation or other shareholders fail "to comply with the provisions of this Agreement, this Agreement may be enforced by specific performance." (Dkt. #1-5 § 13.1). The Shareholders' Agreement further states that it will be governed under Texas law. (Dkt. #1-5 § 13.3).

Fleming alleges that Foster had a history of representing Providence, along with its shareholders and employees, in legal matters such as divorce proceedings, will and estate planning, and minor criminal and misdemeanor proceedings. As part of this practice, Foster provided legal advice to Fleming and her husband in 2013 regarding their purchase of a used-car-sales business and later advised them when the business began to fail.

Based on this, Fleming alleges that she believed Foster was her personal attorney. Fleming further alleges that, prior to signing the Shareholders' Agreement,

Foster advised her that the noncompete provision has one exclusive remedy for breach: Providence may defer payment for a departing shareholder's shares for twenty-four months without interest.

She further alleges that Foster advised her to purchase Providence shares and sign the Shareholders' Agreement—advice and representations that Fleming alleges were material to her decision to enter into the Shareholders' Agreement. Fleming also alleges that she trusted Foster, and Foster knew or should have known that Fleming relied on him for legal advice regarding the Shareholders' Agreement based on the special relationship of trust they shared. Fleming did not hire any other attorney to review the terms of the Shareholders' Agreement.

Contrary to Foster's alleged representation regarding Providence's exclusive remedy for violating the noncompete provision in the Shareholders' Agreement, Providence initiated this lawsuit against Fleming to enforce the noncompete provision, injuring Fleming's trade and business.

Fleming further alleges that Foster undertook actions that effectively killed the deal for Truly to acquire Providence. Specifically, Fleming maintains that Foster made a last-minute demand that he and his firm, Ramsey & Foster, be contracted to perform certain legal work for Truly, and that this demand was made in an effort to make Ramsey & Foster more attractive for a sale of the law firm and to enrich Foster himself. Fleming further alleges that, but for Foster's "undisclosed self-dealing," through which he subordinated her interest as a shareholder of Providence to his own

interests, the sale would have gone through and Fleming would have benefited as a result. (Dkt. #105 ¶ 120); (Dkt. #110 ¶ 22).

Against Providence, Fleming asserts causes of action for: (1) breach of the Shareholders' Agreement; (2) breach of fiduciary duties; (3) common-law fraud, fraud in the sale of stock, and negligent misrepresentation; (4) negligence; (5) tortious interference with contract; and (6) violations of the Texas Covenants Not to Compete Act. Fleming asserts that Foster had authority and control over Providence, and as such his acts and omissions are imputed to Providence. Providence has moved to dismiss Fleming's breach-of-fiduciary-duty claim, fraud-based claims, and negligence claim, contending that all of these claims fail under Federal Rule of Civil Procedure 12(b)(6).

Against the Third-Party Defendants, Fleming asserts causes of action for: (1) breach of fiduciary duties; (2) common-law fraud, fraud in the sale of stock, and negligent misrepresentation; (3) negligence; and (4) tortious interference with prospective business relations. Fleming asserts that Foster had authority and control over Ramsey & Foster, and as such his acts and omissions are imputed to the firm. The Third-Party Defendants have moved to dismiss all of Fleming's claims against them, also contending that Fleming's claims fail under Rule 12(b)(6).

## C. Fleming's Motion to Amend

Additionally, Fleming seeks leave to amend her counterclaims and third-party complaint to "clarify arguments made and the causes of action brought and add more specific facts." (Dkt. #167 at 2). Providence and the Third-Party Defendants assert

that Fleming's motion for leave to amend should be denied because their dismissal motions are fully briefed and because Fleming's proposed amendments to her pleadings are futile, arguing that even as amended, her claims would be subject to dismissal under Rule 12(b)(6). (Dkt. #172).

## II. LEGAL STANDARDS

### A. Motion to Dismiss

Rule 12(b)(6) authorizes dismissal of a claim when the pleader has failed to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). Under Rule 8(a)(2), a pleading need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "To survive a motion to dismiss, a [pleading] must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim is plausible "when the [claimant] pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although a probability that the defendant is liable is not required, the plausibility standard demands "more than a sheer possibility. . . ." *Id.*

In assessing a motion to dismiss under Rule 12(b)(6), the "court accepts all well-pleaded facts as true, viewing them in the light most favorable to the [nonmovant]." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quotation omitted). Legal conclusions "must be supported by factual allegations."

*Iqbal*, 556 U.S. at 679. To determine whether the claimant has pleaded enough to "nudge[] their claims across the line from conceivable to plausible," a court draws on its own "judicial experience and common sense." *Id.* at 679–80 (quoting *Twombly*, 550 U.S. at 570).

In ruling on a 12(b)(6) motion, a court "may rely on the complaint, its proper attachments, 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 726 (5th Cir. 2018) (quoting *Wolcott v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011)); *see also Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000)).

Additionally, Rule 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b); *see also Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992) ("At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." (cleaned up)).

## B. Leave to Amend

Rule 15(a) governs motions for leave to amend and directs that courts "should freely give leave when justice so requires."[4] FED. R. CIV. P. 15(a)(2). This rule "evinces

---

[4] Because Fleming moved for leave to amend prior to the deadline for doing so set in the Court's Scheduling Order, *see* (Dkt. #137 at 1), the more stringent Rule 16(b)(4) good-cause standard does not apply. *See S&W Enters., L.L.C. v. SouthTrust Bank of Ala.*, NA, 315

a bias in favor of granting leave to amend." *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 566 (5th Cir. 2002) (quotation omitted). Courts "must have a substantial reason to deny a request for leave to amend." *Id.* (quotation omitted). In making this discretionary determination, courts may consider factors "such as whether there has been undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment." *Id.* (quotation omitted). Amendment is futile where the amended pleading would fail to state a claim under Rule 12(b)(6). *In Re Life Partners Holdings, Inc.*, 926 F.3d 103, 125 (5th Cir. 2019) (citing *Lewis v. Fresne*, 252 F.3d 352, 360 n.7 (5th Cir. 2001)).

## III. DISCUSSION

For the most part, Fleming's claims center on her allegation that she relied on Foster, as her personal attorney, for the purpose of interpreting and signing the Shareholders' Agreement. Fleming plainly incorporates the Shareholders' Agreement in her counterclaims and complaint by reference. Indeed, the entire theory of her case is based on the interpretation of these documents, and her pleadings are replete with references to and excerpts of them. *See* (Dkt. #105); (Dkt. #110). Though the Shareholders' Agreement is not attached to Fleming's pleadings, because it is incorporated by reference into her pleadings, the Court may rely on it in ruling on the dismissal motions.[5] *See Innova Hosp.*, 892 F.3d at 726.

---

F.3d 533, 536 (5th Cir. 2003) (Federal Rule of Civil Procedure 16(b) "governs amendment of pleadings after a scheduling order deadline has expired.").

[5] The original shareholders' agreement and the first amendment thereto are attached

The Shareholders' Agreement directly refutes Fleming's claims that she was justified in relying on Foster. And where there is a conflict between allegations and an exhibit, "it is well settled that the exhibit[] control[s]." *Simmons v. Peavy-Welsh Lumber Co.*, 113 F.2d 812, 813 (5th Cir. 1940) (affirming dismissal of complaint where plaintiff alleged a contract existed, but the letters attached "did not show an express contract [and] refuted the inference of an implied one"); *Rogers v. City of Yoakum*, 660 F.App'x 279, 285 n.6 (5th Cir. 2016) (quoting *Lone Star Fund V*, 594 F.3d at 387 and *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 377 (5th Cir. 2004)) ("When an allegation is contradicted by" contents of exhibits "central to the claim and referenced by the complaint," then "the exhibit and not the allegation controls.").[6]  In other words, the Court accepts "as true all of the well pleaded allegations of fact but look[s] to the exhibits themselves for the contents thereof." *Simmons*, 113 F.2d at 812. Here, Fleming's allegations cannot be reconciled with the exhibits she incorporates in her pleadings. *See id.* at 813.

Based on the unambiguous language in the Shareholders' Agreement, and for the additional reasons stated below, the Court concludes that each of Fleming's

to Providence's original complaint against Fleming and all Defendants in this case. (Dkt. #1-5, #1-6).

[6] *See also, e.g.*, *Associated Builders, Inc. v. Ala. Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974) (citation omitted) ("Conclusory allegations and unwarranted deductions of fact are not admitted as true, especially when such conclusions are contradicted by facts disclosed by a document appended to the complaint. If the appended document . . . reveals facts which foreclose recovery as a matter of law, dismissal is appropriate."); *Merisier v. Johnson Cnty.*, No. 3:19-CV-2911-X-BN, 2021 WL 681443, at *14 (N.D. Tex. Jan. 14, 2021), *report and recommendation adopted*, 2021 WL 674123 (N.D. Tex. Feb. 22, 2021) (relying on *Simmons* and dismissing claims where exhibits attached to the pleadings "conflict[ed] with factual allegations elsewhere in the complaint").

causes of action that Providence and the Third-Party Defendants have moved to dismiss should be dismissed. The Court will examine each of the causes of action Providence and the Third-Party Defendants seek to dismiss, followed by Fleming's proposed amendments to those claims.

## A. Fleming's Fraud-Based Claims

Fleming brings causes of action for common-law fraud, fraud in the sale of stock under the Texas Business and Commerce Code, and negligent misrepresentation against Providence and the Third-Party Defendants, asserting that Foster induced her to sign the Shareholders' Agreement based on his misrepresentation of the meaning of its noncompete provision.

Under Texas law, claims for common-law fraud, fraud in the sale of stock, and negligent misrepresentation all require that the party bringing the claim have justifiably relied upon the allegedly fraudulent or wrongful representation. *See JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653–54 (Tex. 2018) (citations omitted) (explaining that justifiable reliance is an element of common-law fraud and of negligent misrepresentation); *Bykowicz v. Pulte Home Corp.*, 950 F.2d 1046, 1050 (5th Cir. 1992) (citation omitted) (explaining that justifiable reliance is the applicable standard under Texas Business and Commerce Code § 27.01).

Here, the parties dispute whether the disclaimer of reliance is enforceable. And citing *Orca*, Providence and the Third-Party Defendants assert that, because the

Shareholders' Agreement includes clear language disclaiming Fleming's reliance on statements by Foster, justifiable reliance may be negated as a matter of law.

Considering each issue in turn, and for the reasons set forth below, the Court concludes that the disclaimer of reliance is enforceable and justifiable reliance is negated as a matter of law. Fleming's fraud claims thus fail, as "[a]ll of the paths to relief which the pleading[s] suggest[] are blocked by the allegations and the [incorporated] documents themselves." *Gen. Guar. Ins. Co. v. Parkerson*, 369 F.2d 821, 825 (5th Cir. 1966).

### i. Enforceability of the disclaimer

The Court first considers whether the disclaimer of reliance in the Shareholders' Agreement is enforceable. "The question of whether an adequate disclaimer of reliance exists is a matter of law." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). The Texas Supreme Court's decisions in *Schlumberger Technology Corp. v. Swanson* and *Forest Oil Corp. v. McAllen* guide the Court's analysis. *See Schlumberger*, 959 S.W.2d 171, 179–81 (Tex. 1997) (holding that when knowledgeable parties expressly discuss material issues during contract negotiations but nevertheless elect to include waiver-of-reliance and release-of-claims provisions, the Court will uphold a release that clearly expresses the parties' intent to disclaim reliance on representations about specific matters in dispute); *Forest Oil*, 268 S.W.3d 51, 60 (Tex. 2008) (holding that a waiver-of-reliance provision was binding where its language was clear and the totality of the surrounding circumstances supported enforceability). Courts consider the "contract

itself" and the "totality of the circumstances" surrounding contract formation in determining whether a waiver of reliance is binding. *Forest Oil*, 268 S.W.3d at 60.[7] Five factors are relevant to this inquiry:

> (1) the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute; (2) the complaining party was represented by counsel; (3) the parties dealt with each other in an arm's length transaction; (4) the parties were knowledgeable in business matters; and (5) the release language was clear.

*Id.*

Whether the disclaimer of reliance is "clear and unequivocal" is a threshold inquiry. *See Italian Cowboy*, 341 S.W.3d at 336–37 n.8; *see also Tex. Standard Oil & Gas, L.P. v. Frankel Offshore Energy, Inc.,* 394 S.W.3d 753, 763 (Tex. App.—Houston [1st Dist.] 2012) (explaining that the fifth factor is a "threshold requirement"). The four "other extrinsic considerations" are "factors" and "not elements that all must be established for enforceability of a disclaimer." *Tex. Standard Oil & Gas*, 394 S.W.3d at 775 (citing *Forest Oil*, 268 S.W.3d at 60).

The threshold requirement is met here. The disclaimer in the Shareholders' Agreement states that "Fleming has made and conducted due inquiry . . . and is entering into this agreement based on *her due diligence investigation* . . . and is *not relying upon any representation or warranty of the Sellers* . . . or of the Corporation or

---

[7] Though the primary claims in both *Schlumberger* and *Forest Oil* were for fraudulent inducement, an enforceable disclaimer of reliance can also negate the element of justifiable reliance for general fraud claims. *See Schlumberger*, 959 S.W.2d at 182 (enforcing a disclaimer of reliance and concluding that it negated the element of justifiable reliance as a matter of law, precluding common-law fraud claim for the same reasons it precluded fraudulent-inducement claim).

any affiliate thereof or any officer, director, shareholder, [or] . . . agent . . . in the performance of such due diligence or otherwise." (Dkt. #1-6 ¶ 11) (emphases added). There is no plausible interpretation of this provision other than that Fleming agreed not to rely on any representation of Providence, any Providence shareholder, or any Providence officer, director, employee, agent, etc., in entering into the Shareholders' Agreement. When Fleming executed the Shareholders' Agreement, Foster was plainly a "Seller," officer, director, shareholder, and agent of Providence. The disclaimer is unambiguous and shows that the parties "gave the requisite clear and unequivocal expression of intent necessary to disclaim reliance." *Schlumberger,* 959 S.W.2d at 179; *see also id.* at 179–80 (concluding that a disclaimer stating that "none of us is relying upon any statement or representation of any agent of the parties being released hereby" and "[e]ach of us is relying on his or her own judgment" was "clear and unequivocal"). Such an "all-embracing disclaimer of any and all representations, as here, shows the parties' clear intent." *Forest Oil*, 268 S.W.3d at 58; *see also id.* at 54 n.4, 58 (concluding that the parties' broad disclaimer of reliance, which stated that "in executing the releases contained in this Agreement, [the parties are not] relying upon any statement or representation of any agent of the parties being released hereby [and we are] relying on [our] own judgment . . . ," showed the "parties' clear intent").

Having concluded that the threshold requirement is met, the Court now examines the remaining factors. First, "[t]here is nothing boilerplate about the [Shareholders'] Agreement; the contract is clearly unique to the parties' relationship."

*Tex. Standard Oil & Gas*, 394 S.W.3d at 772. Though Fleming does not explicitly discuss negotiation of the Shareholders' Agreement, it is clear from the pleadings and briefing that the parties "specifically discussed the issue which has become the topic of the subsequent dispute," i.e., the noncompete, prior to executing the Shareholders' Agreement. *Forest Oil*, 268 S.W.3d at 60. Therefore, this factor weighs in favor of enforcing the disclaimer.

Second, and to be sure, Fleming was not represented by counsel. However, Fleming expressly acknowledged that "all other signatories," including Fleming, were "advised to seek separate, independent legal counsel with respect to their respective legal rights and obligations associated with this [Shareholders'] Agreement." (Dkt. #1-5 § 13.14). Thus, the Court concludes that this factor is neutral.

Third, the parties to the Shareholders' Agreement were party to an arm's length transaction. When analyzing this factor, Texas courts have considered *Black's Law Dictionary*'s definition of "arm's length": "Of or relating to dealings between two parties who are not related or not on close terms and who are presumed to have roughly equal bargaining power; not involved a confidential relationship." *Pogue v. Williamson*, 605 S.W.3d 656, 667 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (quoting *Arm's-length*, BLACK'S LAW DICTIONARY (9th ed. 2009)) (indicating that *Schlumberger* suggests this definition "accurately reflects the concern this factor aims to address"). The *Schlumberger* court rejected the argument that the contract at issue was not the product of an arm's length transaction by examining whether a

fiduciary, confidential/informal fiduciary,[8] partnership, or other special relationship existed between the parties and concluding that no such relationship existed. *See* 959 S.W.2d at 175–177. In Part III(C) & n.10 *infra*, this Court similarly analyzes whether Fleming and Foster had a formal or informal fiduciary relationship. As set forth below, none exists. They were thus dealing at arm's length in the execution of the Shareholders' Agreement, and this factor weighs in favor of enforcing the disclaimer.

Even if Fleming and Foster were not dealing with each other at arm's length, that would not be dispositive. *See Tex. Standard Oil & Gas*, 394 S.W.3d at 776. In *Texas Standard Oil & Gas*, the court undertook an analysis of whether the parties dealt at arm's length and assumed, for the purpose of deciding the enforceability of a fraudulent-inducement release, that the parties had a fiduciary relationship relative to the performance of the operative agreement. *Id.* at 773. The court concluded that "[e]ven if execution of the Settlement Agreement cannot be considered entirely an arm's length transaction because the parties were still fiduciaries, the [remaining] *Forest Oil* factors support enforceability of the fraudulent-inducement release," noting that the facts supporting the *Forest Oil* factors "negate any notion" that the plaintiff "was somehow dependent" on the defendant "as its fiduciary to explain the fraudulent-inducement release or that [the plaintiff's] ability to understand the release was inhibited due to the fiduciary relationship" *Id.* at 776. The court also "refuse[d] to adopt a blanket rule that [a disclaimer of reliance or

---

[8] Informal fiduciary relationships are sometimes referred to as confidential relationships. *See Vanderpool v. Vanderpool*, 442 S.W.3d 756, 765 (Tex. App.—Tyler 2014, no pet.).

fraudulent-inducement release] in a settlement agreement between fiduciaries is unenforceable," noting that the *Forest Oil* court "did not expressly hold that a disclaimer is enforceable only if the settlement agreement resulted from an arm's length transaction or otherwise hold that a disclaimer between fiduciaries is unenforceable." *Id.* at 774–75. The same reasoning applies here.

Fourth, at the time Fleming signed the Shareholders' Agreement, she was the president of a title company at which she had worked for five years. She was thus knowledgeable in business matters. This factor weighs in favor of enforcing the disclaimer.

Regarding enforceability, Fleming argues that this disclaimer "does not . . . cover [her] own attorney advising her in the transaction." (Dkt. #131 at 7). But even accepting as true Fleming's assertion that she believed Foster was her personal attorney, Foster did not cease to be a Providence shareholder, officer, director, or agent just because he was allegedly her personal attorney. And where her personal attorney was Foster, who was a Seller, and an officer, director, shareholder, and agent of Providence, the disclaimer explicitly and unambiguously encompasses any representations made by Foster concerning the Shareholders' Agreement.

Because the disclaimer in the Shareholders' Agreement is clear and unequivocal, the parties specifically discussed the issue which has become the topic of the subsequent dispute, Fleming acknowledged that she was plainly advised to seek independent counsel, the parties were dealing at arm's length, and Fleming was knowledgeable in business matters, the Court concludes that the "contract itself" and

the "totality of the circumstances" support enforceability of the disclaimer of reliance provision. *See Forest Oil*, 268 S.W.3d at 60. As the Texas Supreme Court has said, "After-the-fact protests of misrepresentation are easily lodged, and parties who contractually promise not to rely on extra-contractual statements—*more than that, promise that they have in fact not relied upon such statements*—should be held to their word." *Id.* The Court therefore concludes that the disclaimer is binding and enforceable.

### ii. Justifiable reliance

The Court thus turns to whether the element of justifiable reliance may be negated as a matter of law.

Justifiable reliance "can be negated as a matter of law when circumstances exist under which reliance cannot be justified." *Orca*, 546 S.W.3d at 654; *Schlumberger*, 959 S.W.2d at 180, 182 (enforcing a disclaimer of reliance with "clear language," which "unequivocally disclaimed" plaintiff's reliance on the counterparty and concluding that it negated the element of reliance and precluded claims for fraudulent inducement and common-law fraud as a matter of law). In making this determination, courts consider the "nature of the parties' relationship and the contract." *Orca*, 546 S.W.3d at 654 (cleaned up).

When parties deal at arm's length, the party alleging fraud "must exercise ordinary care for the protection of his own interests," as the "failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party." *Id.* (quoting *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d

419, 425 (Tex. 2015)). And where that party "fails to exercise such diligence, it is charged with knowledge of all facts that would have been discovered by a reasonably prudent person similarly situated." *Id.* (quotation omitted). A party may not "blindly rely" on a defendant's representation "where the plaintiff's knowledge, experience, and background warrant investigation into any representations before the plaintiff acts in reliance upon those representations." *Id.* (quotation omitted).

As Providence and the Third-Party Defendants point out, the Texas Supreme Court has recognized that when there are "red flags" or "contradictory language" indicating that reliance is unwarranted, justifiable reliance may be negated as a matter of law. *Orca*, 546 S.W.3d at 650, 660 & n.2 (citation omitted). The Court analyzes each of these aspects in turn.

### a. Red flags

In considering whether there are "red flags" that negate justifiable reliance, Texas courts "view the circumstances in their entirety while accounting for the parties' relative levels of sophistication." *Id.* at 656. In *Orca*, the court concluded that Orca, the lessee and a new company whose key players were sophisticated oil-and-gas businesspeople, could not establish justifiable reliance for fraud and negligent misrepresentation claims against the lessor's representative regarding an oil-and-gas lease given several red flags, including the lessor's representative's equivocation and negation-of-warranty language in the lease, among others. *Id.*

Fleming argues that unlike the "world-savvy" and "sophisticated oil-and-gas businesspeople" in *Orca*, she "was not a sophisticated party to the [Shareholders']

Agreement." (Dkt. #131 at 7). Her argument ignores the instruction that courts must consider "the parties' *relative* levels of sophistication," *Orca*, 546 S.W.3d at 656 (emphasis added), as compared to the value and complexity of the agreement at issue.

The *Orca* parties were signatories to a "complicated, multi-million-dollar transaction" and thus were "expected to recognize 'red flags' that the less experienced may overlook." *Orca*, 546 S.W.3d at 656. Although arguably Fleming was relatively less sophisticated than the parties in *Orca*, the Shareholders' Agreement was similarly relatively less sophisticated and complex than the transaction in *Orca*. The Shareholders' Agreement covered significantly less money—a few hundred thousand dollars—and is, in its plain terms, not particularly complicated. When Fleming executed the agreement, she was the president of a title company and an experienced businesswoman. Her "relative level of sophistication" thus made her "more than capable" of reviewing and understanding the Shareholders' Agreement, *see id.*, a relatively brief contract whose meaning is clear based on its plain language. Fleming was thus sufficiently sophisticated to recognize the red flags within the Shareholders' Agreement and surrounding circumstances.

There are multiple "red flags" in the plain text of the Shareholders' Agreement that Fleming should have recognized based on a simple reading of the document: she was advised to obtain her own "independent" counsel; Foster was represented by his own independent counsel; the Shareholders' Agreement contained an explicit disclaimer of reliance on representations made by Providence and its sellers, officers, and directors; the plain terms of the Shareholders' Agreement did not state that the

deferred-payback provision was the exclusive remedy for breach of the noncompete; and it provided for enforcement through specific performance. *See Orca*, 546 S.W.3d at 657 (concluding post-trial that negation-of-warranty language was one of many red flags that in total negated justifiable reliance).

Fleming further argues that this "was not a situation like in *Orca* where the parties were adverse to each other such that T. Fleming should have known to seek legal counsel other than the counsel she had relied on many times in the past." (Dkt. #131 at 7). This argument is unpersuasive. Foster was a counterparty to the Shareholders' Agreement who, as Fleming concedes, sold shares to Fleming through the Shareholders' Agreement. They were thus patently adverse. Fleming's argument that interpreting and executing the Shareholders' Agreement was not a situation in which she should have known to seek separate legal counsel is also unconvincing, as the plain language of the agreement advised her to do just that.

### b. Direct contradiction

Providence and the Third-Party Defendants also assert that Fleming cannot plausibly allege justifiable reliance because her interpretation of the noncompete is directly contrary to the meaning of the unambiguous provision. Fleming responds that the noncompete provision was ambiguous regarding the ramifications of a breach of its terms. (Dkt. #131 at 6); *see also* (Dkt. #142 at 4 (arguing that Foster's representation was not "directly contrary" to the language of the noncompete provision)).

23

Texas courts consistently hold that "a party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous terms." *Orca*, 546 S.W.3d at 658 (citing *Westergren*, 453 S.W.3d at 424–25). A direct contradiction therefore exists if a reasonable person who has read the writing cannot still plausibly claim to believe the earlier representation. *Id.* at 659. There may be direct contradiction "even when the terminology appearing in the representation and the writing are not exactly the same." *Id.* (concluding that a representation that a trust had title was a direct contradiction of an express contractual provision explaining that JPMorgan and the trust made no guarantees pertaining to title, negating the element of reliance); *see also, e.g.*, *Mikob Props., Inc. v. Joachim*, 468 S.W.3d 587, 599 (Tex. App.—Dallas 2015, pet. denied) (holding that a representation that a settlement agreement covered all parties was directly contradicted by the agreement explicitly listing some defendants while remaining silent about one, thus barring the unlisted defendant from establishing justifiable reliance); *Playboy Enters. v. Ed. Caballero, S.A. de C.V.*, 202 S.W.3d 250, 256–58 (Tex. App.—Corpus Christi 2006, pet. denied) (concluding that an alleged representation that renewal of the parties' license agreement would be automatic was a direct contradiction because the contract stated the licensee would have the option "to request negotiations concerning an extension of the license" if the licensee was in full compliance with the agreement).

Here, the alleged representation that delayed repayment was the only remedy for violation of the noncompete provision is directly contradicted by the text of the

Shareholders' Agreement. The portion of the noncompete provision that Fleming alleges Foster misrepresented reads: "Breach of this covenant shall entitle the payees of the promissory notes given in payment for the Shares acquired under Section 8.2 herein to defer all payments for a period not to exceed twenty-four (24) months, without interest." (Dkt. #1-6 at 5). What is missing from this provision to make Fleming's allegation plausible is any mention that payment of the promissory note is the *sole* or *exclusive* remedy. Further, Section 13.1 of the Shareholders' Agreement provides that failure to comply with any provision of the Shareholders' Agreement "may be enforced by specific performance." (Dkt. #1-5 § 13.1). This provision directly contradicts Foster's alleged representation that delayed payment would be the only remedy for Fleming's failure to comply with the noncompete because any reasonable person who read the Shareholders' Agreement and saw the availability of specific performance as a remedy could not plausibly claim to believe Foster's earlier representation. *See Orca*, 546 S.W.3d at 659.

\* \* \*

Given the Shareholders' Agreement's express disclaimer of reliance, the numerous "red flags," Fleming's status as a sophisticated businesswoman, and the direct contradiction between Foster's representation and the unambiguous text of the noncompete provision and specific-performance clause, Fleming cannot establish justifiable reliance as a matter of law. *See Orca*, 546 S.W.3d at 660.

Fleming's "failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party," and she is thus "charged

with knowledge of all facts that would have been discovered by a reasonably prudent person similarly situated." *Orca*, 546 S.W.3d at 654. A reasonably prudent person similarly situated would have, at a minimum, read the contract and recognized the red flags and direct contradiction.

Fleming's fraud-based causes of action therefore must be dismissed.

### iii. Statute of limitations, the discovery rule, and Fleming's request for leave to amend

Providence and the Third-Party Defendants also assert that Fleming's fraud-based claims are barred by the applicable limitations statutes. Because the Court has concluded that Fleming has substantively failed to state a claim for her fraud-based causes of action based on her inability to plausibly allege justifiable reliance as a matter of law, it need not address whether such claims are also barred by any applicable statute of limitations.

Fleming's proposed amendments to her fraud-based claims are therefore futile, as Fleming seeks only to affirmatively plead the discovery rule with respect to these claims. (Dkt. #168 ¶ 124); (Dkt. #169 ¶ 26). The discovery rule is "a very limited exception to statutes of limitations that defers accrual of a cause of action until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to the cause of action." *Weaver*, 427 S.W.3d at 565 (cleaned up). Because Fleming's proposed amendment addresses only the statute-of-limitations defense, and not the underlying substantive issues with her claims, the amendment is necessarily futile, as it would still be subject to dismissal pursuant to the current dismissal motions. *In Re Life Partners Holdings, Inc.*, 926 F.3d at 125 (citing *Lewis*,

26

252 F.3d at 360 n.7) (amendment is futile where the amendment would fail to state a claim under Rule 12(b)(6)).

The Court therefore will not allow Fleming's proposed amendments to her fraud-based causes of action.

## B. Fleming's Negligence Claim

Fleming has also asserted a cause of action for negligence against Providence and the Third-Party Defendants. According to Fleming, through Foster's actions Providence and the Third-Party Defendants undertook a duty to advise her regarding the terms of the Shareholders' Agreement, which they breached by recklessly or knowingly misleading Fleming about the meaning of the noncompete provision, thereby damaging Fleming's business. Providence and the Third-Party Defendants assert that the duty Fleming alleges is barred by the plain language of the disclaimer. The Court agrees.

To state a claim for negligence, Fleming must establish "a duty, a breach of that duty, and damages proximately caused by the breach." *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006) (citation omitted).

Fleming has failed to plausibly allege the existence of a duty. Again, the express language of the disclaimer states that Fleming "is not relying upon any representation or warranty of the Sellers . . . of the Corporation or any affiliate thereof or any officer, director, [or] shareholder" in entering into the Shareholders' Agreement. (Dkt. #1-6 ¶ 11). This language explicitly and directly refutes the proposition that Foster had a duty to advise Fleming regarding the meaning of the agreement. And, as discussed herein, *see* Part III *supra*, when "an allegation is

27

contradicted by" contents of exhibits "central to the claim and referenced by the complaint," then "the exhibit and not the allegation controls." *Rogers*, 660 F.App'x at 285 n.6 (quoting *Lone Star Fund V*, 594 F.3d at 387 and *U.S. ex rel. Riley*, 355 F.3d at 377). The disclaimer thus controls this inquiry. Fleming cannot plead that Foster—or by extension Providence and Ramsey & Foster —had a duty to advise her regarding the meaning of the agreement. Fleming's negligence claims therefore must also be dismissed.

Providence and the Third-Party Defendants also argue that Fleming's negligence claims are barred by the statute of limitations. But again, because Fleming has failed to substantively state claims for negligence, the Court need not address the statute of limitations issue. In Fleming's motion for leave to amend, she proposes to affirmatively plead the discovery rule to save her claims from being barred by limitations. But such an amendment would be futile for the same reasons that such a proposed amendment would be futile for her fraud-based claims, as explained herein, *see* Part III(A)(iii) *supra*.

Fleming also seeks leave to assert an alternative cause of action: "negligent failure to disclose," premised on her allegation that Foster should have known that Fleming saw him as her lawyer and thus had a duty to inform her that he was not acting as her lawyer. (Dkt. #168 ¶ 127); (Dkt. #169 ¶ 29). The Court first notes that the "existence of a duty to disclose is relevant when a failure to disclose is the basis of a fraud cause of action"—not negligence. *Samson Lone Star Ltd. P'ship v. Hooks*, 497 S.W.3d 1, 18 n.5 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

Regardless, "[f]raud by non-disclosure . . . occurs when a party has a duty to disclose certain information and fails to disclose it." *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219 (Tex. 2019) (citing *Schlumberger*, 959 S.W.2d at 181). And the elements of fraud by non-disclosure are: "(1) the defendant deliberately failed to disclose material facts; (2) the defendant had a duty to disclose such facts to the plaintiff; (3) the plaintiff was ignorant of the facts and did not have an equal opportunity to discover them; (4) the defendant intended the plaintiff to act or refrain from acting based on the nondisclosure; and (5) the plaintiff relied on the non-disclosure, which resulted in injury." *Id.* at 219–20 (citations omitted).

This claim fails for the same reason Fleming's existing negligence claim fails: the Shareholders' Agreement explicitly and directly refutes the allegation that Foster had a duty to advise her regarding the meaning of the agreement. The proposed failure-to-disclose claim fails for a second reason: Fleming cannot establish that she did not have an opportunity to discover the material fact—i.e., that Foster was not her lawyer for the purpose of executing the Shareholders' Agreement—because even a cursory review of the plain language of the agreement tells her so. Fleming thus cannot state a claim for negligent failure to disclose. Such an amendment would therefore be futile.

For the foregoing reasons, the Court will not allow Fleming's proposed amendments to her negligence-based causes of action

## C. Fleming's Breach-of-Fiduciary-Duty Claims

Fleming alleges two instances that form the basis of her breach-of-fiduciary-duty claims against Providence and the Third-Party Defendants: (1) Foster's 2013 misrepresentation about the meaning of the noncompete provision; and (2) Foster's 2019 self-dealing during the acquisition negotiation between Providence and Truly— *i.e.*, Foster demanding that Ramsey & Foster be contracted for certain of Truly's legal work, thereby purportedly killing the deal and harming Fleming. (Dkt. #110 ¶22); (Dkt. #131 at 4–5). Fleming asserts that the fiduciary duty arose from her special relationship with Foster, as he was her "attorney[,] mentor, and friend." (Dkt. #142 at 8). She also asserts that "Foster (and Providence through Foster) had a special relationship with and owed a fiduciary duty to T. Fleming, a shareholder with financial interests in Providence," and that Foster acted as Fleming's and the other Providence shareholders' counsel during the 2019 negotiations. (Dkt. #131 at 4); *see also* (Dkt. #105 ¶ 114); (Dkt. #110 ¶ 12).

Though Fleming's fiduciary duty claims are not entirely clear, at bottom, she asserts: (1) a fiduciary duty arising from an alleged attorney-client relationship with Foster, and by extension with Providence and Ramsey & Foster; and (2) a fiduciary duty that Foster, and by extension Providence and Ramsey & Foster, owed her due to her status as a Providence shareholder.[9]  Both attempts to allege a fiduciary duty fail.

---

[9] To the extent Fleming also intends to assert a theory of fiduciary duty based on a "confidential relationship" or an "informal fiduciary relationship" with Foster, that claim fails on its face. First, this argument simply rehashes Fleming's claims of an attorney-client relationship and a fiduciary duty owed to her as a Providence shareholder. *See* (Dkt. #131

The elements of a breach-of-fiduciary-duty claim are: "(1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (quoting *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied)). Providence and the Third-Party Defendants dispute the existence of any fiduciary relationship. The Court thus considers whether Fleming has plausibly alleged either an attorney-client relationship with respect to Foster's 2013 misrepresentation of the noncompete or a

---

at 5 (Fleming arguing that "Providence, acting through Dan Foster, cultivated a confidential relationship resulting in informal fiduciary duties which it breached by engaging in undisclosed self-dealing")); (Dkt. #138 at 3–4 (Fleming discussing an informal fiduciary relationship with Foster resulting from Foster "represent[ing] Fleming in connection with purchasing a used car sales business and when the business failed")).

Further, although Texas law recognizes that an informal fiduciary relationship may arise "where one person trusts in and relies on another, whether the relation is a moral, social, domestic, or purely personal one," under Texas law it is clear that "not every relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship." *Schlumberger*, 959 S.W.2d at 176–77. "Instead, a fiduciary relationship is an extraordinary one that the law does not recognize lightly." *Mary E. Bivins Found. v. Highland Cap. Mgmt. L.P.*, 451 S.W.3d 104, 113 (Tex. App. —Dallas 2014, no pet.) (cleaned up).

Accepting Fleming's allegations as true, the facts come nowhere close to plausibly alleging such an extraordinary informal fiduciary relationship. Fleming fails to identify any case where such a relationship has been recognized, and Texas case law, including *Schlumberger* itself, underscores why no such relationship existed here. *See, e.g.*, *Schlumberger*, 959 S.W.2d at 177 (concluding that no confidential relationship imposing a fiduciary duty existed in the absence of evidence of a prior fiduciary relationship between the parties, though the plaintiffs argued that the parties trusted each other, where the plaintiffs alleged a duty concerning negotiations for release of claims and disclaimer of reliance); *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex.1962) (holding, in a suit to set aside deeds, that no informal fiduciary relationship existed between grantors and grantee where they had become close friends and where grantee helped grantors secure loans and personally guaranteed one loan, explaining that "mere subjective trust alone is not enough to transform arms-length dealing into a fiduciary relationship so as to avoid the statute of frauds").

fiduciary relationship arising from her status as a Providence shareholder with respect to Foster's alleged 2019 self-dealing.

### i. Attorney-client relationship

Fiduciary relationships between attorneys and clients exist as a matter of law. *Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld, L.L.P.*, 105 S.W.3d 244, 253 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (citation omitted). The attorney-client relationship is contractual and involves an attorney agreeing to "render professional services for a client." *Id.* at 254 (citation omitted). It may be "expressly created by contract" or "implied from the actions of the parties." *Mellon Serv. Co. v. Touche Ross & Co.*, 17 S.W.3d 432, 437 (Tex. App.—Houston [1st Dist.] 2000, no pet.) (citation omitted). The "determination of whether there is a meeting of the minds must be based on objective standards of what the parties did and said and not on their alleged subjective states of mind." *Tanox,* 105 S.W.3d at 254–55 (citing *Terrell v. State*, 891 S.W.2d 307, 313 (Tex. App.—El Paso 1994, pet. ref'd)).

And "whether the agreement is express or implied, there must be evidence *both* parties intended to create an attorney-client relationship." *Belliveau v. Barco, Inc.*, 987 F.3d 122, 133 (5th Cir. 2021) (citing *Kiger v. Balestri*, 376 S.W.3d 287, 291 (Tex. App.—Dallas 2012, pet. denied)). Said differently, "courts determine whether an attorney-client contract can be implied using an objective standard and do not consider the parties' unstated, subjective beliefs." *Id.* (cleaned up).

Fleming does not allege that an attorney-relationship was created by written contract, nor does she allege that she ever hired Foster as her attorney, so the Court

considers whether she has pleaded facts sufficient to plausibly allege an implied attorney-client relationship.

First, Fleming's allegation that Foster provided unspecified legal services to other, unidentified Providence employees does not give rise to any attorney-client relationship between Foster and Fleming because the relevant relationship is the one between Foster and Fleming, not Foster and third parties.

Next, Fleming alleges that Foster "consulted with" the Flemings "in connection with their purchase of a used car sale business" in 2013 and later "consulted with the Flemings in connection with a forbearance/workout agreement" when that business failed. (Dkt. #105 ¶ 111); (Dkt. #110 ¶ 9). This allegation forms the basis for Fleming's argument that Foster was her attorney, including for the purpose of interpreting and executing the Shareholders' Agreement.

The Third-Party Defendants argue that Fleming has not alleged a plausible basis under which Foster, or Ramsey & Foster by extension, owed a fiduciary duty to Fleming regarding the Shareholders' Agreement because: (1) the Shareholders' Agreement expressly disclaims reliance on their representations; (2) the Shareholders' Agreement states that Fleming was relying on her own due diligence and not the specified others' representations; and (3) Foster's status as a party to the Shareholders' Agreement renders it "nonsensical" to suggest that he owed duties to a counterparty. (Dkt. #132 at 8); *see also* (Dkt. #143 at 3–4). Providence adds that even if Foster did represent the Flemings in connection with their used-car business, that fact does not give rise to a fiduciary relationship between Fleming and Foster, and

Providence by extension, for all purposes, including for the purpose of interpreting and executing the Shareholders' Agreement. (Dkt. #133 at 3–4). The Court agrees.

Fleming's allegations, taken as true, do not plausibly allege an implied attorney-client relationship for the purpose of interpreting and signing the Shareholders' Agreement because an "objective" assessment of what Fleming alleges the "parties did and said" must take into account the Shareholders' Agreement provision that expressly disclaimed Fleming's reliance on Foster's representations. An objective assessment must also disregard Fleming's subjective belief that Foster was her lawyer. *See Tanox*, 105 S.W.3d at 254–55 (explaining that a plaintiff's "subjective belief" that a defendant was her attorney "is not relevant to" the question of whether an attorney-client relationship exists); *Belliveau*, 987 F.3d at 133 (observing that the existence of an attorney-client relationship is judged by an objective standard, not subjective beliefs, under Texas law).

Even taking as true the allegation that Foster was Fleming's attorney for the purpose of her dealings with the used-car business, Fleming has not plausibly alleged that such an attorney-client relationship extended to counseling her regarding the Shareholders' Agreement. The Court also notes that Fleming nowhere alleges that she and Foster had an agreement, whether written or oral, that Foster would serve as her lawyer in any and every type of legal transaction or dispute. Likewise, Fleming has not alleged any facts, beyond her subjective belief, showing that Fleming and Foster had a "meeting of the minds" that he was going to be her attorney for the Shareholders' Agreement. And, as explained herein, *see* Part III(A)(i) *supra*, the plain

34

language of the Shareholders' Agreement unequivocally forecloses any notion that Foster served as her attorney regarding the negotiation and execution of that agreement.

As aptly stated by one federal district court, "while previous representation may suggest continued representation, such relationship is not implied or assumed in the face of an express waiver as there was in this case." *N. Am. Sav. Bank, F.S.B. v. Henderson*, No. 5:08-CV-601-BO, 2010 WL 11565537, at *4 (E.D.N.C. Aug. 25, 2010) (acknowledging that an attorney-client relationship may be implied and concluding that none existed where the defendant produced evidence expressly disclaiming an attorney-client relationship for the transaction at issue because a "claim of an attorney-client or fiduciary relationship . . . is not viable in the face of undisputed evidence that it was expressly disclaimed"). Here, given the express disclaimer of reliance provision and the lack of objective indications demonstrating that Foster and Fleming intended to create an implied attorney-client relationship for the purposes of the Shareholders' Agreement, the Court concludes that Fleming has failed to plausibly allege that an implied attorney-client relationship existed.

### ii. Fiduciary relationship arising from Fleming's status as a shareholder

The Court now turns to Fleming's assertion of a fiduciary relationship arising from her status as a Providence shareholder based on her allegation that Foster's "undisclosed self-dealing" as part of the acquisition negotiations was a breach of a fiduciary duty. Fleming asserts that Foster, and by extension Providence and Ramsey & Foster, represented Fleming during the acquisition negotiations and thus had a

fiduciary duty to Fleming as "a shareholder with financial interests in Providence." (Dkt. #131 at 4); (Dkt. #142 at 9).

A corporation's officers "owe fiduciary duties to the corporation[] they serve," however, they "do not owe fiduciary duties to individual shareholders unless a contract or special relationship exists between them in addition to the corporate relationship." *Bivins*, 451 S.W.3d at 113 (quoting *Myer v. Cuevas*, 119 S.W.3d 830, 836 (Tex. App.—San Antonio 2003, no pet.)). So, Providence and the Third-Party Defendants are correct in their argument that this theory of fiduciary duty is "backwards"—Fleming owed fiduciary duties to Providence as its officer and director, not the other way around. *See* (Dkt. #117 at 8); (Dkt. #132 at 8).[10] The fiduciary duties that the directors and officers of Providence, such as Foster, allegedly owed to Fleming must instead arise from her role as a shareholder.

As the Fifth Circuit has explained, under Texas law, breach of fiduciary duty allegations against a corporation's directors may only be advanced through a shareholder's derivative suit. *Gearhart Indus. v. Smith Int'l, Inc.*, 741 F.2d 707, 721 (5th Cir. 1984) (citing *Bounds v. Stephenson,* 187 S.W. 1031 (Tex. Civ. App.—Dallas 1916, writ ref'd)). Fleming does not have standing to bring such claims on her own behalf in this case. *See id.* This is so because "directors' duties of loyalty and care run to the corporation, not to individual shareholders." *Id.; see also Ritchie v. Rupe*,

---

[10] Further, the contract that bears on the relationship here is the Shareholders' Agreement, which expressly disclaims an attorney-client or other special relationship between Fleming and Foster. And the only other "special relationship" Fleming could argue exists in this context is the alleged attorney-client relationship, which the Court has concluded did not exist as a matter of law, *see* Part III(C)(i) *supra*.

443 S.W.3d 856, 888 (Tex. 2014) ("[W]e cannot adopt a common-law rule that requires directors to act in the best interests of each individual shareholder at the expense of the corporation.").

In *Ritchie*, the Texas Supreme Court explained that it had "not previously recognized a formal fiduciary duty to individual shareholders" and "better judgment counsels against doing so." 443 S.W.3d at 890 (explaining that "[i]mposing on directors and officers a common-law duty not to act 'oppressively' against individual shareholders," which was at issue in *Ritchie*, "is the equivalent of, or at least closely akin to, imposing on directors and officers a fiduciary duty to individual shareholders"). Fleming's attempt to avoid this result by arguing that the facts of *Ritchie* are different than those before this Court misses the mark. Notwithstanding any factual distinctions, *Ritchie*'s legal principles are equally controlling here.

Foster did not owe Fleming a direct fiduciary duty pursuant to his role as a director of Providence. He similarly did not owe her a fiduciary duty as a co-shareholder, as co-shareholders generally do not owe fiduciary duties to each other. *Rowe v. Rowe*, 887 S.W.2d 191, 198 (Tex. App.—Fort Worth 1994, writ denied) (holding that shareholder could not prevail on breach-of-fiduciary-duty claim against another shareholder because alleged mishandling of funds did not result in any injury to the corporation). Because Fleming cannot establish a viable breach-of-fiduciary-duty claim against Foster, she likewise cannot establish one against Providence or Ramsey & Foster based upon Foster's actions.

Fleming's breach-of-fiduciary-duty causes of action will therefore be dismissed.

37

### iii. Fleming's proposed amendments to her pleadings

Fleming seeks leave to amend her pleadings to include additional factual allegations regarding Foster's legal advice and counsel concerning Fleming and her husband's used-car business purchase and dealings. She seeks to allege that Foster "had Joe Kimball, another lawyer with the Ramsey & Foster law firm, draft and prepare formation documents for . . . the Flemings['] new used car business, and to serve as that entities' [sic] registered agent." (Dkt. #168 ¶ 112); (Dkt. #169 ¶ 10). Fleming also seeks to add that "when that used car business began to fail, Foster consulted with and gave legal advice to Fleming and prepared a deed in lieu of foreclosure and release of lien to convey property from the business back to the seller," and that "[s]ometime thereafter, the floor plan lender for the Flemings['] used car business presented them with a Foreclosure Agreement and Dan Foster reviewed that Forbearance Agreement for the Flemings and gave them legal advice on their rights thereunder." (Dkt. #168 ¶ 112); (Dkt. #169 ¶ 10).

These proposed additional factual allegations do not save Fleming's breach-of-fiduciary-duty claims because the Court has already concluded that, even taking as true the allegation that Foster was Fleming's attorney for the purpose of the purchase of and later dealings regarding the used-car business, Fleming has not plausibly alleged that such an attorney-client relationship extended to counseling her regarding the Shareholders' Agreement.

Fleming further seeks to affirmatively plead the discovery rule in her claim against the Third-Party Defendants. But the discovery rule will not revive Fleming's

breach-of-fiduciary-duty causes of action for the same reason the discovery rule cannot save her fraud and negligence causes of action—even if the rule were applicable, Fleming would not be able to allege any plausible breach-of-fiduciary-duty claim. *See* Parts III(A)(iii), III(B) *supra*.

Because each of Fleming's proposed amendments regarding her breach-of-fiduciary-duty causes of action would be futile the Court will not allow such amendments.

### D. Fleming's Tortious Interference with Prospective Business Relations Claim Against the Third-Party Defendants

Lastly, Fleming claims that Foster and his law firm intentionally interfered with the prospective "business relationship between Fleming and Truly," a relationship that would benefit Fleming through employment with Truly and the financial benefit of the sale of her Providence shares when the acquisition deal closed. She alleges that the Third-Party Defendants' "last-minute demands to enrich themselves" killed the deal, injuring Fleming because she did not receive those benefits. (Dkt. #110 ¶¶ 29–30).

Under Texas law, to state a claim for tortious interference with prospective business relations, a plaintiff must plead, among other elements, that "the defendant's conduct was independently tortious or unlawful." *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013) (citing, among others, *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001)).

Fleming alleges that the independently tortious conduct at issue includes the Third-Party Defendants' common-law fraud, negligence, and breach of fiduciary duty.

(Dkt. #110 ¶ 30). Because Fleming has failed to state a claim for any of those causes of action against the Third-Party Defendants, she has failed to allege independently tortious conduct, and thus has failed to state a claim for tortious interference.

Fleming does not seek to amend this claim. It will be dismissed.

## E. Fleming's Additional Proposed Amendments

The Court notes that Providence did not seek dismissal of Fleming's causes of action for breach of the Shareholders' Agreement or for breach of the Texas Covenants Not to Compete Act. The Court also notes that Fleming seeks to amend her counterclaims against Providence to remove her cause of action for tortious interference with contract. *See* (Dkt. #139); (Dkt. #168). Such a removal of claims will streamline the issues in this case. Fleming's motion for leave to amend, (Dkt. #167), is therefore granted in part for this limited amendment.

Fleming is ordered to file an amended counterclaim against Providence, including only her causes of action for breach of the Shareholders' Agreement and for breach of the Texas Covenants Not to Compete Act, and the factual allegations in her original counterclaim, (Dkt. #105 ¶¶ 108–116), to the extent they support these remaining causes of action, **within fourteen days** of this Memorandum Opinion and Order.[11]

## IV. CONCLUSION

For the foregoing reasons, it is **ORDERED** that Providence's Motion to

---

[11] The Court notes that by separate order, it granted Providence's motion to amend its complaint. (Dkt. #220). Fleming may thus file her answer to Providence's amended complaint jointly with her amended counterclaims.

Dismiss Counterclaims Asserted by Tracie L. Fleming, (Dkt. #117), and Third-Party Defendants Daniel Foster and Ramsey & Foster LP's Motion to Dismiss Third Party Claims Asserted by Tracie L. Fleming, (Dkt. #132), are **GRANTED**.

Because all of Fleming's causes of action against Foster and Ramsey & Foster LP have been dismissed, it is **ORDERED** that Daniel Foster and Ramsey & Foster LP are **DISMISSED** as third-party defendants in this case. The Clerk will terminate Third-Party Defendants Daniel Foster and Ramsey & Foster LP as parties in this matter.

It is further **ORDERED** that Tracie L. Fleming's Amended Motion for Leave to File (i) Restated Original Answer & First Amended Counterclaim and (ii) First Amended Third Party Claim Against Daniel Foster and Ramsey & Foster LP, (Dkt. #167), is **GRANTED in part** for the limited amendment set forth in Part III(E) *supra*. All other relief requested therein is **DENIED**.

Accordingly, Tracie L. Fleming's [Original] Motion for Leave to File (i) Restated Original Answer & First Amended Counterclaim and (ii) First Amended Third Party Claim Against Daniel Foster and Ramsey & Foster LP, (Dkt. #139), is **DENIED as moot**.

Finally, Tracie Fleming is **ORDERED** to file an amended counterclaim **within fourteen days** of this Memorandum Opinion and Order as set forth in Part III(E) *supra*.

**So ORDERED and SIGNED this 29th day of March, 2022.**

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE