UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| PROVIDENCE TITLE COMPANY | § | |
| | § | |
| v. | § | CIVIL NO. 4:21-CV-147-SDJ |
| | § | |
| TRULY TITLE, INC., ET AL. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Providence Title Company alleges that Defendants Truly Title, Inc., Graham Hanks (Truly's President of Texas Operations), Tracie Fleming, Mark Fleming, and Kim Sheets-Sheffield misappropriated its trade secrets in violation of the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, and the Texas Uniform Trade Secrets Act ("TUTSA"), TEX. CIV. PRAC. & REM. CODE § 134A.001, *et seq*. All Defendants have moved for summary judgment on these claims. (Dkt. #217, #218, #219, #258, #265). In this Memorandum Opinion and Order, the Court only addresses Providence's DTSA claim, Defendants' counterclaims for attorney's fees under the DTSA, and the various motions to seal. After considering the briefs and the applicable law, the Court concludes that (1) Defendants are entitled to summary judgment on the DTSA claim, (2) Defendants are not entitled to attorney's fees under the DTSA, and (3) the motions to seal must be denied.

## I. BACKGROUND

Because this Memorandum Opinion and Order only considers the claims concerning the DTSA, the Court only includes facts relevant to those claims. Although

1

Providence brought several other claims and Defendants assert additional counterclaims, some facts concerning those disputes will be omitted.

## A. Factual Background

Providence and Truly are competitors in the Texas title insurance market. In April 2019, Truly and Providence commenced negotiating the potential acquisition of Providence by Truly. The parties entered into a nondisclosure agreement ("NDA"), whereby the parties agreed to keep confidential certain information disclosed for the purpose of negotiating. Truly also agreed to a non-solicitation agreement that restricted its ability to solicit Providence's employees. Pursuant to these agreements, Providence supplied Truly with confidential and proprietary information. However, the parties were unable to agree to terms and negotiations ceased in November 2019.

According to Providence, after the breakdown in the parties' negotiations, Truly began to use the information Providence provided to solicit Providence's employees and customers. Specifically, less than one year after Providence and Truly ceased their acquisition talks, Truly began discussing with Defendants Tracie Fleming and Mark Fleming the possibility of their leaving Providence to work for Truly. At the time, Tracie Fleming was Providence's President and Mark Fleming was Providence's team lead for operations in Johnson County, Texas. Unknown to Providence, Truly had entered into employment agreements with Tracie Fleming and Mark Fleming by December of 2020. The agreements provided that Tracie Fleming would serve as Truly's Executive Vice President and Area Manager over the Greater Fort Worth Area and that Mark Fleming would serve as a Senior Vice President. Providence did not learn of Truly's agreements with Tracie and Mark Fleming until

the Flemings resigned from their positions with Providence on February 3, 2021. Defendant Kim Sheets-Sheffield, another one of Providence's team leads, also left Providence to work for Truly.

The departure of these key employees was accompanied by an exodus of Providence personnel to Truly from several of Providence's North Texas offices. In the roughly two months between Tracie Fleming's agreeing to work for Truly and her departure from Providence, over a dozen additional employees left Providence for Truly. In total, twenty-three Providence employees joined Truly during the relevant timeframe. Providence alleges that Truly successfully poached its employees and customers and targeted for expansion the locations where Providence was profitable by misappropriating the following alleged trade secrets: (1) its customer lists; (2) its employee compensation information; and (3) its branch-specific financial information, such as certain locations' profits and losses ("P&L").

Providence claims that Truly acquired its customer lists from Tracie Fleming. Shortly before her departure from Providence and the commencement of her employment with Truly, Tracie Fleming accessed Providence's "at risk" report and its "business source" report. Providence's at risk report records sources of business that had not opened new orders in the preceding three months, thus enabling Providence to monitor its referral sources and ensure it retains their business. The business source report is Providence's master customer list, which records all sources of business. According to Providence, Tracie Fleming had not accessed the at risk report in nearly three years and had not accessed the business source report in over one

year. She also accessed a DropBox login page and a USB device around the same time she reviewed the at risk report. However, Providence's forensic analysis failed to yield any evidence that Tracie Fleming actually took the customer lists or shared them with Truly. Nonetheless, Providence claims Defendants used these lists to target its customers.

Providence further claims, and the evidence shows, that Truly received Providence's other purported trade secrets from Tracie Fleming and Sheets-Sheffield, as well as directly from Providence during the course of the acquisition negotiations. Before leaving Providence, Sheets-Sheffield sent a text message to Graham Hanks, informing him of the base salaries and commission percentages for several employees in her office, including herself. Tracie Fleming provided Hanks with similar compensation information, and she also shared financial information for certain Providence branch locations. Providence alleges that Truly was then able to use this information along with the files Providence provided during the acquisition negotiations to solicit Providence's employees and customers and to target profitable locations for expansion. Providence also alleges that Sheets-Sheffield and the Flemings assisted Truly in soliciting Providence employees and customers.

## B.   Procedural Background

Shortly after the commencement of this suit, Providence moved for a preliminary injunction to "enjoin all Defendants from using any of Providence's trade secrets, including its data regarding finances, employee[s], offices, salaries, and customers, or publicly disclosing such information." (Dkt. #8 at 15). Providence principally focused on its compensation and branch-specific financial information.

4

The Court denied the motion for preliminary injunction as to Providence's misappropriation claim. The Court held that this information does not constitute trade secrets, but instead "constitute[s] the types of generic business data kept by companies that, while often considered confidential, do[es] not provide any independent economic value that is derived from being kept secret"—an essential element of a DTSA claim. (Dkt. #94 at 37). The Court explained that "whether the information Fleming and [Sheets-]Sheffield provided to Truly has any economic value at all is wholly contingent on the relative economic value and performance of the Providence employees in question and whether the use of the information results in the successful solicitation of those employees. Information that depends entirely on other factors for its economic value cannot be said to have independent economic value." (Dkt. #94 at 39).

After the Court ruled on the motion for preliminary injunction, robust motion practice ensued. Currently, there are seven motions for partial or complete summary judgment pending, which address both Providence's claims and Defendants' counterclaims. (Dkt. #217, #218, #219, #255, #258, #262, #265). With this Memorandum Opinion and Order, the Court considers the motions for summary judgment that address Providence's DTSA claim.[1]

---

[1] In addition to its misappropriation claim, Providence also asserted that all Defendants attempted and conspired to misappropriate its trade secrets in violation of 18 U.S.C. § 1832. However, the Court sua sponte dismissed those claims because Section 1832 does not confer a private right of action. (Dkt. #371).

5

## II. Legal Standard

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd ex rel. Est. of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting Fed. R. Civ. P. 56(a)). A defendant is entitled to summary judgment if it "identifies a lack of evidence to support the plaintiff's claim on an issue for which the plaintiff would bear the burden of proof at trial," unless the plaintiff proffers "summary judgment evidence sufficient to sustain a finding in plaintiff's favor on that issue." *Smith v. Harris Cnty.*, 956 F.3d 311, 316 (5th Cir. 2020) (cleaned up).

Because Federal Rule of Civil Procedure 56 requires that there be no "genuine issue of *material* fact" to succeed on a motion for summary judgment, "the mere existence of *some* alleged factual dispute" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (first emphasis omitted). A fact is "material" when, under the relevant substantive law, its resolution might govern the outcome of the suit. *Id.* at 248. "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (citing *Anderson*, 477 U.S. at 248). When a movant shows that the nonmovant failed to proffer sufficient evidence to establish an essential element of its claim, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily

renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"Courts consider the evidence in the light most favorable to the nonmovant, yet the nonmovant may not rely on mere allegations in the pleading; rather, the nonmovant must respond to the motion for summary judgment by setting forth particular facts indicating that there is a genuine issue for trial." *Int'l Ass'n of Machinists & Aerospace Workers v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000). Further, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) (cleaned up). Thus, the nonmovant must cite to the evidence it contends supports its opposition to the motion for summary judgment. *See* FED. R. CIV. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

## III. DISCUSSION

### A. Providence's DTSA Claim Fails.

Pursuant to the DTSA, "[a]n owner of a trade secret that is misappropriated may bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).[2] To succeed on a DTSA claim, a plaintiff must show that "(1) a trade secret existed, (2) the

---

[2] The Court previously held that Providence adequately pleaded the interstate-commerce element of its DTSA claim such that it survived Defendants' motion to dismiss. (Dkt. #94 at 5–13). Defendants do not attempt to relitigate that holding here.

trade secret was acquired through a breach of a confidential relationship or discovered by improper means, and (3) the defendant *used* the trade secret without authorization from the plaintiff." *CAE Integrated, L.L.C. v. Moov Techs., Inc.*, 44 F.4th 257, 262 (5th Cir. 2022) (per curiam) (quoting *GE Betz, Inc. v. Moffitt-Johnston*, 885 F.3d 318, 325 (5th Cir. 2018)).

A "trade secret" includes "all forms and types of financial, business, scientific, technical, economic, or engineering information" (1) that the owner has taken reasonable measures to keep confidential and (2) that derive independent economic value, actual or potential, from not being generally known by or readily accessible to the public. 18 U.S.C. § 1839(3); *see also CAE Integrated*, 44 F.4th at 262 ("A trade secret is information which derives independent economic value from being not generally known or readily ascertainable through proper means."). Whether a trade secret exists is a question of fact. *CAE Integrated*, 44 F.4th at 262.

Providence contends that Defendants violated the DTSA by misappropriating its customer lists, compensation information, and branch-specific financial data. Defendants argue that the compensation and branch-specific financial information at issue here do not constitute trade secrets. They also argue that Providence provided no evidence that any Defendant actually used the alleged trade secrets. The Court will address these arguments in turn.

### i. Providence's Business Information Does Not Derive Independent Economic Value from Its Secrecy.

Providence argues that its business information—its compensation and branch-specific financial information—constitutes trade secrets. Business

information constitutes a trade secret under the DTSA if (1) "the owner [of the information] has taken reasonable measures to keep such information secret;" and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). Notably, business information is not necessarily a trade secret simply because it is confidential. *See Brand Servs., L.L.C. v. Irex Corp.*, 909 F.3d 151, 158 (5th Cir. 2018) (acknowledging that not all confidential business information qualifies as a trade secret under the similarly worded Louisiana Uniform Trade Secrets Act); *see also H&E Equip. Servs., Inc. v. St. Germain*, No. 19-134-SDD-EWD, 2020 WL 1678327, at *6 (M.D. La. Apr. 6, 2020) ("Confidential information and trade secrets are not the same."); *St. Clair v. Nellcor Puritan Bennett LLC*, No. CV–10–1275–PHX–LOA, 2011 WL 5335559, at *2 (D. Ariz. Nov. 7, 2011) ("[C]onfidentiality alone does not transform business information into a trade secret."); *Sw. Whey, Inc. v. Nutrition 101, Inc.*, 117 F.Supp.2d 770, 777 (C.D. Ill. 2000) ("[G]eneralized confidential business information does not constitute a protectable trade secret." (cleaned up)). The DTSA makes plain that, in addition to being confidential, business information alleged to be a trade secret must have independent economic value, which must be derived from the fact that the information is secret.

As commentators have explained, while "courts recognize that plaintiffs have the burden to prove independent economic value," courts often fail to give this element proper consideration. Camilla A. Hrdy & Mark A. Lemley, *Abandoning*

*Trade Secrets*, 73 STAN. L. REV. 1, 31 (2021). Instead, "many courts rely on a series of presumptions to prove independent economic value and accept evidence that really doesn't show such value at all," and thus they "essentially read 'independent economic value' out of the statute." *Id.* at 9, 31; *see also* Sharon K. Sandeen, *The Evolution of Trade Secret Law and Why Courts Commit Error When They Do Not Follow the Uniform Trade Secrets Act*, 33 HAMLINE L. REV. 493, 525 (2010) ("The economic value requirement of the UTSA was not simply a definitional flourish but was specifically designed to increase the plaintiff's burden of proof in order to ensure that a claim for relief was not provided for illusory information or information of little import."). But courts are dutybound to give meaning to each word in a statute when possible. *See, e.g.*, *Tesfamichael v. Gonzales*, 411 F.3d 169, 175 (5th Cir. 2005) ("It is axiomatic that courts should strive to give operative meaning to every word in a statute."). Thus, this Court must carefully consider whether the materials at issue derive any independent economic value from their secrecy. 18 U.S.C. § 1839(3).

Although there is little applicable precedent in this Circuit interpreting the DTSA's "independent economic value" requirement, the Fifth Circuit addressed the phrase "independent economic value" in conjunction with trade secrets in *Reingold v. Swiftships, Inc.*, 126 F.3d 645 (5th Cir. 1997). There, the Fifth Circuit considered whether a ship mold met the Louisiana Uniform Trade Secrets Act's requirement that a trade secret derive independent economic value from not being generally known to others who could obtain economic value from the trade secret's disclosure or use. *Id.* at 650. The ship mold at issue, which was constructed over a period of nine months

at a cost of $1 million, consisted of a ninety-foot frame with a cavity that could be used to shape fiberglass into a ship hull. *Id.* The owner of the ship mold used the mold to build ship hulls, which he then sold to customers. *Id.* at 646. The owner also leased the mold to the defendant for the purpose of building commercial ship hulls. *Id.* at 647.

The Fifth Circuit had little trouble concluding that the ship mold in *Reingold* derived independent economic value from the fact that it was not generally known to others. The fact that a competitor paid to lease the mold, the Fifth Circuit found, was strong evidence of the mold's independent economic value. *Id.* at 650. The competitor could not have made those specific ship hulls without the mold, and because that was the only mold of its kind in the market, the competitor had to pay the owner for the privilege to use it. In other words, the independent economic value the owner obtained from having a unique, not-generally-known ship mold was apparent: the owner could create ship hulls that his competitors could not, unless the owner licensed use of the mold to a competitor, for which the owner could obtain compensation. Thus, the mold *itself* was valuable. Without anything more, the possessor of the mold could make and sell ship hulls.

The compensation and branch-specific financial information Providence claims are trade secrets are unlike the ship mold in *Reingold* because these alleged trade secrets do not derive *independent* economic value from their secrecy. On their own, the purported trade secrets do not give Providence a competitive advantage or add value. They do not reveal any strategies, technologies, or business models developed

11

or employed by Providence to enhance its provision of title insurance services or otherwise to compete in the title insurance market in a way that it previously could not. Instead, its compensation and branch-specific financial information are the types of generic business information kept by companies that, while often considered confidential, do not provide any independent economic value that is derived from being kept secret.

Providence contends that the information has independent economic value because it gave Truly a "roadmap" to "poach entire offices, which Truly knew to be profitable," replicating "overnight[] what had taken [Providence] decades to develop." (Dkt. #292 at 26–28). It argues that, while negotiations were ongoing, Truly's consultant, Chris Cranton, used the revenue data acquired during due diligence to project which Providence locations would be most profitable, and that, after negotiations ceased, Truly targeted these locations for expansion based on Cranton's forecast and the information that Tracie Fleming shared. According to Providence, Truly staffed these offices by recruiting Providence's personnel, which it accomplished by using Providence's compensation information provided by Tracie Fleming and Sheets-Sheffield. This argument is essentially the same as the one raised by Providence in its motion for preliminary injunction, and it fails now for the same reasons it failed previously.

Providence's theory does not establish that the business information at issue is *independently* valuable. Instead, any value that could be derived from the information is contingent on additional factors. Providence argues that Truly used

Providence's business information to determine which locations to target and what salaries to offer Providence employees. Even taking that argument as true,[3] any value would be derived from the successful solicitation of an employee who is worth the salary he or she was making at Providence, or from Truly's ability to gain market share in the regions where Providence was succeeding, which would require the successful solicitation of Providence's clients. Truly did not—and could not—reap an economic benefit by merely obtaining and possessing Providence's alleged trade secrets—something else was necessary. Information does not have "independent economic value" if its value depends upon an additional factor.

Providence argues that the value of this information is demonstrated by Truly's success in the locations that Cranton had projected and Tracie Fleming confirmed to be profitable. But Truly's success alone does not demonstrate that the information was independently valuable; at most, it indicates that the factors—the business information *plus* something else (e.g., successful solicitation of Providence's employees, hiring Providence employees worth their salary, increase in market share by converting Providence's clients)—have panned out for Truly. This success was not guaranteed, and it cannot be credited to the business information alone. Had Truly merely possessed the alleged trade secrets or had it failed in soliciting Providence's employees and customers, the business information would have been worthless. In sum, unlike the ship mold in *Reingold* which equipped its possessor with the innate capability to make one-of-a-kind ships, the economic value of the compensation and

---

[3] As explained below, this argument is unsupported by the record.

branch-specific financial information here is contingent on additional factors. Thus, they do not derive *independent* economic value from their secrecy, and, therefore, are not trade secrets.

### ii. Providence Failed to Show that Defendants Used its Purported Trade Secrets.

Even if the items at issue here constitute trade secrets, Providence's DTSA claim fails for another reason: Providence failed to show that any Defendant used them. In *GE Betz*, the Fifth Circuit explained that "[a] cause of action for misappropriation of trade secrets accrues when the trade secret is *actually used*." 885 F.3d at 325–26 (cleaned up) (considering Texas state law). The court reiterated this principle in *CAE Integrated* in the context of both DTSA and TUTSA claims. 44 F.4th at 262 (citing *GE Betz*, 885 F.3d at 325–26). Later in the opinion and in a footnote, the *CAE Integrated* court seemed to relax the "use" standard, explaining that the plaintiff "need not show actual use of trade secrets," but only that the defendant is "'in a position to use' trade secrets." *Id.* at 263 n.19 (quoting *TFC Partners, Inc. v. Stratton Amenities, LLC*, No. 1:19-CV-58, 2019 WL 369152, at *3 (W.D. Tex. Jan. 30, 2019), and citing *Cardoni v. Prosperity Bank*, 805 F.3d 573, 590 (5th Cir. 2015); *Malone v. PLH Grp., Inc.*, No. 01-19-00016-CV, 2020 WL 1680058, at *4–5 (Tex. App.—Houston [1st Dist.] Apr. 7, 2020, pet. denied)). However, *CAE Integrated* and the cases to which it cites all discuss the relaxed standard in the context of a motion for preliminary injunction—not a motion for summary judgment. This distinction makes sense because the DTSA and TUTSA contain separate provisions governing injunctive relief—both of which permit a court to grant an

14

injunction to prevent actual *or* threatened misappropriation. *See* 18 U.S.C. § 1836(b)(3)(A); TEX. CIV. PRAC. & REM. CODE § 134A.003(a). Damages, in contrast, are limited to instances of actual misappropriation. *See* 18 U.S.C. § 1836(b)(3)(B); TEX. CIV. PRAC. & REM. CODE § 134A.004(a).

In *Malone*—a Texas state court decision cited in *CAE Integrated*—the court emphasized this dichotomy, explaining that "[i]t is accurate that, in the pre-trial temporary-injunctive-relief context, a trade-secret owner is not required to prove that its ex-employee is actually using a trade secret to be entitled to temporary injunctive relief. The owner 'need only prove that he is in possession of the information and is in a position to use it.'" 2020 WL 1680058, at *5 (cleaned up). *However*, on the merits, "[a]ctual and unauthorized use of trade secrets must be proved to prevail on a misappropriation claim." *Id.* (quoting *Eagle Oil & Gas Co. v. Shale Expl., LLC*, 549 S.W.3d 256, 273 (Tex. App.—Houston [1st Dist.] 2018, pet. dism'd)).

The DTSA's and TUTSA's requirements that a plaintiff prove that the defendant actually used the trade secret stem from the acts' respective statutes of limitations for misappropriation, both of which require a plaintiff to bring his misappropriation claim within three years "after the date on which the misappropriation . . . is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d); *see also* TEX. CIV. PRAC. & REM. CODE § 16.010(a) ("A person must bring suit for misappropriation of trade secrets not later than three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered."). For trade secret

15

misappropriation to be discovered, there must have been a discoverable act—i.e., use of the trade secret.

As the Texas Supreme Court has explained, "[a] cause of action for trade-secret misappropriation accrues when the trade secret is actually used" because that is the moment "when a wrongful act causes a legal injury." *Sw. Energy Prod. Co v. Berry-Helfand*, 491 S.W.3d 699, 722 (Tex. 2016) (cleaned up). Threatened or potential use—albeit sufficient for injunctive relief—is only a threatened or potential legal wrong. When there has been no use, a cause of action for trade secret misappropriation would not accrue. *See id.*

The same reasoning applies to the DTSA, which only permits a court to award damages for actual misappropriation, which requires actual use for a cause of action to accrue. *GE Betz*, 885 F.3d at 325–26; *Sw. Energy Prod.*, 491 S.W.3d at 721 (cleaned up). Thus, under *GE Betz*, *CAE Integrated*, and the cases on which they rely, a plaintiff must show that a defendant actually used its trade secrets to succeed on a misappropriation claim.[4] "As a general matter, any exploitation of the trade secret

---

[4] The Court notes that the DTSA's language suggests that either "acquisition of a trade secret . . . by improper means" *or* "disclosure or use of a trade secret" constitutes misappropriation. *See* 18 U.S.C. § 1839(5); *see also Clean Energy v. Trillium Transp. Fuels, LLC*, No. H-19-244, 2022 WL 4451865, at *3 n.3 (S.D. Tex. Aug. 24, 2022) ("The court notes that both DTSA and TUTSA define misappropriation in two general ways. The first way appears to allow for a cause of action for improper acquisition (not use) of the trade secret. The other way allows for a cause of action when the trade secret is actually used." (citations omitted)), *report and recommendation adopted*, 2022 WL 4454376 (Sept. 23, 2022). However, controlling Fifth Circuit precedent construes the DTSA to *require* use. *See CAE Integrated*, at 262 (requiring both improper acquisition and use). Further, the parties do not dispute that use is a requirement.

that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use.'" *GE Betz*, 885 F.3d at 326. (cleaned up).

### 1. Providence failed to show that any Defendant used its customer lists.

Providence asserts that its customer lists—consisting of its "business source" report and its "at risk" report—are trade secrets that Tracie Fleming accessed and used on behalf of Truly. Although Providence has no direct evidence supporting this assertion, it points to evidence showing Tracie Fleming's suspicious behavior concerning these lists. On December 9, 2020—while she was finalizing her contract with Truly—Tracie Fleming accessed Providence's business source report, which she had not done in over a year. (Dkt. #295-3 ¶ 18); (Dkt. #295-9). Similarly, on January 28, 2021—days before she resigned from Providence—Tracie Fleming accessed the at risk report, which she had not done in nearly three years. (Dkt. #295-9). The at risk report was the last document Tracie Fleming accessed. (Dkt. #295-9 at 8). That same day, Tracie Fleming accessed a DropBox login page on the internet. (Dkt. #296-84). She also accessed a USB device on her laptop on February 2, 2021—the day before she resigned. (Dkt. #296-84).

Providence, however, has not identified any direct evidence that Tracie Fleming actually transmitted these reports or used them in connection with her employment at Truly. Nonetheless, Providence asserts that "the mere fact that [Tracie] Fleming was reviewing a list of Providence's vulnerable clients on her way out the door suggests she was viewing this information to benefit Truly." (Dkt. #292 at 19–20). Providence further contends that this evidence is bolstered by the fact that

17

Truly successfully acquired business from Providence's clients thereafter. (Dkt. #298-5 ¶¶ 12–14).

At the outset, the Court agrees with Providence that customer lists may constitute trade secrets. *See Complete Logistical Servs., LLC v. Rulh*, 350 F.Supp.3d 512, 518 (E.D. La. 2018). Nonetheless, Providence's misappropriation claim necessarily fails because it has no evidence that any Defendant actually used the customer lists. The facts of this case are strikingly similar to those in *GE Betz*. In that case, the individual defendant resigned from her role as an executive with the plaintiff, GE, to join the entity defendant in a newly-established role that would directly compete with GE, a position she accepted while still working for GE. 885 F.3d at 322. She lied to GE about the duties in her new role, denying that she would be competing against it. *Id.*

In the weeks leading up to her departure from GE, the individual defendant engaged in highly suspicious activity on her computer. *Id.* Computer monitoring software generated a report showing that someone using the individual defendant's computer (presumably the individual defendant) downloaded over 27,000 files to an external hard drive mere days after the defendant announced her resignation. *Id.* Those files contained GE's client information. *Id.* at 323. And on her last day at GE, the individual defendant sent GE's most recent financial data to her email address associated with the entity defendant. *Id.* at 326. Within a year of the individual defendant's employment with the entity defendant, the entity defendant had acquired

18

many of GE's customers—many of which were customers with GE while the individual defendant worked there. *Id.*

On appeal, the Fifth Circuit considered whether the district court properly granted summary judgment in favor of the defendants on GE's misappropriation of trade secrets claim. *Id.* at 325.[5] Although the court acknowledged that "proof of trade secret misappropriation often depends upon circumstantial evidence," it held that the evidence GE presented was not enough, and thus it affirmed summary judgment. *Id.* at 326 (cleaned up).

As to the evidence that the individual defendant downloaded tens of thousands of files containing client information and emailed herself GE's most recent financial data, the court explained that inferring use based on this circumstantial evidence would "collapse the improper-acquisition prong and the use prong of the misappropriation of trade secrets cause of action." *Id.* at 327. In other words, a mere showing of improper acquisition is insufficient to establish use. Instead, a plaintiff must provide "evidence of actual use." *Id.*

And as to the evidence that the entity defendant successfully acquired many of GE's customers shortly after the individual defendant joined its employ, the court held that it would be "unreasonable to infer from such success that [the defendants] used GE's trade secrets. The mere fact of [the entity defendant's] ability to compete does not itself suggest that [it] did so by misappropriating trade secrets." *Id.* at 326.

---

[5] While the *GE Betz* court only considered Texas state law, its analysis of "use" is apposite here because, as discussed above, both the DTSA and Texas state law require a showing of actual use.

Thus, the fact that a defendant is successful and acquires clients from a plaintiff does not demonstrate that the defendant used the plaintiff's trade secrets. *Id.*; *see also CAE Integrated*, 44 F.4th at 263 ("[The plaintiff] contends that [the defendant] could never have succeeded without [the plaintiff's] data, claiming that the 'use' of this data can reasonably be inferred from [the defendant's] results. This inference is insufficient to support a finding that [the defendant] used [the plaintiff's] trade secrets." (cleaned up)).

Providence asks this Court to make the same inferences as those rejected by the *GE Betz* court. Like GE, Providence relies on insufficient circumstantial evidence that does not show use. Specifically, it points to evidence that (1) Tracie Fleming accessed the client lists towards the end of her employment with Providence and shortly before joining Truly, (2) around that same time, Tracie Fleming accessed tools that would allow her to transmit the lists, and (3) Truly successful acquired many of Providence's customers. *See* (Dkt. #298-5 ¶ 14).[6] Based on this circumstantial evidence showing Tracie Fleming's suspicious behavior and Truly's subsequent success, Providence urges the Court to find that "[Tracie] Fleming likely printed, uploaded, photographed, hand-copied, or simply memorized these trade secret lists

---

[6] Providence also argues that the fact that Tracie Fleming and Sheets-Sheffield pursued their former clients indicates that they used the customer lists. However, as the *CAE Integrated* court explained, a defendant's "knowledge of whom he worked with . . ., absent other evidence, is insufficient to support a finding that he misappropriated trade secrets." 44 F.4th at 263. Providence failed to present any evidence that Tracie Fleming or Sheets-Sheffield relied on anything more than their memory when they contacted their clients, so it failed to show that they actually used the customer lists.

for use at Truly in pursuing Providence's customers." (Dkt. #314 at 7).[7] As the *GE Betz* court explained, however, this evidence is insufficient to establish that Defendants actually used the customer lists. 885 F.3d at 326–27. And since use is an essential element under the DTSA, Defendants are entitled to summary judgment as to their alleged misappropriation of Providence's customer lists. *See id.* at 325–27.

### 2. Providence failed to show that any Defendant used its compensation information.

Providence alleges, and the evidence shows, that Truly obtained Providence's compensation information from Tracie Fleming and Kim Sheets-Sheffield. Both Tracie Fleming and Sheets-Sheffield admit that they had communications with Hanks regarding proposed salaries and compensation structures for Providence employees whom they hoped Truly would hire. (Dkt. #296-30 at 46–47) (Tracie Fleming); (Dkt. #296-60 at 22) (Sheets-Sheffield). And, according to Hanks, Sheets-Sheffield relayed some of this information to him while she was still employed at Providence. (Dkt. #296-49 at 24–25). However, Providence failed to point to any evidence that Truly or any other Defendant actually *used* the information, and all Defendants expressly deny ever doing so.

The only evidence Providence cites to show that Defendants used Providence's compensation information is its conclusory statement that Tracie Fleming "used her

---

[7] Providence further argues that "Truly has completely failed to articulate a plausible, alternative reason for [Tracie] Fleming to access these customer lists in her final days at Providence." (Dkt. #314 at 7). Providence confuses the burden of proof: The burden is on Providence to provide "evidence of actual use," not on Defendants to show the lack thereof. *See GE Betz*, 885 F.3d at 327; *see generally Celotex Corp.*, 477 U.S. at 323 ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.")

knowledge to make 'good offers' that would be attractive to the employees Truly wanted to poach." (Dkt. #292 at 21). Providence is quoting—and mischaracterizing—Tracie Fleming's deposition, where she was asked what information she provided to Hanks "regarding the Providence employees' compensation and structure." (Dkt. #296-30 at 47). Tracie Fleming responded that she provided Hanks with "[w]hat [she] believed would be . . . good offers for the people who reached out and wanted an offer." (Dkt. #296-30 at 47). This quote merely identifies what Tracie Fleming sent to Truly—it does not show that she or Truly or any other Defendant actually used the information to prepare offers or to otherwise poach Providence employees. And, as use cannot be inferred from mere results, the fact that Truly successfully recruited many Providence employees is insufficient to satisfy the DTSA's "use" element. *See CAE Integrated*, 44 F.4th at 263.

In sum, Providence has shown acquisition—perhaps even improper acquisition—but not use. However, the Court cannot "collapse the improper-acquisition prong and the use prong of the misappropriation of trade secrets cause of action." *GE Betz*, 885 F.3d at 327. And since Providence has proffered no other evidence of actual use, Defendants are entitled to summary judgment.

### 3. Providence failed to show that any Defendant used its branch-specific financial information.

For the same reasons explained in the preceding section, Providence likewise failed to show that any Defendant used its branch-specific financial information. Providence argues, and the evidence shows, that Truly received such financial information under the strict requirements of the NDA during negotiations, as well as

from Tracie Fleming after negotiations ceased. *See* (Dkt. #296-30 at 24) (Tracie Fleming) (Q: "Isn't it true that you actually shared information about Providence's profits and performance prior to getting your offer letter from Mr. Hanks?" A: "At a branch level, yes."). However, Defendants deny that they ever used this information, and Providence has failed to offer any evidence showing otherwise.

Akin to its arguments regarding its customer lists and compensation information, Providence appears to argue that Defendants must have used Providence's branch-specific financial information because Truly successfully "pick[ed] off" the most profitable Providence branches. (Dkt. #292 at 22). Providence theorizes that Truly confirmed Cranton's forecast[8] with the information Tracie Fleming sent to Hanks, and then used this knowledge to decide which locations to target. (Dkt. #292 at 22) ("[T]he evidence suggests that Truly used Cranton's forecast (which incorporated the branch-level P&L information) to pick off some of the very offices he had identified as being most profitable during the term of the NDA."); (Dkt. #292 at 23) ("These numbers [conveyed by Tracie Fleming] confirmed Cranton's analysis from mid-2019 (made during its due diligence investigation), which predicted the Johnson County offices would be among Providence's better performing

---

[8] Recall that Cranton made his report when Truly was contemplating purchasing Providence. Although Cranton incorporated the branch-specific P&L information when preparing his forecast, he had acquired that information lawfully under the terms of the NDA. Truly asserts that "[n]o one at Truly accessed (much less used) any data provided by Providence in diligence from the collapse of the contemplated deal on or about November 13, 2019 through the commencement of this litigation on February 4, 2021 (i.e., the day this lawsuit was first filed in Texas state district court)," and that it has only accessed any such information to "(a) find out who exactly Kim Sheets-Sheffield was; and, (b) to see whether Providence's employee handbook had any references to employee non-compete agreements." (Dkt. #258 at 19–20). Providence has not provided any controverting evidence.

branch locations by the end of 2020."). According to Providence, "[b]y leveraging Providence's trade secret information, Truly's Southlake, Alliance, Burleson, and Cleburne branches (staffed primarily with former Providence employees)" were allegedly able to generate substantial revenue in their first full month of operations. (Dkt. #314 at 9) (citing (Dkt. #298-5 ¶ 15)).

This evidence does not show that any Defendant actually used the branch-specific P&L information, and thus Defendants are entitled to summary judgment. In its attempt to establish use, Providence once again demonstrates acquisition, points to Truly's success, and hypothesizes that the latter resulted from the former. But the Fifth Circuit has been clear: use cannot be inferred from results. *See CAE Integrated*, 44 F.4th at 263 (finding insufficient the plaintiff's argument that the "'use' of [its] data can reasonably be inferred from [the defendant's] *results*"); *GE Betz*, 885 F.3d at 326 ("With respect to the fact that [the entity defendant] enjoyed success with clients whose information [the individual defendant] allegedly misappropriated, it would . . . be unreasonable to infer from such success that [the defendants] used GE's trade secrets. The mere fact of [the defendant's] ability to compete does not itself suggest that [the defendant] did so by misappropriating trade secrets."). Accordingly, Truly's success in expanding into locations where Providence was profitable is insufficient to show use.

Nor does mere acquisition—even improper acquisition—show use. *See GE Betz*, 885 F.3d at 327 (refusing to "collapse the improper-acquisition prong and the use prong of the misappropriation of trade secrets cause of action"). Instead,

24

Providence was required to proffer evidence showing "actual use." *Id.* It failed to do so, and thus Defendants are entitled to summary judgment.

*     *     *

In sum, Providence has failed to show that Defendants violated the DTSA. Providence's compensation and branch-specific financial information do not derive independent economic value from their secrecy, and thus they are not trade secrets. Providence also failed to show that any Defendant "actually used" its purported trade secrets—an essential element of the DTSA. *See id.* Therefore, Defendants are entitled to summary judgment on Providence's DTSA claim.[9]

## B. Defendants Are Not Entitled To Attorney's Fees Under the DTSA.

In their motions for summary judgment, Mark Fleming, Tracie Fleming, and Sheets-Sheffield move for attorney's fees under the DTSA. (Dkt. #217 at 19–20); (Dkt. #218 at 26–27); (Dkt. #219 at 26). The DTSA permits a court to award attorney's fees to the prevailing party "if a claim of the misappropriation is made in bad faith." 18 U.S.C. § 1836(b)(3)(D).

Here, while these Defendants rightly note that they have prevailed on Providence's DTSA claim, they failed to proffer any evidence that Providence made such claim in bad faith. In fact, they did not even attempt to make such a showing.

---

[9] Truly also argues that Providence failed to take reasonable measures to keep its purported trade secrets confidential. However, because the Court concludes that the compensation and branch-specific financial information do not derive independent economic value from their secrecy—and thus are not trade secrets—and that no Defendant actually used any of the purported trade secrets, the Court need not address whether Providence took reasonable measures to keep the information confidential.

Thus, they have failed to establish that Providence acted in bad faith, and therefore they are not entitled to attorney's fees under the DTSA.

## C. All Pending Motions to Seal Must be Denied.

Also before the Court are various motions to seal relating to the DTSA claims discussed above. (Dkt. #248, #249, #250, #293, #297, #308, #313, #316). However, many of these motions can be summarily denied for failure to comply with the sealing standard. Those motions, (Dkt. #248, #249, #250, #293, #308, #313, #316), merely argue that the relevant documents have been designated as "Confidential Information" or for "Attorneys Eyes Only" and, therefore, they must be filed under seal.

These arguments misunderstand the relationship between documents marked "confidential" within the context of discovery production and documents that are to be filed as part of the judicial record. The Fifth Circuit has made clear that "courts are duty-bound to protect public access to judicial proceedings and records," a duty that is all too "easy to overlook" in the context of stipulated sealings, and that it is inappropriate to "presum[e] that whatever satisfies the lenient protective-order standard will necessarily satisfy the stringent sealing-order standard." *Binh Hoa Le v. Exeter Fin. Corp.*, 990 F.3d 410, 417–18 (5th Cir. 2021). That's because a strict balancing test applies to a sealing request once a document becomes a judicial record. *Id.* at 419. The Court must "undertake a case-by-case, document-by-document, line-by-line balancing of the public's common law right of access against the interests favoring nondisclosure." *Id.* (cleaned up). Courts are instructed to be "ungenerous with their discretion to seal judicial records." *Id.* at 418.

26

The parties, therefore, should have provided the Court with information sufficient to undertake this analysis in their requests that the documents be filed under seal. But they did not. Instead, they merely suggest that the documents should be sealed because they have been designated "Confidential" or for "Attorneys Eyes Only." Considering the public's right of access to inspect judicial records and the presumption in favor of disclosure, the Court finds that the parties have failed to articulate sufficient reasons to support the following motions to file under seal: (Dkt. #248, #249, #250, #293, #308, #313, #316).

Only one motion, (Dkt. #297), filed by Providence, identifies the information Providence seeks to seal (at least partially) and proffers a reason other than the documents' designations as "confidential"—although it still relies heavily on such designations. However, Providence's arguments are conclusory and insufficient. It simply claims that the information is confidential or sensitive (which is a step above merely pointing out that it is labeled as such by the other side, but still insufficient), and that the information should not be publicly disclosed. (Dkt. #297 at 5–6). The sealing standard is more exacting than that:

> Given the judiciary's solemn duty to promote judicial transparency, we must be alert to conflation errors (extending protective-order standards to material filed with the court). The secrecy of judicial records, including stipulated secrecy, must be justified and weighed against the presumption of openness that can be rebutted only by compelling countervailing interests favoring nondisclosure. All too often, judicial records are sealed without any showing that secrecy is warranted or why the public's presumptive right of access is subordinated.

*Binh Hoa Le*, 990 F.3d at 420–21 (footnote omitted).

Here, Providence has not provided the Court with enough information to justify and weigh Providence's interests in keeping the documents under seal against the public's right of access. It has identified no countervailing interests, other than its conclusory statements that the information is confidential or sensitive. Thus, this motion to seal, (Dkt. #297), along with the motions to seal discussed above, (Dkt. #248, #249, #250, #293, #308, #313, #316), must be denied.

## IV. CONCLUSION

For the foregoing reasons, it is **ORDERED** that Defendants' motions, (Dkt. #217, #218, #219, #258, #265), are **GRANTED in part**. They are **GRANTED** with respect to Providence's Defend Trade Secrets Act claim, and that claim is hereby **DISMISSED with prejudice**. Mark Fleming's, Tracie Fleming's, and Sheets-Sheffield's motions for summary judgment, (Dkt. #217, #218, #219), are **DENIED** with respect to their counterclaims for attorney's fees under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(D).[10]

It is further **ORDERED** that all pending motions to seal, (Dkt. #248, #249, #250, #293, #297, #308, #313, #316), are **DENIED without prejudice**.

It is further **ORDERED** that the exhibits referenced in the motions to seal, (Dkt. #248, #249, #250, #293, #297, #308, #313, #316), shall remain under seal until **May 17, 2024**. In the interim, either party may submit renewed motions to seal that are consistent with Fifth Circuit precedent.

---

[10] The Court will separately issue orders on the claims not resolved by this Memorandum Opinion and Order.

**So ORDERED and SIGNED this 2nd day of May, 2024.**

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE