UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| PROVIDENCE TITLE COMPANY | § | |
| | § | |
| v. | § | CIVIL NO. 4:21-CV-147-SDJ |
| | § | |
| TRULY TITLE, INC., ET AL. | § | |

## MEMORANDUM OPINION AND ORDER

Providence Title Company and Truly Title, Inc. are competitors in the Texas title insurance market. In 2019, Truly and Providence unsuccessfully negotiated Truly's potential acquisition of Providence. Afterward, Truly recruited a number of Providence's senior employees in North Texas, including Tracie Fleming, Mark Fleming, and Kim Sheets-Sheffield. The departure of these key employees was accompanied by an exodus of Providence personnel to Truly from several of Providence's North Texas offices.

Providence maintains that the actions of Truly, Truly's president of Texas operations—Graham Hanks, Tracie Fleming, Mark Fleming, and Sheets-Sheffield associated with these events went well beyond free market competition, embracing instead violations of state and federal law. Based on these allegations, Providence asserts various causes of action against Mark and Tracie Fleming, including claims for violations of the federal Defend Trade Secrets Act and the Texas Uniform Trade Secrets Act, breaches of fiduciary duty, breaches of a Providence Shareholders' Agreement executed by Tracie Fleming (the "Shareholders' Agreement"), tortious interference with prospective customer and contractual relationships, and civil

1

conspiracy. Providence also asserts claims against Mark Fleming for knowing participation in a breach of fiduciary duty and tortious interference with the Shareholders' Agreement.[1]

Tracie and Mark Fleming assert counterclaims against Providence for attorney's fees and costs incurred in responding to Providence's claims that they misappropriated its trade secrets and breached the Shareholders' Agreement. Tracie asserts an additional counterclaim against Providence for Providence's alleged breach of the Shareholders' Agreement for failing to repurchase her shares after she resigned from Providence. Tracie also seeks attorney's fees and costs incurred in bringing that counterclaim.

Before the Court are motions for summary judgment filed by Defendants Mark Fleming, (Dkt. #217), Tracie Fleming, (Dkt. #218) (collectively, the "Flemings"),[2] and Plaintiff Providence Title Company, (Dkt. #255). Mark moves for summary judgment on all of Providence's claims against him, as well as his counterclaims against Providence. Tracie moves for summary judgment on some—but not all—of Providence's claims against her, including Providence's claims for breach of fiduciary duty and breach of the Shareholders' Agreement, as well as her counterclaim against Providence for its alleged breach of the Shareholders' Agreement. Providence likewise

---

[1] Providence also asserts various causes of action against the other Defendants. The Court will address those claims in subsequent orders.

[2] When referring to Mark or Tracie Fleming individually, the Court will use their first names for ease of readability.

moves for summary judgment on Tracie's counterclaim for breach of the Shareholders' Agreement.

In this order, the Court will consider Providence's tort and contract claims, including Providence's claims against the Flemings for breaches of fiduciary duties and breaches of the Shareholders' Agreement, and its claims against Mark for tortious interference with the Shareholders' Agreement, tortious interference with prospective contractual and customer relationships, knowing participation in a breach of fiduciary duty, and civil conspiracy. The Court will also consider Tracie's counterclaim for Providence's alleged breach of the Shareholders' Agreement and the Flemings' counterclaims for attorney's fees and costs.

## I. BACKGROUND

### A. Factual Background

Tracie and Mark Fleming are former employees of Providence—a title insurance company located in Texas. Tracie joined Providence in 2008, and she eventually became its President and minority shareholder. Mark started at Providence in 2016, serving as the Team Leader for Johnson County.

Both Tracie and Mark Fleming resigned from Providence on February 3, 2021, to join Truly, Providence's competitor and former prospective purchaser. Nearly two years before the Flemings resigned, in April 2019, Truly and Providence commenced negotiating Truly's potential acquisition of Providence. However, the parties were unable to agree to terms and negotiations ceased in November 2019. Less than one year later, Truly began discussing with the Flemings the possibility of their leaving

Providence to work for Truly. Unknown to Providence, Tracie and Mark accepted offers of employment from Truly in December of 2020. The agreements provided that Tracie would serve as Truly's Executive Vice President and Area Manager over the Greater Fort Worth Area and that Mark would serve as a Senior Vice President.

Prior to their February 3 departures, the Flemings had not told anyone at Providence that they intended to resign and join Truly, except for their daughter, who also worked at Providence. It was not until after the Flemings resigned that they revealed to their colleagues that they were leaving Providence. Following the Flemings' departures, a number of other employees left Providence to join Truly— totaling nearly two dozen in all during the relevant timeframe. According to Providence, the Flemings played a role in this exodus by soliciting employees to join them at Truly. Providence also contends that the Flemings took several actions before they left Providence to Truly's benefit and Providence's detriment, such as providing confidential information to Truly and scouting locations to establish an office for Truly's expansion.

## B. Procedural Background

Providence contends that the Flemings' actions violated both state and federal law. It brought claims against the Flemings for (1) violation of the federal Defend Trade Secrets Act ("DTSA"),[3] (2) conspiracy to violate the DTSA,[4] (3) violation of the

---

[3] The Court granted summary judgment in favor of Defendants on this claim. (Dkt. #372).

[4] The Court dismissed this claim. (Dkt. #371).

Texas Uniform Trade Secrets Act ("TUTSA"), (4) breach of fiduciary duty, (5) breach of the Shareholders' Agreement, (6) tortious interference with prospective contractual relationship, (7) tortious interference with prospective customer relationships, and (8) civil conspiracy. Additionally, Providence brought claims against Mark, but not Tracie, for knowingly participating in a breach of fiduciary duty[5] and for tortiously interfering with the Shareholders' Agreement. The Flemings asserted counterclaims against Providence for attorney's fees and costs incurred in defending against Providence's claims. Tracie also asserted a counterclaim for breach of the Shareholders' Agreement.

Shortly after the commencement of this suit, Providence moved for a preliminary injunction to enjoin (1) the Flemings from violating the noncompete provision of the Shareholders' Agreement, (2) all Defendants from soliciting Providence's employees and customers, and (3) all Defendants from using Providence's trade secrets. (Dkt. #8). The Court granted the motion in part, finding that Tracie likely violated the noncompete provision. *See Providence Title Co. v. Truly Title, Inc.*, 547 F.Supp.3d 585, 598–606 (E.D. Tex. 2021). Accordingly, the Court enjoined her from working for Truly or any other Providence competitor in several Texas counties for two years pursuant to the noncompete. *See id.* However, the Court

---

[5] Providence originally asserted a cause of action for aiding and abetting a breach of fiduciary duty, but the Court dismissed that claim after determining that no such cause of action exists in Texas. (Dkt. #329). However, the Court permitted Providence to amend its complaint by removing the dismissed aiding-and-abetting cause of action and adding a knowing-participation cause of action. (Dkt. #329).

determined that Providence was not entitled to a preliminary injunction on the remainder of its claims.

After the Court ruled on the motion for preliminary injunction, robust motion practice ensued. Currently, there are seven motions for partial or complete summary judgment pending. (Dkt. #217, #218, #219, #255, #258, #262, #265). Mark moves for summary judgment on all of Providence's claims against him, as well as his counterclaims for attorney's fees and costs. (Dkt. #217). Tracie moves for summary judgment on most—but not all—of Providence's claims against her, as well as her counterclaims. (Dkt. #218). Providence moves for summary judgment on Tracie's counterclaim for breach of the Shareholders' Agreement. (Dkt. #255). In this Memorandum Opinion and Order, the Court considers Providence's tort and contract claims against the Flemings and the Flemings' counterclaims against Providence.

## II. Legal Standard

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd ex rel. Est. of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)). A defendant is entitled to summary judgment if it "identifies a lack of evidence to support the plaintiff's claim on an issue for which the plaintiff would bear the burden of proof at trial," unless the plaintiff proffers "summary judgment evidence sufficient to sustain a finding in plaintiff's favor on that issue." *Smith v. Harris Cnty.*, 956 F.3d 311, 316 (5th Cir. 2020) (cleaned up).

Because Federal Rule of Civil Procedure 56 requires that there be no "genuine issue of *material* fact" to succeed on a motion for summary judgment, "the mere existence of *some* alleged factual dispute" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (first emphasis omitted). A fact is "material" when, under the relevant substantive law, its resolution might govern the outcome of the suit. *Id.* at 248. "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (citing *Anderson*, 477 U.S. at 248). When a movant shows that the nonmovant failed to proffer sufficient evidence to establish an essential element of its claim, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"Courts consider the evidence in the light most favorable to the nonmovant, yet the nonmovant may not rely on mere allegations in the pleading; rather, the nonmovant must respond to the motion for summary judgment by setting forth particular facts indicating that there is a genuine issue for trial." *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000). Further, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Malacara v. Garber*, 353 F.3d 393, 405

(5th Cir. 2003) (cleaned up). Thus, the nonmovant must cite to the evidence it contends supports its opposition to the motion for summary judgment. *See* FED. R. CIV. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

### III. DISCUSSION

#### A. Jurisdiction

When Providence brought this action, it asserted federal question jurisdiction under 28 U.S.C. §1331, premised on Defendants' alleged violations of the federal DTSA. Providence also asserted a number of Texas state-law claims, all premised on Defendants' alleged misconduct during and after the failed negotiations concerning Truly's potential acquisition of Providence. Several Defendants brought counterclaims against Providence—likewise premised on both state and federal law. Through the course of the litigation, the Court has dismissed all federal claims and counterclaims in this matter, except certain counterclaims for attorney's fees brought under federal law.[6] (Dkt. #371, #372, #381). All that remain are causes of action premised on state law.

Generally, a district court has original jurisdiction over claims that arise under federal law, 28 U.S.C. § 1331, as well as cases that arise under state law and meet certain diversity-of-citizenship and amount-in-controversy requirements, *id.* § 1332.

---

[6] As the Fifth Circuit has explained, "a request for attorneys' fees, even if allowable under federal but not state law, does not in itself present federal question jurisdiction." *Bernhard v. Whitney Nat'l Bank*, 523 F.3d 546, 552 (5th Cir. 2008).

A district court may exercise supplemental jurisdiction over state claims over which it would not have original jurisdiction so long as those claims are "part of the same case or controversy" as the original-jurisdiction claims. *Id.* § 1367(a).

Having dismissed all federal claims and counterclaims (save the requests for attorney's fees), the Court must now consider whether it should retain supplemental jurisdiction over the remaining state-law claims. *See Enochs v. Lampasas Cnty.*, 641 F.3d 155, 161 (5th Cir. 2011) ("Courts are instructed to examine their jurisdiction at every stage of the litigation." (cleaned up)). Pursuant to the supplemental jurisdiction statute, "district courts may decline to exercise supplemental jurisdiction . . . if (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." § 1367(c). Courts are also instructed to consider the "common law factors of judicial economy, convenience, fairness, and comity." *Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.*, 554 F.3d 595, 602 (5th Cir. 2009).

Although courts have broad discretion to decide remaining state-law claims, the "general rule is to dismiss state claims when the federal claims to which they are pendent are dismissed." *Enochs*, 641 F.3d at 161 (cleaned up); *see also Brookshire Bros. Holding*, 554 F.3d at 602 ("The general rule is that a court should decline to exercise jurisdiction over remaining state-law claims when all federal-law claims are

eliminated before trial . . . ."). However, the general rule "is neither mandatory nor absolute; no single factor is dispositive." *Brookshire Bros. Holding*, 554 F.3d at 602.

After considering the statutory and common-law factors, the Court concludes that it should retain jurisdiction over the remaining state-law claims and counterclaims. This case has been pending since February 2021—three-and-a-half years. The Court has ruled on numerous substantive motions, including a motion for preliminary injunction, motions to dismiss, and a motion to compel. And while only state-law claims remain, those claims are not novel or complex. Instead, the remaining claims before the Court involve straightforward tort and contract issues implicating a broad body of governing precedent.

Further, the remaining state-law claims have been fully briefed and motions for summary judgment on the majority of claims are ripe for adjudication. The Court's rulings on those motions will be the final step before trial on any claim that survives. If the Court remanded the case to state court, the case would begin anew, and the "state court judge would face the burdensome task of becoming acquainted with the multi-year federal-court history of the parties' dispute." *Clapper v. Am. Realty Invs., Inc.*, No. 3:14-CV-2970, 2018 WL 2739014, at *3 (N.D. Tex. June 6, 2018). Remand would serve only to delay the resolution of this case and waste significant resources of the parties and the state court.

Finally, each party has requested that the Court retain jurisdiction. (Dkt. #383, #384, #385, #386). Thus, no party will be prejudiced by the Court's retention of the claims, and each agrees that the balance of the factors favors

exercising supplemental jurisdiction. The Court concurs and, therefore, will exercise supplemental jurisdiction over all remaining claims and counterclaims.

## B. Evidentiary Objections

Before turning to the merits of the motions, the Court must first address Providence's numerous objections to evidence submitted by Tracie Fleming. "The issue at the summary judgment phase is not whether the parties have presented admissible evidence to support their motions for summary judgment, but whether they have shown that they will be able to present admissible evidence at trial." *BP Energy Co. v. Glob. Health Tech. Grp., LLC*, No. H-19-3243, 2020 WL 5947605, at *6 (S.D. Tex. Oct. 7, 2020). Parties may submit declarations in support of their positions on summary judgment. Such declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4).

### i. Tracie Fleming Declaration

In its Motion to Strike Tracie Fleming's Summary Judgment Evidence, (Dkt. #243), Providence objects to several statements Tracie made in her first declaration, (Dkt. #218-2).[7] Providence objects to Paragraphs 4 and 5 in their entirety, arguing that these paragraphs are not relevant, involve legal opinions, and are an improper attempt to use parol evidence. In these paragraphs, Tracie offers her understanding of the meaning of the terms of the noncompete provision found in

---

[7] Tracie failed to respond to any objection.

Paragraph 8.4 of the Shareholders' Agreement, including the ostensible purpose behind the drafting of that provision. "Only where a contract is ambiguous may a court consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument. No issue regarding the parties' intentions is raised *unless* the contract is ambiguous—and evidence of those intentions cannot be used to create an ambiguity." *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 764–65 (Tex. 2018) (cleaned up). The Court has reviewed Paragraph 8.4 of the Shareholders' Agreement and concludes that it is unambiguous. Therefore, Tracie's testimony is inadmissible parol evidence. Providence's objections to Paragraphs 4 and 5 are **SUSTAINED**.

Providence objects to Paragraph 6 on the same grounds that it objected to Paragraphs 4 and 5. In this paragraph, Tracie testifies as to what Dan Foster Sr. (Providence's CEO and Chairman of the Board) told her regarding Truly's employment agreement, specifically that it would be stricter than Providence's. However, this testimony does not go to the meaning of Providence's Shareholders' Agreement, but rather what Foster Sr. represented about the comparative effect of the agreements. Providence also objects to Tracie's statement that "Dan has always taken pride in the fact that people stay because they want to work at Providence not because he makes them sign non-competes or contracts to do so," arguing that Tracie has no personal knowledge supporting this statement. However, at trial, Tracie could plausibly testify as to her impressions of Foster Sr.'s purported pride. Therefore, these objections are **OVERRULED**.

Providence objects to Paragraph 7, wherein Tracie explains that "her understanding of the clear meaning of intent of paragraph 8.4" is informed by Providence's prior conduct when it sued a different former shareholder. While the suit is a public record for which the Court may take judicial notice, Tracie's "understanding" of Paragraph 8.4 is irrelevant because the terms of the Agreement are unambiguous. Therefore, Providence's objection is **SUSTAINED**.

Providence further objects to a single sentence in Paragraph 8, arguing that it is impermissibly speculative. This sentence states, "Dan allowed this third Burleson office to open despite having knowledge of my concerns and frustrations." However, even though the foundation for this statement is thin, the Court will not strike it because Tracie could plausibly testify as to why she believes that Foster Sr. had such knowledge. Therefore, this objection is **OVERRULED**.

Providence objects to Paragraph 9 as irrelevant, hearsay, and speculative. In this paragraph, Tracie recounts a conversation she had with a Providence employee. On its face, Tracie's testimony regarding what the employee told her appears to be hearsay, and Tracie fails to counter that the statements fall under an exception to the hearsay rule or an applicable exclusion. FED. R. EVID. 801, 803. And since her impression relies solely on what appears to be inadmissible hearsay, it has no grounding in a competent factual basis and is not based on personal knowledge. Therefore, Providence's objection is **SUSTAINED**.

Providence objects to the third sentence in Paragraph 11, wherein Tracie offers her interpretation of Foster Sr.'s statement that the Advisory Committee should "play

nice in the sandbox." Contrary to Providence's assertion that Tracie's interpretation is speculative and unsupported by personal knowledge or a reliable foundation, the Court concludes that Tracie is merely stating her impression as to what Foster Sr. meant. This objection is **OVERRULED**.

Providence objects to Paragraph 12, wherein Tracie explains that Foster Sr. created an organizational hierarchy chart. However, rather than provide the chart, Tracie simply recites the hierarchy. Providence argues that this testimony violates Federal Rule of Evidence 1002, which states that "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." Since Tracie failed to provide the rule of evidence or statute that excused her from providing the original, Providence's objection is **SUSTAINED**.

Providence also objects to references to the alleged hierarchy in Paragraph 13. For the same reasons provided in the previous paragraph, this objection is **SUSTAINED**.

Providence objects to the portions of Paragraph 14 where Tracie testifies about "Dan's change of attitude towards her" and her sense that "Dan was trying to push [her] out of the company." The Court agrees with Providence that Tracie does not have personal knowledge of Foster Sr.'s changed attitude or his intentions. While Tracie can testify about circumstances she observed and has personal knowledge of, she may not present conclusory testimony premised on speculation. Providence's objection is **SUSTAINED**.

Providence objects to Tracie's characterization in Paragraph 15 of Providence's motion for preliminary injunction, arguing that Tracie mischaracterizes the motion. Tracie's characterization of what Providence said in the motion is fit for legal argument—not factual testimony. Providence's objection is **SUSTAINED**.

Providence objects to the last sentence in Paragraph 20 as hearsay. That sentence states, "I understand Dan Foster Jr."—Providence's CFO—"testified in deposition that he now holds some of my shares in ownership, but he has not paid me any money or given me a promissory note in payment for my shares." The Court agrees that the first clause of the sentence (everything preceding the comma) is hearsay, and thus Providence's objection is **SUSTAINED**.

Providence objects to sentences four, five, six, and seven of Paragraph 22, as well as Exhibit A-4, arguing that the evidence is inadmissible hearsay. Essentially, Providence takes issue with Tracie's reliance on a LinkedIn post to show that Providence hired a new CEO and shareholder. Tracie does not explain why this out-of-court statement and her conclusions drawn from it should be admitted, so Providence's objection is **SUSTAINED**.

Providence objects to Tracie's statement in Paragraph 23 that Foster Sr. "t[ook] and convert[ed]" her shares. This objection is **SUSTAINED** because it offers a legal conclusion.

Finally, Providence objects to Exhibit A-5 of Tracie's declaration because Tracie failed to produce this document—her background check authorization for Truly—during discovery. Pursuant to Federal Rule of Civil Procedure 37(c), "[i]f a

party fails to provide information . . ., the party is not allowed to use that information . . . to supply evidence on a motion . . . , unless the failure was substantially justified or is harmless." Tracie does not dispute that she failed to provide this document to Providence during discovery, and she does not explain how her failure was substantially justified or harmless. Therefore, this objection is **SUSTAINED**.

### ii. Email Between Counsel

Providence objects to Exhibit S-4, (Dkt. #218-20), on the grounds that it is irrelevant and filled with hearsay. This exhibit contains an exchange between counsel for Truly and counsel for Providence concerning Providence's ethical and discovery obligations after it hired a new CEO who had previously served as Truly's outside counsel. The Court agrees with Providence that this exchange is irrelevant. Therefore, this objection is **SUSTAINED**.

### iii. Evidence Presented in Tracie's Reply Brief

Providence raised additional objections in its sur-reply to Tracie's motion for partial summary judgment. (Dkt. #267). It objects to Paragraph 4 of Tracie's response declaration, arguing that it contains hearsay. Specifically, Providence objects to Tracie's statements that Providence employees provided other potential employers with information concerning their pay, that those employees were "less concerned about the money and were more concerned about changing their environment," and that "[t]hey were appalled" by Foster Sr.'s actions. However, Tracie did not provide a statement made by any of those employees. *See* FED. R. EVID. 801(a) ("'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, if the person

intended it as an assertion."). Tracie is permitted to testify about her assessment of a situation and on her impression of others' reactions. Therefore, this objection is **OVERRULED**.

Providence objects to Paragraph 10, wherein Tracie incorporates all of her prior declarations in this case. Providence argues that this statement does not give fair notice of what paragraphs Tracie intends to incorporate, and that it has objected to many parts of Tracie's prior declarations. However, Tracie is clear about what she seeks to incorporate: all of her prior declarations. Thus, the Court **OVERRULES** this objection, but the Court notes that all statements that the Court has previously stricken remain stricken.

Providence objects to Exhibit C-1, which is Tracie Fleming's, Mark Fleming's, and Kim Sheets-Sheffield's Supplemental Rule 26(a)(2) Expert Disclosures in Rebuttal. Providence argues that the document is comprised of inadmissible hearsay. However, the Federal Rules of Evidence require more than a general assertion to mount a valid objection. "Federal Rule of Evidence 103(a)(1) requires an objecting party to make specific objections detailing the specific evidence the party wishes to have stricken and stating the specific grounds upon which each piece of evidence should be stricken." *Tucker v. SAS Inst., Inc.*, 462 F.Supp.2d 715, 722 (N.D. Tex. 2006). Since Providence failed to identify specific statements that it contends are hearsay, this objection is **OVERRULED**.

Providence objects to Exhibit A to Exhibit C-1, which contains the rebuttal expert report concerning Tracie's computer activity. Providence asserts that the

report contains hearsay. For the reasons described in the previous paragraph, this objection is improper. Providence also argues that, while the expert identifies this report in his declaration, he does not testify to the truth or accuracy of the report. However, the expert signed his declaration under the penalty of perjury and attested that his statements in the declaration—including his ultimate findings, as provided in the report—are true. And, in any event, "[t]he issue at the summary judgment phase is not whether the parties have presented admissible evidence to support their motions for summary judgment, but whether they have shown that they will be able to present admissible evidence at trial." *BP Energy Co.*, 2020 WL 5947605, at *6. However, the second and third pages of the report concern Sheets-Sheffield's activity, which is irrelevant to Tracie's motion. Therefore, this objection is **OVERRULED** as to page one of Exhibit A to Exhibit C-1, and it is **SUSTAINED** as to pages two and three of the same.

Providence objects to Exhibit D-1 as an inadmissible settlement communication. Under Rule of Evidence 408, "conduct or a statement made during compromise negotiations about the claim" "is not admissible . . . either to prove or disprove the validity or amount of a disputed claim." Tracie does not dispute that this email chain concerns settlement negotiations, and she attempts to use the evidence to show the amount she owed Providence. Therefore, this evidence is inadmissible. Providence's objection is **SUSTAINED**.

### iv. Tracie's Evidence in Opposition to Providence's Motion for Summary Judgment

Finally, in its reply brief in support of its partial motion for summary judgment concerning Tracie's counterclaim for Providence's alleged breach of the Shareholders' Agreement, (Dkt. #284), Providence objects to evidence Tracie presented in her response to the motion, (Dkt. #281). Providence objects to Tracie's "selective mischaracterization" of Foster Sr.'s deposition testimony concerning Providence's obligation to repurchase Tracie's Providence shares and requests that the Court take his statements in context and consider his follow-up statements. This objection is **SUSTAINED**. The Court will consider the relevant context of Foster Sr.'s statements.

Providence objects to Exhibit B-5, which is the same settlement correspondence discussed above, and Exhibit B-4, which is the same correspondence concerning Providence's obligations after it hired a new CEO who had previously served as Truly's outside counsel. These objections are **SUSTAINED**.

Providence objects to Paragraphs 2, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 19, and 21 of Tracie's declaration, (Dkt. #281-2), as irrelevant. "[T]he bar [for relevancy] is low—evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Hicks-Fields v. Harris Cnty.*, 860 F.3d 803, 809 (5th Cir. 2017) (cleaned up). Without the benefit of a response from Tracie, the Court agrees with Providence that all paragraphs—except Paragraph 21—are irrelevant to the motion. Paragraph 21 incorporates Tracie's prior

declarations, some of which contain relevant information. Therefore, this objection is **SUSTAINED** as to Paragraphs 2, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, and 19, and it is **OVERRULED** as to Paragraph 21, but the Court notes that its rulings on objections to testimony in prior declarations apply with equal force to the incorporated testimony.

Providence also objects to Exhibit F, an excerpt from Michael Kirby's deposition, arguing that it is irrelevant as to whether any party is in breach of the Shareholders' Agreement. The Court agrees. Therefore, this objection is **SUSTAINED**.

Providence objects to the first five sentences of Paragraph 4 of Tracie's declaration, wherein Tracie explains that she paid for her Providence shares and that she communicated with Providence directors concerning her payoff amount. She further states that "[n]ot until [she] resigned and left Providence did Dan or anyone else at Providence take the position that [she] had not paid for [her] shares." Providence also objects to Exhibit A-7, which is an email discussion wherein Tracie confirmed her outstanding balance with Steve Ramsey (a Providence shareholder and member of the Board of Directors), Foster Sr., and Foster Jr. Providence argues that this testimony "contain[s] hearsay." (Dkt. #284 at 5). At the outset, Providence's failure to identify the specific statements that it contends constitute hearsay warrants overruling this objection. *See Tucker*, 462 F.Supp.2d at 722 ("Federal Rule of Evidence 103(a)(1) requires an objecting party to make specific objections detailing the specific evidence the party wishes to have stricken and stating the specific

20

grounds upon which each piece of evidence should be stricken."). And, in any event, statements made by Providence directors are excluded from the definition of hearsay. FED. R. EVID. 801(d)(2). These objections are **OVERRULED**.

Providence also objects to the eighth sentence in Paragraph 4 and the sixth sentence of Paragraph 18, wherein Tracie states that her shares have been transferred or sold and that she never received payment. Tracie's testimony demonstrates that she is familiar with actions taken in regard to her shares, and the Court finds that this evidence passes the low relevancy bar. These objections are **OVERRULED**.

Providence objects to Paragraph 5, wherein Tracie explains her understanding of the terms of Paragraph 8.4 of the Shareholders' Agreement. To the extent Tracie offers legal conclusions, the objection is **SUSTAINED**.

Providence objects to Paragraph 6 as irrelevant to Providence's motion. The Court agrees. This objection is **SUSTAINED**.

Providence objects to Tracie's statement in Paragraph 20 that she "paid for [her] Providence shares" as conclusory and "not the best evidence as to whether she paid." Tracie is competent to testify about whether she paid. Therefore, this objection is **OVERRULED**.

## C. Motion for Summary Judgment

Providence asserts several causes of action against the Flemings for their conduct leading up to and following their resignations from Providence. Mark Fleming moves for summary judgment on all such claims, and Tracie Fleming moves

for summary judgment on most of them. This order resolves the Flemings' summary-judgment motions challenging Providence's tort and contract claims, including its claims for breach of fiduciary duty, breach of the Shareholders' Agreement, tortious interference with the Shareholders' Agreement, tortious interference with prospective contractual and customer relationships, knowing participation, and civil conspiracy. This order also addresses Tracie's counterclaim for breach of the Shareholders' Agreement and the Flemings' counterclaims for attorney's fees and costs.

### i. Breach of Fiduciary Duty

Providence alleges that Tracie and Mark owed it fiduciary duties that they breached by purportedly poaching Providence's employees and making efforts to assist Truly while they were still employed at Providence. To succeed on a breach-of-fiduciary-duty claim, a plaintiff must establish (1) a fiduciary relationship existed between the parties, (2) the defendant breached his fiduciary duty, and (3) the breach injured the plaintiff or benefited the defendant. *Zhu v. Lam*, 426 S.W.3d 333, 339 (Tex. App.—Houston [1st Dist.] 2014, no pet.). "When a fiduciary relationship of agency exists between employee and employer, the employee has a duty to act primarily for the benefit of the employer in matters connected with his agency." *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 510 (Tex. App.—Houston [1st Dist.] 2003, no pet.). A fiduciary also owes the duty "not to compete with the principal on his own account in matters relating to the subject matter of the agency[,] the duty to deal fairly with the principal in all transactions between them[,] [and the] duty to

22

deal openly with the employer and to fully disclose to the employer information about matters affecting the company's business." *Id.*

At the same time, however, "[a] fiduciary relationship . . . does not preclude the fiduciary from making preparations for a future competing business venture; nor do such preparations necessarily constitute a breach of fiduciary duties." *Id.* "This is because an employer's right to demand and receive loyalty must be tempered by society's legitimate interest in encouraging competition." *Id.* Thus, "[a]n at-will employee may properly plan to compete with his employer, and may take active steps to do so while still employed. The employee has no general duty to disclose his plans and may secretly join with other employees in the endeavor without violating any duty to the employer." *Id.* (citation omitted). However, even an at-will employee "may not (1) appropriate the company's trade secrets; (2) solicit his employer's customers while still working for his employer; (3) solicit the departure of other employees while still working for his employer, or (4) carry away confidential information, such as customer lists." *Id.* at 512.

### a. Tracie Fleming is Not Entitled to Summary Judgment on Providence's Breach-of-Fiduciary-Duty Claim.

Tracie does not dispute that, as an officer of Providence, she owed Providence certain fiduciary duties. However, Tracie argues that she never breached those duties because her complained-of actions only amounted to lawful preparations to compete against Providence. For its part, Providence contends that Tracie breached her fiduciary duties by providing Truly with confidential financial information, poaching

23

Providence's employees—including her husband—and helping Truly prepare to open offices that would directly compete with Providence.

At the outset, the Court notes that Providence's attempt to flip the burden of proof and require Tracie to show that she did not breach any fiduciary duty is misguided. This burden-shifting rule applies only when the fiduciary is transacting with the principal. As the cases Providence cites explain, "[a]ll *transactions* between a fiduciary and her principal are presumptively fraudulent and void; therefore, the burden lies on the fiduciary to establish the validity of any particular transaction in which she is involved." *Jordan v. Lyles*, 455 S.W.3d 785, 792 (Tex. App.—Tyler 2015, no pet.) (emphasis added); *Lesikar v. Rappeport*, 33 S.W.3d 282, 298 (Tex. App.—Texarkana 2000, pet. denied). Here, the dispute concerns Tracie's conduct regarding her employment with Truly—not a transaction between her and Providence. Thus, the presumption of fraud is inapplicable, and the burden remains with Providence to establish that Tracie breached her fiduciary duty. Providence has met this burden.

Specifically, Providence has presented sufficient evidence that Tracie breached her fiduciary duty to survive summary judgment on this claim. Tracie's actions arguably exceeded lawful preparation to join Truly and instead embrace conduct that a reasonable jury could determine constituted a breach of her duty. The evidence shows that even before receiving her offer letter from Truly, Tracie shared financial performance data for several of Providence's offices with Graham Hanks—Truly's President of Texas Operations. (Dkt. #245-9 at 19–20). Text messages between Tracie and Hanks show that on numerous occasions Tracie provided Hanks with the year-

over-year revenue for Providence's Johnson County operations. (Dkt. #248-7 at 2, 5). Providence posits that Truly used this data to determine where an expansion would be most profitable. Although there is no evidence Truly used the data in this manner, *see Providence Title Co. v. Truly Title, Inc.*, No. 4:21-CV-147, 2024 WL 1932418, at \*10–11 (E.D. Tex. May 2, 2024), and it is unclear what prompted Tracie to share such specific information, a reasonable jury could find that Tracie was not acting primarily for the benefit of Providence when she provided this information to Hanks.

Further, Tracie failed to explain how sending Providence's financial data to Truly was merely a preparatory step to lawfully competing against Providence. The fact that Tracie sent this information months before she accepted an offer to join Truly further discredits her argument that such conduct constituted lawful preparation to join a competitor.

Providence also argues that Tracie breached her fiduciary duty by working with Truly to solicit her husband, Mark, while they were still employed at Providence. The evidence shows that Tracie negotiated some of the terms of Mark's employment with Truly, including his salary and the number of paid-time-off ("PTO") days he would receive. Tracie admitted in her deposition that she provided Hanks the salary for Mark that would make her "comfortable to make a move." (Dkt. #245-9 at 17–18). Further, Tracie texted Hanks to request an increase to Mark's PTO before Mark signed Truly's offer letter. (Dkt. #248-7 at 17) ("[Mark is] ready to sign… are you changing me the pto days?").

While a departing fiduciary "has no general duty to disclose his plans and may secretly join with other employees in the endeavor without violating any duty to the employer," he may not "solicit the departure of other employees while still working for his employer." *Abetter Trucking*, 113 S.W.3d at 510, 512. The evidence presented could lead a reasonable juror to conclude that Tracie's active negotiations with Truly regarding the terms of employment for one of Providence's employees—while they were both still working at Providence—constituted a breach of her fiduciary duty. *See id.* at 512.

Providence further argues that summary judgment should be denied because Tracie worked with Truly to coordinate the opening of new offices in Johnson County while she was still working for Providence, including by visiting potential sites and sending her thoughts to Hanks. It also argues that she failed to take any action at Providence to retain employees who would eventually leave for Truly and that she recruited Providence's employees after she departed. As the court in *Abetter* explained, "[t]he right to prepare to compete notwithstanding, if the nature of a party's preparation to compete is significant, it may give rise to a cause of action for breach of a fiduciary duty. This is particularly true if a supervisor-manager acts as a 'corporate pied piper' and lures all of his employer's personnel away, thus destroying the business." *Id.* at 511–12 (citation omitted). Providence argues that is exactly what happened here. However, since the Court concludes that the evidence discussed above is sufficient to raise a genuine dispute as to whether Tracie breached her fiduciary duty, the Court need not analyze each piece of evidence Providence contends supports

26

its claim. The evidence showing that Tracie provided Hanks with Providence's financial performance data and negotiated the compensation for one of its leaders— albeit her husband—is enough to proceed to trial on this claim.

### b. Mark Fleming is Entitled to Summary Judgment on Providence's Breach-of-Fiduciary-Duty Claim.

Providence argues that Mark also breached his fiduciary duty by soliciting Providence's employees. It is undisputed that immediately after Mark resigned from Providence, he invited his former employees to join him outside of Providence's building, explaining that he "want[ed] to tell [them] something." (Dkt. #217-2 at 7). When outside, he informed them that he and Tracie were resigning from Providence, but he did not say that they were joining Truly. (Dkt. #217-2 at 7). Instead, he told the Providence employees that "if [they'd] like to know where [he's] going, [they] have [his] cell phone." (Dkt. #217-2 at 7). Subsequently, while Mark was driving home, he called the other offices under his supervision and told them the same thing. (Dkt. #217-2 at 8–9). That evening, calls from Providence employees came pouring in. According to a call log that Mark maintained, within approximately four hours of him telling his former employees that he resigned, fourteen Providence employees called him to ask for a job offer to "wherever [he] [was] going." (Dkt. #217-2 at 11).[8]

---

[8] In his deposition, Mark testified that he does not recall whether he told the callers that he was joining Truly, or whether they simply asked for an offer to "wherever" he was going.

Mark is entitled to summary judgment on this claim because, even assuming that he was in a fiduciary relationship with Providence,[9] his conduct was lawful. At the outset, Providence has presented no evidence that Mark told any Providence employee—save his wife and daughter, who also worked at Providence—that he was joining Truly until after he left, and he only did so after the Providence employees reached out to him. Thus, to the extent his conduct could even be considered soliciting (which is dubious, at best), he was free to do so. In Texas, "once an employee resigns, he may actively compete with his former employer." *Abetter*, 113 S.W.3d at 510. Indeed, doing so is ordinarily a constitutional right. *Id.* And Mark owed Providence "no general duty to disclose his plans." *Navigant*, 508 F.3d at 285.

Providence argues that Mark's conduct is comparable to that of the defendant in *Herider Farms-El Paso, Inc. v. Criswell*, 519 S.W.2d 473 (Tex. Civ. App.—El Paso 1975, writ ref'd n.r.e.). In that case, the defendant, who was the manager of plaintiff Herider Farms-El Paso, Inc. ("Herider"), quit his job to directly compete with Herider. *Id.* at 475. The defendant originally told Herider that he intended to resign but that he would work for an additional thirty days. *Id.* However, almost immediately after

---

[9] Mark contends that he did not owe Providence a fiduciary duty because he was only an at-will employee. "It is generally true that employees are not fiduciaries of their employers simply by virtue of the employment relationship." *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 216 (5th Cir. 2018) (citing *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 202 (Tex. 2002)). However, "[a]ny employee who occupies a position of trust owes fiduciary duties to his employer." *Pfeiffer v. Ajamie PLLC*, 469 F.Supp.3d 752, 761 (S.D. Tex. 2019) (citing *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2019)). As Team Leader for Johnson County, it is at least arguable that Mark had a fiduciary relationship with Providence. And, in any event, "under common-law principles of agency, employees do owe certain limited fiduciary duties to not compete with their employers." *D'Onofrio*, 888 F.3d at 216.

giving notice of his resignation, "he contacted all of Herider's employees in El Paso and asked them to go to work for him"—and almost all of them did. *Id.* When Herider's owner arrived at work after the weekend, there was only one employee remaining. *Id.* Based on the defendant's "raid[]" of Herider's employees and the additional steps he took to prepare to compete against Herider, the court denied the defendant's motion for summary judgment on Herider's breach-of-fiduciary-duty claim. *Id.* at 475–79.

Here, unlike the defendant in *Herider*, Mark did not contact Providence's employees to request that they come work for him. In fact, he did not even tell them that he was joining Truly—just that he had resigned from Providence. It was not until after Mark resigned—not merely after giving notice, like the defendant in *Herider*—that he communicated his plans to his former colleagues. And he did not ask them to work for him; instead, they asked him for an offer letter.

The only people that knew about Mark's plans were Tracie and his daughter. But Providence has provided no evidence that Mark solicited Tracie or his daughter from Providence. *Eurecat US, Inc. v. Marklund*, 527 S.W.3d 367, 281 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("The commonly understood meaning of the term 'solicit' is to 'make petition to: ENTREAT, IMPORTUNE, CONCERN'; 'to approach with a request or a plea (as in selling or begging)'; 'to move to action; serve as an urge or incentive: INCITE;' 'to strongly urge (as one's cause or point): insist upon'; 'to endeavor to obtain by asking or pleading'; and 'to seek eagerly or actively.'" (cleaned up) (quoting Webster's Third New Int'l Dictionary 2169 (1993)). The evidence only

shows that they were informed of Mark's plans. In short, *Herider* is inapposite because Mark did not solicit any Providence employee, including Tracie or his daughter, to work for Truly.

To the extent Providence argues that Mark breached his duty by simply looking for office space or competing with Providence once he joined Truly, such actions are lawful. *See* (Dkt. #246-16 at 8) (Hanks) ("I think Mark might have driven [by] some locations."). In Texas, "[t]here is nothing legally wrong in engaging in . . . competition [with one's former employer] or in preparing to compete before the employment terminates." *Abetter*, 113 S.W.3d at 510; *see id.* at 511 (affirming the jury's verdict that defendant did not breach his fiduciary duty, even though—while still employed with the former employer—he incorporated his competing company, obtained permits, obtained insurance, and had been told by several employees that they intended to join him). Mark's minimal preparation to compete by searching for an office does not amount to a breach of a fiduciary duty. Nor does his post-employment competition.

Since Providence has failed to proffer any evidence that Mark solicited Providence's employees or that he unlawfully competed while he was employed by Providence, he is entitled to summary judgment on Providence's breach-of-fiduciary-duty claim.

### ii. Breach of Shareholders' Agreement

Tracie and Providence assert claims against each other for breach of the Shareholders' Agreement.[10] To establish a breach of contract, the plaintiff must show: "(1) the existence of a valid contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach." *Velvet Snout, LLC v. Sharp*, 441 S.W.3d 448, 451 (Tex. App.—El Paso 2014, no pet.).

Providence asserts that Tracie breached the Shareholders' Agreement by working for Truly in violation of the noncompete provision contained therein. Tracie argues that Providence breached the Agreement by failing to repurchase her shares of Providence stock after she resigned. The Court will first address Tracie's motion for summary judgment on Providence's claim, and then turn to the parties' cross-motions for summary judgment on Tracie's counterclaim.

### a. The Noncompete Provision is an Unenforceable Restraint of Trade.

Tracie first became a Providence shareholder in 2013 when she purchased 60,000 shares of Providence stock for $120,000. Over the years, she purchased more stock, eventually acquiring 11% of Providence for $280,000. The First Amendment to the Shareholders' Agreement—which Tracie signed when she first purchased stock—contains the following noncompete provision:

---

[10] Providence also brought a claim against Mark for breach of the Shareholders' Agreement, but Providence has since abandoned that claim. (Dkt. #246 at 24). Accordingly, that claim is dismissed.

> Non-Compete. Offering Shareholder agrees for a period of twenty-four
> (24) months from the date of the Closing (defined in Section 8.1) he/she
> will not (i) serve as a partner, employee, consultant, officer, director,
> member, manager, agent, associate, investor, or otherwise, or (ii)
> directly or indirectly, own, purchase, organize or take preparatory steps
> for the organization of, or (iii) build, design, finance, acquire, lease,
> operate, manage, invest in, work or consult for or otherwise affiliate
> hisself [sic]/herself with any business in competition with or otherwise
> similar to Providence's business within the Texas counties of Tarrant,
> Dallas, Harris, Bexar or any Texas counties contiguous to such stated
> counties. Breach of this covenant shall entitle the payees of the
> promissory notes given in payment for the Shares acquired under
> Section 8.2 herein to defer all payments for a period not to exceed
> twenty-four (24) months, without interest.

(Dkt. #218-2 at 35).

Providence asserts that Tracie breached this provision by joining Truly's employ. When Providence first brought suit, it sought a preliminary injunction to prevent Tracie from working for Truly. In her opposition to Providence's motion, Tracie contested the noncompete provision's enforceability on the grounds that its geographic limits were unreasonable and broader than necessary to protect Providence's interests. *See generally* TEX. BUS. & COM. CODE § 15.50(a) ("[A] covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee."). The Court disagreed and granted a preliminary injunction after determining that Providence was likely to succeed in showing that Tracie breached the noncompete, which the Court determined was triggered on May 24, 2021. *Providence Title*, 547 F.Supp.3d at 599–

603. The Fifth Circuit upheld the preliminary injunction enforcing the noncompete provision. *Providence Title Co. v. Fleming*, No. 21-40578, 2023 WL 316138 (5th Cir. 2023) (per curiam). Subsequently, on June 1, 2023, the Court dissolved the preliminary injunction because the noncompete provision's two-year application period had passed. (Dkt. #362).

Tracie now moves for summary judgment on Providence's claim that she breached the noncompete agreement, again contending that the noncompete is unenforceable.[11] This time, however, Tracie makes a different argument. She now argues that the noncompete is unenforceable because it is not "ancillary to or part of an otherwise enforceable agreement." TEX. BUS. & COM. CODE § 15.50(a).[12] Tracie

---

[11] Although Providence was awarded preliminary injunctive relief to insulate it from the harm it would have suffered had Tracie been in breach of the noncompete provision for the entire two-year period, Providence also seeks damages for the harm resulting from Tracie's alleged breach. *See generally* TEX. BUS. & COM. CODE § 15.51(a) ("[A] court may award the promisee under a covenant not to compete damages, injunctive relief, or both damages and injunctive relief for a breach by the promisor of the covenant."). Thus, there remains a ripe dispute concerning the enforceability of the noncompete provision.

[12] As the Fifth Circuit recognized, at the preliminary-injunction stage of these proceedings Tracie failed to make the argument that the noncompete was not ancillary to or part of an otherwise enforceable agreement. *Providence Title*, 2023 WL 316138, at *3. Instead, she first made this argument in her motion for reconsideration of the preliminary injunction. (Dkt. #107). A week after she filed that motion, she appealed the preliminary injunction—likewise arguing, inter alia, that the noncompete was unenforceable because it was not ancillary to or part of an otherwise enforceable agreement. Because the appeal divested this Court of jurisdiction to entertain the motion to reconsider, the Court denied the motion—never reaching Tracie's new unenforceability argument. *Providence Title Co. v. Truly Title, Inc.*, No. 4:21-CV-147, 2021 WL 5003273 (E.D. Tex. Oct. 28, 2021). Nor did the Fifth Circuit consider this question, as "arguments not [timely] raised in the district court are forfeited on appeal." *Providence Title*, 2023 WL 316138, at *3. Thus, whether the noncompete agreement is ancillary to or part of an otherwise enforceable agreement has not been considered until now.

does not contest that the Shareholders' Agreement and the First Amendment thereto—which contains the noncompete provision—are enforceable agreements. However, she argues that the covenant is not ancillary to or part of those agreements. To meet this requirement, the employer must establish that "(a) the consideration given by the employer in the agreement is reasonably related to an interest worthy of protection and (b) the covenant not to compete was designed to enforce the employee's consideration or return promise in the agreement." *Titan Oil & Gas Consultants, LLC v. Willis*, 614 S.W.3d 261, 267 (Tex. App.—Texarkana 2020, pet. denied). "Unless both elements of the test are satisfied, the covenant cannot be ancillary to or a part of an otherwise enforceable agreement, and is therefore a naked restraint of trade and unenforceable." *Light v. Centel Cellular Co. of Tex.*, 883 S.W.2d 642, 647 (Tex. 1994), *abrogated on other grounds by Marsh USA Inc. v. Cook*, 354 S.W.3d 764 (Tex. 2011).

As to the first prong, consideration reasonably related to an interest worthy of protection includes trade secrets, confidential information, and goodwill. *Marsh*, 354 S.W.3d at 774. In *Marsh*, the Texas Supreme Court held that an employer's issuance of stock options to an employee "provided the required statutory nexus between the noncompete and the company's interest in protecting its goodwill." *Id.* at 777. As the court explained, "[s]tockholders are 'owners' who, beyond employees, benefit from the growth and development of the company. Owners' interests are furthered by fostering the goodwill between the employer and its clients. The stock options are reasonably related to the protection of this business goodwill." *Id.*

34

Like the employee in *Marsh*, Tracie became an owner of her employer when she acquired Providence stock pursuant to the First Amendment to the Shareholders' Agreement. By virtue of being an owner of Providence, she was in a position to enjoy the benefits of Providence's goodwill. Consistent with *Marsh*'s holding, the Court concludes that Tracie's ownership interest was reasonably related to the protection of Providence's goodwill—an interest worthy of protection.[13]

The second prong requires courts to "consider whether the effect of the covenant was to prevent the employee from breaching the promise he gave as consideration in the separate agreement." *Neurodiagnostic Tex, L.L.C. v. Pierce*, 506 S.W.3d 153, 166 (Tex. App.—Tyler 2016, no pet.). Taken together, the Shareholders' Agreement and the First Amendment concern shareholders' and Providence's obligations regarding the transfer of Providence shares. (Dkt. #218-2 at 14–35). They do not contain any promises from employees concerning trade secrets, confidential information, specialized training, or other interests related to Providence's competitiveness. Instead, the only promises included in the Shareholders' Agreement and the First Amendment relate to the buying and selling of stock. Providence does not argue that the noncompete provision was designed to

---

[13] Tracie argues that Providence has "effectively indicat[ed] its purported goodwill has no value" because it did not repay her for her shares once she resigned. (Dkt. #218 at 21–22). However, as discussed below, Providence has not paid Tracie because the parties dispute the proper amount she is owed. Providence acknowledges that it has an obligation to repay Tracie for her shares. (Dkt. #284 at 2).

enforce these promises—and for good reason: There are no shareholder obligations that the noncompete agreement could plausibly be designed to enforce.

Nonetheless, Providence argues that the second prong is met because the noncompete was designed to (1) enforce the shareholders' "interests . . . to insure . . . the continuity of ownership and management of the Corporation," and (2) protect Providence's goodwill and confidential information. (Dkt. #245 at 31–32) (quoting premise in the Shareholders' Agreement that "the Shareholders and [Providence] . . . believe it to be in their best respective interests, collectively and individually, to enter into this Agreement to insure, to the greatest degree possible, the continuity of ownership and management of [Providence] desired by the parties"). However, Tracie never made any promise to these effects. The statement in the Shareholders' Agreement that the shareholders believe continuity of ownership is beneficial and that they desire to create an agreement to that end is plainly not a promise—it is just a reason for the creation of the Shareholders' Agreement. Nor do the Shareholders' Agreement or First Amendment contain any promises from the shareholders that they will protect Providence's goodwill or confidential information. Since this consideration is entirely absent from the Shareholders' Agreement and the First Amendment, the noncompete could not be designed to enforce such consideration.

Therefore, the noncompete is unenforceable because it is not ancillary to or part of an otherwise enforceable agreement. The requirement that the noncompete be "designed to enforce the employee's consideration or return promise in the agreement" is not met because the only promises Tracie made concerned her

obligations to buy or sell Providence's stock, and the noncompete does not enforce her compliance with those obligations. *See Titan Oil*, 614 S.W.3d at 267. Accordingly, the provision is a "naked restraint of trade and unenforceable." *Light*, 883 S.W.2d at 647. Therefore, Tracie is entitled to summary judgment on Providence's claim that she breached the noncompete provision.

### b. Tracie is Entitled to Immediate Payment for Her Shares.

Tracie counterclaims that Providence is in breach of the Shareholders' Agreement for failing to pay for her shares pursuant to the Agreement's buy-back provision. Under Article 6 of the Shareholders' Agreement, Tracie's termination of employment with Providence gave Providence the "first right to elect to purchase all or any portion" of Tracie's stock, which it elected to do. (Dkt. #218-2 at 21). Although the parties agree that Tracie is entitled to payment for the repurchase of her shares, they dispute the amount owed and the date on which payment must be made. The Court will address the payment date first.

To date, Providence has paid Tracie nothing for her shares. (Dkt. #361) (Providence affirming that it has not paid Tracie as of May 30, 2023). To excuse its nonpayment, Providence relies on Section 8.4 of the First Amendment to the Shareholders' Agreement, which states that breach of the covenant not to compete "shall entitle the payees of the promissory notes given in payment for the Shares acquired under Section 8.2 herein"—i.e., the shares to be transferred at the closing— "to defer all payments for a period not to exceed twenty-four (24) months, without interest." (Dkt. #218-2 at 35). However, Tracie is entitled to payment because (1) the

covenant not to compete is unenforceable, and thus Providence cannot rely on Tracie's purported breach to justify its nonpayment, and (2) even if Tracie breached the covenant and Providence were entitled to defer payment, the deferral period would have ended May 24, 2023 (twenty-four months after closing), at the latest. *See* (Dkt. #218-2 at 23); (Dkt. #362) (Court dissolving the preliminary injunction on June 1, 2023, explaining that "by the terms of [the Shareholders' Agreement], the relevant noncompete provision is no longer in effect."). Therefore, Providence has breached the terms of the Shareholders' Agreement by not paying Tracie for her shares, and any amount Tracie is owed is payable immediately.

### c. Providence Owes Tracie $220,000, Less Any Outstanding Balance.

The parties also dispute the amount Providence owes Tracie for her shares. Article 7 of the Shareholders' Agreement states that

> [t]he total Purchase Price for all the shares of Stock to be purchased pursuant to Article Six . . . shall be the stated value of [Providence] divided by the total issued and outstanding share of common stock[14] and multiplied by the number of shares of Stock being purchased pursuant to Article Six, with the stated value of [Providence] being determined by the Advisory Committee from time to time, or if such stated value has not been determined by such Committee within three prior calendar years then the fair market value of such Stock as determined by an appraisal.

(Dkt. #218-2 at 22).

---

[14] The parties do not dispute that Providence had one million total issued and outstanding shares of common stock. (Dkt. #218-2 at 16).

The Shareholders' Agreement does not define "stated value." "When a term in a written agreement is not specifically defined, as in this agreement, the term should be given its plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used it in a technical or different sense." *See DeNucci v. Matthews*, 463 S.W.3d 200, 217 (Tex. App.—Austin 2015, no pet.). According to Black's Law Dictionary, "stated value" is synonymous with "par value," which means "[t]he value of an instrument or security as shown on its face; esp., the arbitrary dollar amount assigned to a stock share by the corporate charter, or the principal of a bond at maturity." *Par Value*, BLACK'S LAW DICTIONARY (12th ed. 2024).

Providence argues that Tracie is owed $220,000 for her 110,000 shares based on a stated value of $2 million, less $60,000 for the outstanding balance Tracie purportedly owes for her shares. On July 1, 2019, Tracie and other Providence shareholders who comprised the Advisory Committee agreed to buy 100,000 shares of stock from another shareholder for $2 per share, totaling $200,000, which puts Providence's value at $2 million. (Dkt. #255-7). Further, in his declaration, Foster Jr. explains that "[i]n January 2020, [he] purchased 5% of Providence's stock, which was about 50,000 shares, based on a stated value of $2 million for the company." (Dkt. #255-2 ¶ 8). Foster Sr. confirmed this stated value in his deposition. (Dkt. #255-9 at 5) (testifying that Providence's stated value in 2021 was $2 million, and that he believes the stated value in 2020 and 2019 was also $2 million).

Tracie, on the other hand, contends that "the clear stated value for the repurchase calculation is at least $5 million"—the amount for which the Advisory

Committee agreed to sell Providence to Truly in July 2019—which would entitle her to $550,000. (Dkt. #281 at 6). She posits that "[n]owhere in the Agreement is the 'stated value' limited to an annual setting of a price for purchases between shareholders." (Dkt. #281 at 8). While true, this theory does not save her argument. Even if Tracie were correct that the stated value is not based solely on share price (which is dubious, given that the plain meaning of "stated value" centers on share price), her argument still fails because the Advisory Committee continued using the stated value of $2 million even after it accepted Truly's $5 million offer, at least when Foster Jr. purchased shares in January 2020.[15] Therefore, Providence's stated value for purposes of the repurchase price of Tracie's shares is $2 million, or $2 per share. Accordingly, the Court concludes that Providence owes Tracie $220,000 for her 110,000 shares based on a stated value of $2 million, less any outstanding balance owed by Tracie.

### d. There is a Disputed Question as to Whether Tracie Has an Outstanding Balance.

The parties also diverge on the question whether Tracie still owes Providence for the debt she incurred when she financed the purchase of Providence stock. According to Foster Jr.'s declaration, Tracie refinanced her debt to Providence in January 2019 via a promissory note with a principal of $150,860 and an interest rate

---

[15] The Advisory Committee also used a stated value of $2 per share when it repurchased the 100,000 shares of stock from the other Providence shareholder on July 1, 2019. This transaction appears to have occurred after Truly made its $5 million offer but before the Advisory Committee accepted.

of 1.73% per annum. (Dkt. #255-2 at 3, 8).[16] In her declaration, Tracie claims that she made the final payment on her note on December 31, 2020, when she issued a check for $65,710.30. (Dkt. #281-2 at 2); (Dkt. #281-2 at 40) (the "true and correct copy" of the $65,710.30 check). Two weeks later, on January 14, 2021, Tracie emailed Steve Ramsey, Foster Sr., and Foster Jr. to confirm that she owed $60,660 on the principal balance and $5,050.30 in interest, for a total of $65,710.30. (Dkt. #281-2 at 41). In the email, she said that "[i]f everyone agrees" with that payoff amount, she would write "a corrected check today"—which seems to indicate that her December 31 check was not correct or not processed. (Dkt. #281-2 at 41). That same day, Ramsey responded "I do remember that number and I was looking through old correspondence to find that in writing." (Dkt. #281-2 at 41). Foster Sr. replied "[f]ine with me." (Dkt. #281-2 at 42). However, this exchange appears to contradict Tracie's statement in her declaration that she fully paid off her debt with the December 31 check. Further, there is no evidence that she ever issued a "corrected check" as she indicated she would do in her email. (Dkt. #281-2 at 2).

Providence contests Tracie's position, arguing that she still owes $60,000. To support its position, Providence provides the declaration of Foster Jr. and an exhibit attached thereto which ostensibly shows all of the payments Tracie made on her debt. (Dkt. #255-2 at 11). That spreadsheet shows that between July 2019 and December

---

[16] In his declaration, Foster Jr. states that the principal was $150,680, (Dkt. #255-2 at 3), but the promissory note which he attaches as an exhibit shows that the principal amount is $150,860, (Dkt. #255-2 at 11).

31, 2020, Tracie paid a total of $95,860. (Dkt. #255-2 at 11). Foster Jr. notes that, in July 2019, Providence "returned" $5,000 to Tracie "by agreement." (Dkt. #255-2 at 3, 13). However, he does not explain why that amount was returned or what the effect of the return was—i.e., whether that amount would still be owed by Tracie. The spreadsheet shows that Tracie paid $60,660 on December 31, 2020, (Dkt. #255-2 at 11)—not the $65,710.30 reflected on the check. According to Foster Jr., "[t]he final principal payment listed on [the spreadsheet] is for $60,660 rather than the full amount of $65,710.30 that was paid by the Flemings. The remaining $5,050.30 of the Flemings' payment was applied to the then-outstanding interest owed on the Flemings' note." (Dkt. #255-2 at 3). So, it appears that Tracie's December 31 check for $65,710.30 *did* clear. And recall that both Ramsey and Foster Sr. indicated that $65,710.30 was the correct final payment amount. (Dkt. #281-2 at 41–42). Thus, if Tracie paid $65,710.30—as Foster Jr. indicates and as Tracie claims she did—it is unclear why she would have a $60,000 balance, considering that she was told by Ramsey and Foster Sr. that $65,710.30 was the correct balance. But even if they were referring to her balance after she issued the December 31 check, their position that she owed $65,710.30 contradicts Providence's current position that she owes $60,000. Neither of the parties' positions are fully supported by the record.

In any event, the spreadsheet on its face shows that Tracie paid $95,860 towards the $150,860 principal—which would mean that she would only owe $55,000. Perhaps the unaccounted-for $5,000 results from Providence's "return" of that amount to Tracie in July 2019, but that is unclear from the record. In short, there is

a genuine dispute of material fact concerning the amount, if any, Tracie owes. Therefore, summary judgment on this issue is not appropriate.

*     *     *

The parties presented the Court with four main issues concerning Tracie's and Providence's alleged breaches of the Shareholders' Agreement: (1) whether Tracie breached the noncompete provision; (2) whether Providence can defer repurchasing Tracie's shares; (3) the correct repurchase price for Tracie's shares; and (4) whether Tracie has an outstanding balance on her shares. As explained above, the Court concludes that (1) Tracie is entitled to summary judgment on Providence's claim that she breached the noncompete provision because the provision is unenforceable; (2) any payment Providence owes has become due under the terms of the Agreement; (3) the stated value of Providence was $2 million, which means that Providence's one million shares are worth $2 each, and thus Providence owes Tracie $220,000 for her 110,000 shares; and (4) there is a genuine dispute of material fact as to whether Tracie paid off all of her debt to Providence. This final issue will be presented to a jury.

### iii. Tortious Interference with the Shareholders' Agreement

Next, Mark moves for summary judgment on Providence's claim that he tortiously interfered with the Shareholders' Agreement by helping Tracie compete against Providence in violation of the noncompete provision. To prove tortious interference with an existing contract, the plaintiff must establish: "(1) the existence of a valid contract subject to interference; (2) that the defendant willfully and

43

intentionally interfered with the contract; (3) that the interference proximately caused the plaintiff's injury; and (4) that the plaintiff incurred actual damage or loss." *Cmty. Health Sys. Pro. Servs. Corp. v. Hansen*, 525 S.W.3d 671, 689 (Tex. 2017).

At the outset, the Court has concluded that the covenant not to compete—the agreement with which Providence contends Mark interfered—is unenforceable. *See supra* Section III.C.ii.a. Thus, Mark is entitled to summary judgment because the covenant is not a valid contract subject to interference.

Further, even if the covenant not to compete were a valid contract that Tracie violated by working for Truly, Mark is entitled to summary judgment because Providence has presented no evidence that Mark willfully and intentionally interfered with that agreement. "To establish a willful and intentional act of interference, there must be evidence that the defendant was more than a willing participant—the defendant must have knowingly induced one of the contracting parties to breach its obligations under [the] contract." *Greenville Automatic Gas Co. v. Automatic Propane Gas & Supply, LLC*, 465 S.W.3d 778, 786–87 (Tex. App.—Dallas 2015, no pet.).

To establish Mark's purported willful and intentional act of interference with the Shareholders' Agreement, Providence points to largely the same conduct as it does for its other claims: Mark's "scouting" for potential office space while working for Providence and his "migration" of Providence employees to Truly after he resigned from Providence. Providence also argues that Mark continued to interfere with the Shareholders' Agreement once he and Tracie began working for Truly because his

team worked under Tracie's supervision. Essentially, Providence argues that Mark intentionally interfered with the Shareholders' Agreement by getting Truly's new office up and running, and, in doing so, he helped Tracie perform her job at Truly.

What's missing from Providence's evidence is anything showing that Mark's "intent [was] to effect a breach of the contract." *Fluor Enters., Inc. v. Conex Int'l Corp.*, 273 S.W.3d 426, 443 (Tex. App.—Beaumont 2008, no pet.). Providence is required to show that Mark "either desired to cause a breach of the contract between [Tracie] and [Providence], or that [he] believed a breach was substantially certain to result." *Id.* But entirely absent from the record is any evidence that Mark induced Tracie to leave Providence for Truly in violation of the noncompete. Although they discussed their plans to join Truly before they resigned, the evidence does not show that Tracie joined Truly *because* of Mark's inducement or influence. Further, as explained above, Mark's preparatory steps to compete before he resigned—such as looking for office space— and his active competition once he started at Truly were lawful. *See Abetter*, 113 S.W.3d at 511 (upholding the jury's verdict that the defendant lawfully prepared to compete when he incorporated his competing company, obtained permits, and obtained insurance); *id.* ("[O]nce an employee resigns, he may actively compete with his former employer.").

Additionally, Providence's argument that Mark tortiously interfered with the Shareholders' Agreement by doing his job at Truly is meritless. Although perhaps Mark incidentally helped Tracie compete against Providence by connecting Providence's employees with Truly upon their request and by performing his job

duties at Truly, Providence does not cite any case holding that it is unlawful for an employee to merely work with and to the benefit of another whom he knows is bound by a noncompete. Instead, the burden is on Providence to provide evidence that Mark "was more than a willing participant," and that he "knowingly induced" Tracie to breach the Shareholders' Agreement. *Greenville Automatic Gas Co.*, 465 S.W.3d at 786–87. No evidence supports this notion.

Finally, Providence argues that Mark interfered with the Shareholders' Agreement and the Court's now-expired preliminary injunction by receiving "discretionary bonuses" that Providence posits was actually compensation Truly promised to Tracie. According to Providence, after the Court enjoined Tracie from working for Truly, Truly continued to compensate Tracie by making arbitrary discretionary bonus payments to Mark, depositing them into the Flemings' joint account. However, Providence has provided no evidence that these payments to Mark were actually anything other than discretionary bonus payments. Nor has Providence provided evidence that Mark somehow interfered with the noncompete provision by receiving bonuses—even if those bonuses were proxies for payments to Tracie. Regardless of whether she was being compensated in a roundabout way, she was not competing against Providence. And Providence does not explain how it is injured by Truly paying its employees more. Thus, since Providence failed to provide any evidence supporting its claim that Mark intentionally interfered with the Shareholders' Agreement, Mark is entitled to summary judgment on this claim.

46

### iv. Tortious Interference with Prospective Business Relations

Mark also moves for summary judgment on Providence's claims that he tortiously interfered with its prospective contractual and customer relationships ("business relations") by soliciting Providence's employees and concurrently helping Truly acquire those employees' clients.[17] To succeed on a claim for tortious interference with a prospective contractual or business relation, the plaintiff must show that: "(1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result." *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

Providence contends that Mark knew that his leaving and his alleged poaching of Providence's employees would interfere with Providence's business relations

---

[17] In its complaint, Providence alleges that Mark tortiously interfered with the prospective contractual relationship between Providence and a third-party interested purchaser. In his motion, Mark argues that Providence has no evidence supporting this claim. Providence does not controvert Mark's argument, nor does it provide any supporting evidence. Therefore, Mark is entitled to summary judgment on Providence's claim premised on Mark's alleged tortious interference with the prospective contractual relationship between Providence and the interested buyer. *See Celotex*, 477 U.S. at 322 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

because the title industry is a "repeat business" and "[i]f an employee leaves, the business in most cases goes with it." (Dkt. #246-17 at 4, 46) (Truly CEO Michael Tafoya). Thus, under Providence's theory, any time a title-insurance worker departs for a competing company, he risks liability for tortious interference with business relations. That obviously cannot be the case because Texans generally have a constitutional right to "resign from one's employment and go into business in competition with one's former employer." *Abetter*, 113 S.W.3d at 510. And employees "may secretly join with other employees in the endeavor *without violating any duty to the employer*." *Id.* (emphasis added) (cleaned up). "[T]he possibility of crippling, or even destroying, a competitor is inherent in a competitive market," and these results alone do not give rise to a cause of action. *Id.* Here, Mark did not even plot with his employees to leave Providence—they called him and asked for a job.

In any event, Providence's claim fails because Providence has failed to provide sufficient evidence to create a genuine issue of material fact as to whether Mark's conduct was independently tortious. As explained herein, Providence failed to present sufficient evidence to survive summary judgment on any of its tort claims against Mark. Since Mark did not engage in independently tortious conduct, Providence's claim for tortious interference with prospective business relations fails.

### v. Knowing Participation

Mark also moves for summary judgment on Providence's claim that he knowingly participated in Tracie's alleged breach of fiduciary duty. This cause of action requires Providence to prove: "(1) the existence of a fiduciary relationship;

(2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship." *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007) (citing *Cox Tex. Newspapers, L.P. v. Wootten*, 59 S.W.3d 717, 721–22 (Tex. App.—Austin 2001, no pet.)). The third element requires that the defendant "have actual awareness of his participation in the breach of fiduciary duties." *Straehla v. AL Glob. Servs., LLC*, 619 S.W.3d 795, 810 (Tex. App.—San Antonio 2020, no pet.).

This claim fails for the same reasons that Providence's claim for tortious interference with the Shareholders' Agreement fails: there is no evidence that Mark did anything more than prepare to compete before he resigned from Providence and fulfill his job duties at Truly after he began working there—which he was allowed to do. Thus, even if Mark was aware of Tracie's fiduciary relationship with Providence, he is entitled to summary judgment on this claim because the evidence does not show that he participated in her alleged breach—let alone that he was aware that he was doing so. Mark cannot be said to have participated in Tracie's alleged breach by merely preparing to compete with Providence and then lawfully performing his job once he began working at Truly. *Abetter*, 113 S.W.3d at 510 ("An at-will employee may properly plan to compete with his employer, and may take active steps to do so while still employed."); *id.* ("[O]nce an employee resigns, he may actively compete with his former employer."). That Mark's performance somehow benefited Tracie is a mere incident to his lawful actions, and no evidence shows that he and Tracie acted in concert—i.e., there is no evidence that Mark knowingly *participated* in Tracie's

alleged conduct in violation of her fiduciary duties. Since Providence has failed to establish a genuine issue of material fact regarding whether Mark knowingly participated in Tracie's alleged breach of fiduciary duty, Mark is entitled to summary judgment on this claim.

### vi. Civil Conspiracy

Providence's final claim against Mark is for civil conspiracy, which requires Providence to establish: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 141 (Tex. 2019) (cleaned up). "[A] defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). When the underlying claim fails, so too does the derivative civil conspiracy claim. *See Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 930–31 (Tex. 2010).

Providence asserts that Mark conspired with other Defendants to compete against Providence, which they allegedly accomplished through breaches of fiduciary duties, tortious interference with the Shareholders' Agreement, and tortious interference with prospective business relations. However, as explained above, Providence has presented no evidence that Mark participated in any of these torts. Since Providence failed to proffer evidence showing that Mark conspired with another Defendant to further an underlying tort, its civil conspiracy claim against Mark fails.

*See Crossroads Hospice, Inc. v. FC Compassus, LLC*, 606 S.W.3d 294, 307 (Tex. App.—Houston [1st Dist.] 2020, no pet.) ("Because Compassus has not met its burden on its underlying claims of knowing participation of breach of fiduciary duty or tortious interference against Crossroads, its conspiracy claim fails."), *judgment vacated but not withdrawn*, 2020 WL 3866902 (Tex. App.—Houston [1st Dist.] July 9, 2020). Therefore, Mark is entitled to summary judgment.

### vii. Texas Covenants Not to Compete Act

Lastly, the Flemings move for summary judgment on their counterclaims for attorney's fees and costs pursuant to the Texas Covenants Not to Compete Act for Providence's alleged attempt to enforce the noncompete provision to an extent greater than necessary. The Texas Covenants Not to Compete Act states:

> If the primary purpose of the agreement to which the covenant [not to compete] is ancillary is to obligate the promisor to render personal services, the promisor establishes that the promisee knew at the time of the execution of the agreement that the covenant did not contain limitations as to time, geographical area, and scope of activity to be restrained that were reasonable and the limitations imposed a greater restraint than necessary to protect the goodwill or other business interest of the promisee, and the promisee sought to enforce the covenant to a greater extent than was necessary to protect the goodwill or other business interest of the promisee, the court may award the promisor the costs, including reasonable attorney's fees, actually and reasonably incurred by the promisor in defending the action to enforce the covenant.

TEX. BUS. & COM. CODE § 15.51(c).

The Flemings are not entitled to summary judgment on this counterclaim because they have failed to establish that the "primary purpose" of the Shareholders' Agreement "is to obligate the promisor to render personal services." *Id.* Indeed, on its

face, it appears that the Shareholders' Agreement primarily concerns Providence's corporate structure and the rules regarding the issuance and transfer of stock—not obligations to render personal services. (Dkt. #218-2 at 14–27).

The Flemings' motions for summary judgment also fail because they did not present any evidence that Providence "knew . . . that the covenant did not contain limitations as to time, geographical area, and scope of activity to be restrained that were reasonable and the limitations imposed a greater restraint than necessary to protect the goodwill or other business interest of the promisee." TEX. BUS. & COM. CODE § 15.51(c). Instead, they only offer the conclusory argument that Providence sought to impose a greater restraint than necessary. (Dkt. #218 at 27); (Dkt. #259 at 10). This is insufficient to succeed on summary judgment, and thus the motions are denied as to these counterclaims.[18]

### IV. CONCLUSION

For the foregoing reasons, it is **ORDERED** that Mark Fleming's Motion for Summary Judgment, (Dkt. #217), is **GRANTED in part** and **DENIED in part**; Tracie Fleming's Motion for Partial Summary Judgment, (Dkt. #218), is **GRANTED in part** and **DENIED in part**; and Providence's Motion for Partial Summary Judgment, (Dkt. #255), is **GRANTED in part** and **DENIED in part**.

---

[18] In her motion, Tracie also asks for attorney's fees for Providence's breach of the Shareholders' Agreement. However, she offers no legal analysis and does not even provide the provision of the Shareholders' Agreement that would entitle her to an award of attorney's fees. Thus, she has not conclusively shown that she is entitled to attorney's fees, and this request is accordingly denied at this time.

Specifically, Mark Fleming's motion, (Dkt. #217), is **GRANTED** as to Providence's claims against him for breach of fiduciary duty, breach of the Shareholders' Agreement, tortious interference with the Shareholders' Agreement, tortious interference with prospective customer and contractual relationships, knowing participation in a breach of fiduciary duty, and civil conspiracy. Those claims are **DISMISSED**. His motion is **DENIED** as to his counterclaim under the Texas Covenants Not to Compete Act.

Tracie Fleming's motion, (Dkt. #218), is **GRANTED** as to Providence's claim for breach of the Shareholders' Agreement, as the noncompete provision is unenforceable. Tracie Fleming's motion is also **GRANTED** as to Tracie's counterclaim for Providence's breach of the Shareholders' Agreement, as she is due payment from Providence. However, it is **DENIED** as to the amount she is to be paid by Providence for its breach of the Shareholders' Agreement. Tracie Fleming's motion for summary judgment is also **DENIED** as to Providence's claim against her for breach of fiduciary duty, and as to her requests for attorney's fees and costs under the Texas Covenants Not to Compete Act and the Shareholders' Agreement.

Finally, Providence's motion, (Dkt. #255), is **GRANTED** as to the correct stated value for purposes of the repurchase price for Tracie's stock. Providence owes Tracie $220,000, less any amount Tracie still owes Providence. Providence's motion is **DENIED** as to Providence's argument that Tracie owes $60,000.

It is further **ORDERED** that Providence's Motion to Strike Tracie Fleming's Summary Judgment Evidence, (Dkt. #243), is **GRANTED in part** and **DENIED in**

**part**. The evidence for which the Court sustained Providence's objections, *see supra* Section III.B, is **STRICKEN**.

      **So ORDERED and SIGNED this 22nd day of August, 2024.**

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE