UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| PROVIDENCE TITLE COMPANY | § | |
| | § | |
| v. | § | CIVIL NO. 4:21-CV-147-SDJ |
| | § | |
| TRULY TITLE, INC., ET AL. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants Graham Hanks and Truly Title Inc.'s (the "Truly Defendants") Motion for Summary Judgment on Plaintiff Providence Title Company's Tort and Contract Claims. (Dkt. #262). For the following reasons, the motion is **GRANTED in part** and **DENIED in part**.

### I. BACKGROUND

Providence and Truly are competitors in the Texas title insurance market. In April 2019, Truly and Providence commenced negotiating Truly's potential acquisition of Providence. The parties entered into a nondisclosure agreement ("NDA"), whereby the parties agreed to keep confidential certain information disclosed for the purpose of negotiating. Truly also agreed to a non-solicitation agreement that restricted its ability to solicit Providence's employees. Pursuant to these agreements, Providence supplied Truly with confidential and proprietary information. However, the parties were unable to agree to terms and negotiations ceased in November 2019.

According to Providence, after the breakdown in the parties' negotiations, Truly began to use the information Providence provided to solicit Providence's

1

employees and customers. Specifically, less than one year after Providence and Truly ceased their acquisition talks, Truly began discussing with Defendants Tracie Fleming and Mark Fleming the possibility of their leaving Providence to work for Truly. At the time, Tracie Fleming was Providence's President and Mark Fleming was Providence's Team Leader for operations in Johnson County, Texas. Unknown to Providence, Truly had entered into employment agreements with Tracie and Mark Fleming in December of 2020. The agreements provided that Tracie Fleming would serve as Truly's Executive Vice President and Area Manager over the Greater Fort Worth Area and that Mark Fleming would serve as a Senior Vice President. Providence did not learn of Truly's agreements with Tracie and Mark Fleming until the Flemings resigned from their positions with Providence on February 3, 2021. Defendant Kim Sheets-Sheffield, another one of Providence's Team Leaders, also left Providence to work for Truly around the same time.

The departure of these key employees was accompanied by an exodus of Providence personnel to Truly from several of Providence's North Texas offices. In total, nearly two dozen Providence employees joined Truly during the relevant timeframe. Providence contends that the Truly Defendants' actions violated both state and federal law. Specifically, it brought claims against both Defendants for (1) violation of the federal Defend Trade Secrets Act ("DTSA"),[1] (2) conspiracy to violate the DTSA,[2] (3) violation of the Texas Uniform Trade Secrets Act ("TUTSA"),

[1] The Court granted summary judgment in favor of Defendants on this claim. (Dkt. #372).

[2] The Court dismissed this claim. (Dkt. #371).

2

(4) knowing participation in a breach of fiduciary duty,[3] (5) tortious interference with the Shareholders' Agreement, (6) tortious interference with prospective contractual relationship, (7) tortious interference with prospective customer relationships, and (8) civil conspiracy. Additionally, Providence brought a claim against Truly for breaches of the non-solicitation agreement and the NDA.

Shortly after the commencement of this suit, Providence moved for a preliminary injunction to enjoin (1) the Flemings from violating the noncompete agreement, (2) all Defendants from soliciting Providence's employees and customers, and (3) all Defendants from using Providence's trade secrets. (Dkt. #8). Providence's request for an injunction against the Truly Defendants was premised on its claims that Truly breached the NDA and that Defendants misappropriated its trade secrets. The Court denied the motion as to the Truly Defendants, finding that Truly's obligations with respect to Providence's confidential information had expired and that Providence failed to show that Defendants misappropriated any trade secret. *See Providence Title Co. v. Truly Title, Inc.*, 547 F.Supp.3d 585, 607–13 (E.D. Tex. 2021).[4]

After the Court ruled on the motion for preliminary injunction, robust motion practice ensued. The Truly Defendants filed two motions for summary judgment—

---

[3] Providence originally asserted a cause of action for aiding and abetting a breach of fiduciary duty, but the Court dismissed that claim after determining that no such cause of action exists in Texas. (Dkt. #329). However, the Court permitted Providence to amend its complaint by removing the dismissed aiding-and-abetting cause of action and adding a knowing-participation cause of action. (Dkt. #329).

[4] The Court granted the motion in part, finding that Tracie Fleming likely violated the noncompete provision of the Shareholders' Agreement. *See Providence Title*, 547 F.Supp.3d at 599–603.

one seeking judgment on Providence's misappropriation-of-trade-secrets claim, (Dkt. #258), and another seeking judgment on Providence's tort and contract claims, (Dkt. #262). The Court now considers the latter motion.

## II. LEGAL STANDARD

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd ex rel. Est. of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)). A defendant is entitled to summary judgment if it "identifies a lack of evidence to support the plaintiff's claim on an issue for which the plaintiff would bear the burden of proof at trial," unless the plaintiff proffers "summary judgment evidence sufficient to sustain a finding in plaintiff's favor on that issue." *Smith v. Harris Cnty.*, 956 F.3d 311, 316 (5th Cir. 2020) (cleaned up).

Because Federal Rule of Civil Procedure 56 requires that there be no "genuine issue of *material* fact" to succeed on a motion for summary judgment, "the mere existence of *some* alleged factual dispute" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (first emphasis omitted). A fact is "material" when, under the relevant substantive law, its resolution might govern the outcome of the suit. *Id.* at 248. "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (citing *Anderson*, 477 U.S. at 248). When a movant shows that the nonmovant failed to proffer sufficient evidence to establish an essential element of its

claim, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"Courts consider the evidence in the light most favorable to the nonmovant, yet the nonmovant may not rely on mere allegations in the pleading; rather, the nonmovant must respond to the motion for summary judgment by setting forth particular facts indicating that there is a genuine issue for trial." *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000). Further, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) (cleaned up). Thus, the nonmovant must cite to the evidence it contends supports its opposition to the motion for summary judgment. *See* FED. R. CIV. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

### III. DISCUSSION

Providence asserts several causes of action against the Truly Defendants for their conduct following the breakdown in Providence and Truly's acquisition negotiations, including numerous tort and breach-of-contract claims. The Truly Defendants argue that they are entitled to summary judgment because the claims

are preempted by TUTSA[5] and, in any event, Providence has failed to present sufficient evidence supporting its claims.

Because the Court concludes that Providence has failed to present sufficient evidence to survive summary judgment on any of its claims, the Court need not consider whether those claims are likewise preempted. *See Sci. Mach. & Welding, Inc. v. Rose*, No. 3-20-564-CV, 2022 WL 850409, at *3 (Tex. App.—Austin Mar. 23, 2022, no pet.) (mem. op., not designated for publication) (granting summary judgment for lack of evidence and not reaching defendant's TUTSA preemption challenge); *Nguyen v. ABLe Commc'ns, Inc.*, No. 2-19-69-CV, 2020 WL 2071757, at *16, 22 (Tex. App.—Fort Worth Apr. 30, 2020, no pet.) (mem. op., not designated for publication) (assuming claims were not preempted and addressing merits).

## A. Knowing Participation

The Truly Defendants move for summary judgment on Providence's claim that they knowingly participated in breaches of fiduciary duties. This cause of action requires Providence to prove: "(1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship." *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007) (citing *Cox Tex.*

---

[5] TUTSA "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." TEX. CIV. PRAC. & REM. CODE § 134A.007(A). However, it does not affect "contractual remedies, whether or not based upon misappropriation of a trade secret," or "other civil remedies that are not based upon misappropriation of a trade secret." *Id.* § 134A.007(b)(1)–(2). "Where a claim is based on a misappropriation of a trade secret, then it is preempted by [TUTSA]." *Super Starr Int'l, LLC v. Fresh Tex Produce, LLC*, 531 S.W.3d 829, 843 (Tex. App.—Corpus Christi 2017, no pet.).

6

*Newspapers, L.P. v. Wootten*, 59 S.W.3d 717, 721–22 (Tex. App.—Austin 2001, no pet.)).

In evaluating this claim, the Court finds particularly instructive the decision in *Crossroads Hospice, Inc. v. FC Compassus, LLC*, where the court considered whether the defendant—Crossroads—knowingly participated in a breach of fiduciary duty by Darla Clement, the plaintiff's (Compassus) former executive director. 606 S.W.3d 294 (Tex. App.—Houston [1st Dis.] 2020, no pet.), *judgment vacated but not withdrawn*, 2020 WL 3866902 (Tex. App.—Houston [1st Dist.] July 9, 2020).[6] There, while she was still employed by Compassus, Clement reached out to Crossroads—a Compassus competitor—with a business plan for Crossroads to expand into Houston, where Compassus was located. *Id.* at 298. Clement was eventually put into contact with Crossroads's Chief Operating Officer, Tony Chase, who was told that Clement "is the Administrator" and that she "can bring her whole team." *Id.* Shortly thereafter, "in response to Chase's request," Clement provided Chase with salary information for the Compassus employees whom she hoped would leave Compassus for Crossroads—including Dr. Lee, who was expected to bring his patients with him to Crossroads upon his departure. *Id.* Clement then introduced Chase to Dr. Lee via email. *Id.* Clement also provided Chase with a list of employees who were willing to join Crossroads, along with their requested salaries and start

---

[6] "In resolving issues of state law, [courts] are bound to apply the law as interpreted by the state's highest court." *In re Ritz*, 832 F.3d 560, 567 n.5 (5th Cir. 2016) (cleaned up). If no decision from the state's highest court is "directly on point," courts must make an "*Erie*-guess" as to how that court would rule. *Id.* In making such a guess, courts look to, inter alia, on-point decisions of lower courts in the State. *See id.*

dates. *Id.* A few days after Clement provided this information, Clement accepted a job offer from Crossroads. *Id.* Chase then sent Clement several offer letters for her to pass along to Compassus's employees. *Id.* A week later, Clement finally resigned from Compassus and began working at Crossroads. *Id.* at 298–99.

The *Crossroads* court held that this evidence was insufficient to establish a prima facie case that Crossroads participated in Clement's breach of her fiduciary duty. *Id.* at 304. It explained that all of the allegedly tortious actions—e.g., Clement providing Crossroads with salary information, Clement actively engaging in negotiations between Crossroads and Compassus's employees, Clement passing along job offers—were taken by Clement, not Crossroads. *Id.* at 304–05. Notwithstanding the fact that Crossroads was aware that Clement was one of Compassus's administrators, "[t]hat Crossroads knew about Clement's actions, and even approved of and benefitted from them, does not constitute interference in the employment relationship or participation in the solicitation of these employees." *Id.* at 305. The court further explained that at-will employees are free to compete against their employer, and "[t]he fact that Crossroads hired at-will employees who secretly agreed to compete with their employer and took the necessary steps to do so is not, in and of itself, evidence that Crossroads knowingly participated in Clement's alleged solicitation of these employees in violation of her employment agreement." *Id.* Thus, the court concluded that Compassus had not established a prima facie case that Crossroads knowingly participated in Clement's breach of fiduciary duty. *Id.*

The facts in *Crossroads* are strikingly similar to those here. Providence contends that the Truly Defendants knowingly participated in Tracie Fleming's alleged breach of her fiduciary duty[7] by working with Tracie to set up competing offices and "poach" Providence's employees, and, ultimately, acquire their clients. As explained in the Court's order on the Flemings' motions for summary judgment, Tracie—who the Truly Defendants knew to be a Providence officer—provided Graham Hanks with Providence's financial performance data, negotiated some of the terms of Mark Fleming's contract, visited potential office locations for Truly's expansion and sent Hanks her thoughts, and purportedly recruited other Providence employees after she resigned from Providence. However, as the *Crossroads* court found with Clement, every one of these actions was taken by Tracie—not the Truly Defendants. The Truly Defendants' knowledge of Tracie's position and the material benefit they received from Tracie's actions, if any, is insufficient to show that they participated in the alleged breach. *See Crossroads*, 606 S.W.3d at 305 ("That Crossroads knew about Clement's actions, and even approved of and benefitted from them, does not constitute interference in the employment relationship or participation in the solicitation of these employees.").

Nor does Truly's hiring of Providence's at-will employees and its subsequent acquisition of Providence's would-be clients demonstrate that the Truly Defendants knowingly participated in Tracie's alleged breach. *See id.* ("The fact that Crossroads hired at-will employees who secretly agreed to compete with their employer and took

---

[7] As explained in other orders issued on this date, Providence only has a viable breach-of-fiduciary-duty claim against Tracie Fleming.

the necessary steps to do so is not, in and of itself, evidence that Crossroads knowingly participated in Clement's alleged solicitation of these employees in violation of her employment agreement."). Those at-will employees—including Mark Fleming—were free to leave Providence for its competitor, and Truly was free to hire them and acquire their customers. *See Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 510 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ("Absent special circumstances, once an employee resigns, he may actively compete with his former employer."). Thus, this evidence does not support Providence's claim.

Simply put, there is nothing in the record establishing that the Truly Defendants knowingly participated in Tracie's alleged breach of fiduciary duty. The evidence Providence presents is nearly identical to the evidence the *Crossroads* court held insufficient to mount a prima facie claim for knowing participation. Therefore, the Truly Defendants are entitled to summary judgment on this claim.

## B. Tortious Interference with the Shareholders' Agreement

Providence further alleges that the Truly Defendants tortiously interfered with the Shareholders' Agreement between Tracie and Providence by hiring Tracie in violation of the noncompete provision to which Tracie was bound.[8] To prove tortious

---

[8] The noncompete provision is located in the First Amendment to the Shareholders' Agreement. In its entirety, it states:

> Non-Compete. Offering Shareholder agrees for a period of twenty-four (24) months from the date of the Closing (defined in Section 8.1) he/she will not (i) serve as a partner, employee, consultant, officer, director, member, manager, agent, associate, investor, or otherwise, or (ii) directly or indirectly, own, purchase, organize or take preparatory steps for the organization of, or (iii) build, design, finance, acquire, lease, operate, manage, invest in, work or

interference with an existing contract, the plaintiff must establish: "(1) the existence of a valid contract subject to interference; (2) that the defendant willfully and intentionally interfered with the contract; (3) that the interference proximately caused the plaintiff's injury; and (4) that the plaintiff incurred actual damage or loss." *Cmty. Health Sys. Pro. Servs. Corp. v. Hansen*, 525 S.W.3d 671, 689 (Tex. 2017). "To establish a willful and intentional act of interference, there must be evidence that the defendant was more than a willing participant—the defendant must have knowingly induced one of the contracting parties to breach its obligations under a contract." *Crossroads*, 606 S.W.3d at 305 (cleaned up). Consequently, "[t]o establish the element of willful and intentional interference, the interfering party must know of the existence of a contract between the plaintiff and a third party or have knowledge of facts that would lead a reasonable person to conclude that a contract existed." *Id.*

In its order addressing Tracie Fleming's motion for summary judgment, this Court determined that the covenant not to compete—the agreement with which the Truly Defendants allegedly interfered—is unenforceable. Thus, as a preliminary matter, the Truly Defendants are entitled to summary judgment because the covenant is not a valid agreement subject to interference.

---

consult for or otherwise affiliate hisself [sic]/herself with any business in competition with or otherwise similar to Providence's business within the Texas counties of Tarrant, Dallas, Harris, Bexar or any Texas counties contiguous to such stated counties. Breach of this covenant shall entitle the payees of the promissory notes given in payment for the Shares acquired under Section 8.2 herein to defer all payments for a period not to exceed twenty-four (24) months, without interest.

(Dkt. #218-2 at 35).

Further, even if the covenant not to compete were valid, the Truly Defendants would be entitled to summary judgment on this claim because they had no knowledge that Tracie Fleming was bound by a restrictive covenant—and thus they could not have willfully and intentionally interfered with that covenant. The evidence shows that Tracie never provided Truly with the Shareholders' Agreement or any of its amendments—including the First Amendment, which contained the noncompete provision. (Dkt. #296-30 at 13); *see also* (Dkt. #296-39 at 7) (Tracie Fleming) (Q: "[D]id you ever send [the Shareholders' Agreement and the First Amendment] directly to Truly?" A: "No. . . . I didn't think it was their business. . . . [Truly] never indicated they wanted them."). Further, Tracie affirmatively told Hanks that she was not subject to any such employment restriction. (Dkt. #263-27 at 2). Tracie made the same representation to Truly's President and Chief Operating Officer, Michael Kirby. (Dkt. #263-28 at 2) (explaining that Tracie "emphatically" told him that she was not subject to a noncompete agreement). And Tracie affirmed that she was not restricted when she signed her offer letter from Truly. (Dkt. #263-33 at 3) (Tracie's signature affixed to offer letter that states: "By signing this letter, you confirm with [Truly] that you are under no contractual or other legal obligations that would prohibit you from performing your duties with the Company.").

Providence argues that the Truly Defendants' position is "patently nonsensical" because they were aware that Tracie was a shareholder, and, therefore, they must have known about the Shareholders' Agreement and its terms. As Providence notes, Tracie told Hanks in the fall of 2020 that she was seeking legal

12

advice regarding the Shareholders' Agreement "for the purposes of seeing what [she] needed to do to unwind it." (Dkt. #296-30 at 13). Further, Providence avers that Truly "knew of the existence of the First Amendment" because Providence had provided Truly with the Shareholders' Agreement and the Second Amendment to the Shareholders' Agreement during the acquisition negotiations, and the Second Amendment refers to the First Amendment. (Dkt. #290 at 27–28). Based on this evidence, Providence contends that the Truly Defendants were aware of the First Amendment's existence and should have inquired into its terms. It argues that by failing to do so and hiring Tracie, the Truly Defendants willfully and intentionally interfered with the noncompete provision, even though Truly was never provided the First Amendment and even though Tracie repeatedly said no noncompete provision existed.

The Truly Defendants are entitled to summary judgment on this claim because Providence has presented no evidence that they knew or had reason to know that Tracie was bound by a noncompete agreement. It is uncontroverted that no one at Truly was provided the noncompete provision when Truly hired Tracie—and Kirby and Hanks affirmatively testified that they were not provided a copy. Nonetheless, Providence maintains that the Truly Defendants were on inquiry notice of the existence of the noncompete because they were provided the Shareholders' Agreement and the Second Amendment, which references the First Amendment (but apparently does not note the existence of the noncompete provision). In essence, Providence contends that the Truly Defendants should have asked more questions

about the First Amendment, which would have led to their discovery of the noncompete. This argument fails for several reasons.

At the outset, that the Truly Defendants were aware that Tracie was a shareholder and that they received a copy of the Shareholders' Agreement does not support the notion that they knew or should have known about the noncompete. Not every Shareholders' Agreement contains a noncompete provision. Indeed, this Agreement did not contain such a provision until Providence added one with the First Amendment.

Nor does the fact that the Truly Defendants might have been aware of the First Amendment's existence demonstrate that they knew about the noncompete or knew enough to investigate further. While it is true that a defendant can be found liable when he "had knowledge of facts which, if followed by reasonable inquiry, would have led to complete disclosure of the contractual relationship and rights of the parties," the defendant's "duty of inquiry extends only to those matters that are fairly suggested by the facts really known." *Steinmetz & Assocs., Inc. v. Crow*, 700 S.W.2d 276, 280 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.) (cleaned up). Here, the evidence establishes that neither Tracie nor Providence provided the Truly Defendants with the noncompete provision before Truly hired Tracie. And Tracie repeatedly told Truly's officers that she was not bound by a restrictive covenant, including when she affirmed in writing that she was not so bound. In short, nothing in the record demonstrates that the Truly Defendants were aware of any facts suggesting the existence of the noncompete agreement such that they had a duty to

inquire further. Thus, without actual or constructive knowledge of the noncompete, they could not have knowingly induced Tracie to breach its terms. *See Crossroads*, 606 S.W.3d at 305. Therefore, the Truly Defendants are entitled to summary judgment on this claim.

## C. Breach of the Non-Solicitation Agreement and NDA

Truly moves for summary judgment on Providence's claim that it breached the non-solicitation agreement and NDA by allegedly soliciting Providence's employees and using Providence's confidential information to do so in locations it knew Providence to be profitable. To establish a breach of contract, the plaintiff must show: "(1) the existence of a valid contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach." *Velvet Snout, LLC v. Sharp*, 441 S.W.3d 448, 451 (Tex. App.—El Paso 2014, no pet.).

### i. There is a Genuine Dispute as to Whether Truly Breached the Non-Solicitation Agreement.

Truly entered into a non-solicitation agreement via email on May 9, 2019, at Dan Foster Sr.'s (Providence's CEO) request. Foster Sr. explained that he wanted a non-solicitation agreement "to let info get stale" before Truly could attempt to hire Providence's employees (Dkt. #263-17 at 1). In its entirety, the agreement states: "This email confirms that Truly Title, Inc. hereby agrees to a one year non-solicitation of Providence Title employees." (Dkt. #263-17 at 1). The parties did not define what conduct constitutes solicitation, so the Court looks to the term's "commonly understood meaning." *Eurecat US, Inc. v. Marklund*, 527 S.W.3d 367, 381 (Tex.

App.—Houston [14th Dist.] 2017, no pet.). "The commonly understood meaning of the term 'solicit' is to 'make petition to: entreat, importune, concern'; 'to approach with a request or a plea (as in selling or begging)'; 'to move to action; serve as an urge or incentive: incite;' 'to strongly urge (as one's cause or point): insist upon'; 'to endeavor to obtain by asking or pleading'; and 'to seek eagerly or actively.' Put another way, the commonly understood meaning of 'solicit' includes more than merely to ask." *Id.* at 381 (cleaned up) (quoting Webster's Third New Int'l Dictionary 2169 (1993)).

Providence alleges that Truly breached the non-solicitation agreement when Ray Byrns, one of Truly's recruiters, reached out to numerous Providence employees on LinkedIn as early as September 2019—well within the non-solicitation agreement's prohibitionary period. In September 2019, Byrns connected with Providence employee Ms. Peden. (Dkt. #296-70 at 13). Several months later, in March 2020, Byrns sent Ms. Peden a direct message on LinkedIn. (Dkt. #296-70 at 14). Providence did not produce a copy of the message Byrns sent to Ms. Peden, and Byrns testified that he does not remember the content of his message. However, in his deposition, Byrns said that when he reaches out to escrow officers like Ms. Peden, he normally says "how are you doing," or he makes a "sales pitch of . . . we're Truly, this is what we do, would you be interested in meeting." (Dkt. #296-70 at 14–15). He further testified that the reason he would make a "pitch" is to see if the individual would be interested in joining Truly. (Dkt. #296-70 at 15). Byrns similarly reached out to a few other Providence employees before the non-solicitation agreement

16

expired on May 9, 2020,[9] but Providence did not provide those messages either. (Dkt. #296-70 at 16–26). Ms. Peden and the other Providence employees eventually left Providence for Truly. Byrns also posted content on his LinkedIn feed about career opportunities with Truly, which was visible to individuals with whom Byrns was connected—including some of Providence's employees. (Dkt. #296-70 at 18–23).

Truly is not entitled to summary judgment on this claim because there is a genuine dispute of material fact as to whether Truly (through Byrns) solicited Ms. Peden and other Providence employees while the non-solicitation agreement was in effect. Although it is unclear what exactly Byrns told the Providence employees, Byrns testified that he often makes a "sales pitch" for the purposes of "potentially growing Truly's offices." (Dkt. #296-70 at 14–15) (Q: "And the reason you would send out a pitch like that is you were trying to make contacts about potentially growing Truly's offices, right?" A: "Yes."). A reasonable juror could conclude that the purpose of Byrns's communication was to recruit Providence's employees, which would likely constitute solicitation. Indeed, recruiting is part of Byrns's main duties at Truly. (Dkt. #296-70 at 5) (explaining that one of his duties is to "recruit[] new people to the

---

[9] In its briefing, Providence appears to presume that the non-solicitation agreement "expired in November or December of 2020"—one year after the negotiations ceased, rather than one year after Truly entered the agreement. (Dkt. #312 at 9 n.2). Thus, to establish that Truly breached the agreement, it also points to Truly's interactions with the Flemings after May 9, 2020. However, Providence does not provide any legal authority establishing that the enforcement date of the non-solicitation agreement extended one year from the end of the parties' negotiations instead of one year from the contract's execution. The plain language of the email certainly does not contain this term. *Cf. Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) ("To be enforceable, a contract must address all of its essential and material terms with a reasonable degree of certainty and definiteness." (cleaned up)). Therefore, to the extent the non-solicitation agreement is enforceable, the Court concludes that it extended only to May 9, 2020—one year from the date of its execution.

company"). Truly does not offer another explanation for Byrns's contact with Providence's employees.

At this juncture, "the [C]ourt is to consider evidence in the record in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party." *Bluebonnet Hotel Ventures, L.L.C. v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014). Applying this standard, the Court concludes that Providence presented sufficient evidence to establish a genuine dispute as to whether Truly solicited Providence's employees before the non-solicitation agreement expired on May 9, 2020.

Truly also argues that it is entitled to summary judgment because Providence has failed to present evidence showing that it suffered any damages from Truly's purported breach. To show that it suffered damages, Providence points to the evidence it recited in its response to Truly's motion for summary judgment on Providence's misappropriation-of-trade-secrets claims. In that brief, Providence cites to the deposition testimony of Truly's CEO, Michael Tafoya, who explained that "the title business is very mobile," and that "[i]f an employee leaves, the business in most cases goes with [him or her]." (Dkt. #295-33 at 15). Providence also cites to the declaration of Todd K. Lester, an expert retained by Providence, to show that it was harmed by Truly's alleged breach. In his declaration, Lester states that "[u]pon the departure of Providence employees to Truly, Providence's revenue and profits for the five impacted branches drastically declined." (Dkt. #298-5 ¶ 17). Lester further opines that "Providence has experienced, and is continuing to experience, economic

harm and financial damages in the form of lost revenues and profits associated with the sale of title insurance that had been previously generated, as well as reasonably expected to continue to be generated, by its former employees that are now competing against it with Truly in the same, or similar, market locations of the five impacted branch locations." (Dkt. #298-5 ¶ 17). Providence will have to prove these damages at trial, but, at this stage, the Court concludes that this evidence is sufficient to survive summary judgment.

In sum, Providence has presented sufficient evidence to create a genuine dispute of material fact as to whether Truly breached the non-solicitation agreement by communicating with Providence's employees, many or all of whom eventually left Providence for Truly. There is also a genuine dispute as to whether Providence suffered damages as a result of this alleged breach. Therefore, Truly's motion for summary judgment on this claim is denied.

### ii. Providence Presented No Evidence that Truly Breached the NDA.

Providence posits that Truly breached the NDA when Truly used its confidential information, including its employees' salary information and branch-specific financial information, to target certain locations for expansion and hire Providence's employees from those locations. The NDA requires that Truly "only use Confidential Information to advance or enable the Transaction in a manner agreed upon by the Parties" for a period of two years following the receipt of such information. (Dkt. #263-16 at 2). "Confidential information" includes "customer information and/or prospective client lists; employee information; [and] records." (Dkt. #263-16 at 2).

19

Notwithstanding Truly's access and possession of such confidential information—which the parties do not dispute—there is no evidence that Truly ever used Providence's information in an improper manner, as the Court explained in detail in its order granting Defendants' motions for summary judgment on Providence's Defend Trade Secrets Act claim. *Providence Title Co. v. Truly Title, Inc.*, No. 4:21-CV-147, 2024 WL 1932418, at *9–11 (E.D. Tex. May 2, 2024).[10] Since Providence failed to proffer evidence showing that Truly improperly used Providence's confidential information, Truly is entitled to summary judgment on this claim.

## D. Tortious Interference with Prospective Business Relations

The Truly Defendants also move for summary judgment on Providence's claims for tortious interference with prospective contractual and customer relationships ("business relations"). To succeed on a claim for tortious interference with a prospective contractual or business relation, the plaintiff must show that: "(1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct

---

[10] Providence argues that Truly's consultant, Chris Cranton, used the revenue data acquired during due diligence to project which Providence locations would be most profitable, and that, after negotiations ceased, Truly targeted those locations for expansion based on Cranton's forecast and the information that Tracie Fleming shared. However, as the Court explained in its order granting summary judgment on Providence's DTSA claim, Cranton acquired this data lawfully under the terms of the NDA, and there is no evidence that Truly improperly used that data. *Providence Title*, 2024 WL 1932418, at *10 n.8.

was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result." *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

Providence argues that the Truly Defendants tortiously interfered with its prospective customer relations by hiring Providence's employees and, in turn, acquiring those employees' clients. It also contends that this conduct tortiously interfered with a prospective contractual relationship between Providence and an interested buyer, at least by diminishing Providence's value and thus decreasing the prospective buyer's offer.

Even assuming that there was a reasonable probability that Providence would have maintained its clients and that it would have agreed to a sale to the interested buyer, this claim fails because Providence has not presented evidence that the Truly Defendants engaged in independently tortious conduct.

The Texas Supreme Court has explained that:

> to recover for tortious interference with a prospective business relation a plaintiff must prove that the defendant's conduct was independently tortious or wrongful. By independently tortious we do not mean that the plaintiff must be able to prove an independent tort. Rather, we mean only that the plaintiff must prove that the defendant's conduct would be actionable under a recognized tort.

*Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001). As explained herein, Providence has failed to present sufficient evidence to survive summary judgment on any of its tort claims against the Truly Defendants. Thus, the Truly Defendants are entitled to summary judgment on these claims because they did not engage in any "actionable [conduct] under a recognized tort" such that their conduct was

21

"independently tortious or wrongful." *Id.*; *see id.* at 728 (granting judgment for defendant when plaintiffs presented "no evidence" that defendant engaged in "illegal or tortious" conduct); *see also id.* at 727 ("[H]arm that results only from lawful competition is not compensable by the interference tort.").

## E. Civil Conspiracy

Finally, Providence asserts that the Truly Defendants are liable for civil conspiracy, which requires Providence to establish: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Agar Corp., Inc. v. Electro Cirs. Int'l, LLC*, 580 S.W.3d 136, 141 (Tex. 2019) (cleaned up). "[A] defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). When the underlying claim fails, so too does the derivative civil conspiracy claim. *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 930–31 (Tex. 2010); *see also Tummel v. Milane*, 787 F. App'x 226, 227 (5th Cir. 2019) (explaining that, when plaintiffs fail to state a claim for any underlying tort under Texas law, their claims for civil conspiracy likewise fail).

As explained above, Providence has presented no evidence that the Truly Defendants participated in any alleged tort. Since Providence failed to show that the Truly Defendants conspired with any Defendant to further an underlying tort, its civil conspiracy claim fails. *See Crossroads*, 606 S.W.3d at 307 ("Because Compassus has not met its burden on its underlying claims of knowing participation of breach

of fiduciary duty or tortious interference against Crossroads, its conspiracy claim fails."). Therefore, the Truly Defendants are entitled to summary judgment.

## IV. CONCLUSION

For the foregoing reasons, it is **ORDERED** that the Truly Defendants' Motion for Summary Judgment on Providence's Tort and Contract Claims, (Dkt. #262), is **GRANTED in part** and **DENIED in part**. Specifically, the motion is **GRANTED** as to Providence's claims against the Truly Defendants for (1) knowing participation in breaches of fiduciary duties, (2) tortious interference with the Shareholders' Agreement, (3) tortious interference with prospective customer and contractual relationships, and (4) civil conspiracy, and as to Providence's claim against Truly for breach of the nondisclosure agreement. Those claims are **DISMISSED**.

The motion is **DENIED** as to Providence's claim against Truly for breach of the non-solicitation agreement.

**So ORDERED and SIGNED this 22nd day of August, 2024.**

_____
SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE